

# CRIMINAL COMPLAINT

**COPY**

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA | DOCKET NO. **ED13-0288M** |
| v.<br>Dylon Hernandez<br>Matthew Hernandez et al. | MAGISTRATE'S CASE NO. |

FILED
CLERK, U.S. DISTRICT COURT
JUN - 4 2013
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

Complaint for violation of Title 21, U.S.C., §§ 841(a)(1),(b)(1)(A), and 846

| NAME OF MAGISTRATE JUDGE<br>HONORABLE DAVID T. BRISTOW | TITLE<br>UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Riverside, CA |
|---|---|---|

| DATE OF OFFENSE<br>Various | PLACE OF OFFENSE<br>Riverside County | Address of ACCUSED (IF KNOWN) |
|---|---|---|

**COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:**

Beginning on a date unknown, and continuing to on or about June 4, 2013, in Riverside County, within the Central District of California, defendants Matthew Hernandez, Dylon Hernandez, Nancy Hernandez, and Raphael Cervantes knowingly and intentionally conspired to and possessed with the intent to distribute methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1),(b)(1)(A), and 846.

**BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:**

*See* attached affidavit which is incorporated as part of this Complaint.

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:  Not Applicable.

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>Sean Zelka |
|---|---|
| | Official Title<br>SPECIAL AGENT,<br>Drug Enforcement Administration |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE* | DATE<br>6/4/13 |
|---|---|

\* *See* Rules 3 and 4 of the Federal Rules of Criminal Procedure.

AUSA:DA:fgg

# A F F I D A V I T

I, Sean R. Zelka, being duly sworn, declare and state as follows:

## I.        Introduction

1.        I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code Section 2510(7), and I am empowered to conduct investigations and to make arrests for the offenses enumerated in Title 18, United States Code Section 2516. I am a Special Agent ("SA") of the United States Drug Enforcement Administration ("DEA") and have been employed with the DEA since June 1999. I am currently assigned to the DEA's Riverside District Office, Task Force Group 1 ("RDO TFG-1"), investigating large-scale drug trafficking organizations operating in the Southern California area, and elsewhere.

2.        During my employment with the DEA, I have participated in a number of narcotics investigations that involved the possession, possession for sale, transportation and sales of controlled substances. While working these assignments, I have participated in numerous physical surveillances, execution of search warrants, and arrests of numerous drug traffickers resulting in the seizure of over 500 kilograms of controlled substances and over $1,000,000 in drug related proceeds. I have also spoken on numerous occasions to informants, suspects, and other experienced narcotics investigators concerning the methods

and practices of drug traffickers.  I have participated in Title III wiretap
investigations involving the domestic and international distribution of illegal
drugs and their proceeds.  I have also been the affiant in support of numerous
search warrants which have resulted in the seizure of illegal narcotics and other
evidence of drug violations.  I have also received 640 hours of narcotics law
enforcement training while attending DEA Basic Agent Training at the Federal
Bureau of Investigation Academy, Quantico, Virginia.

3.     Prior to joining the DEA, I was employed as a probation/parole
officer with the Washington State Department of Corrections, Seattle,
Washington.  I was employed by the Washington State Department of
Corrections for approximately seven years.  During my tenure with the
Washington State Department of Corrections, I supervised adult felony offenders
on probation and parole for approximately one year.  During the remainder of
my tenure, I conducted fugitive investigations for the Washington State
Department of Corrections and for approximately five of those years I was on
special assignment to the Federal Bureau of Investigation, Federal Fugitive Task
Force, as a Criminal Investigator and held special deputizations as a Police
Officer and United States Marshal.

4.     Based on my training and over 20 total years of working in the
criminal justice field, I am familiar with drug traffickers' methods of operation

including the distribution, storage, transportation of drugs and the collection of

drug proceeds, and methods of money laundering used to conceal the nature of

the proceeds. I have received training and have collaborated with other law

enforcement officers about investigations regarding the unlawful importation,

possession, and distribution of controlled substances, as well as related money

laundering statutes involving the proceeds of specified unlawful activities and

conspiracies associated with criminal narcotics, in violation of Titles 18 and 21 of

the United States Code. I also speak regularly with narcotics investigators at the

federal, state and local level, drug traffickers, and informants, regarding the

manner in which drug traffickers store, sell, and transport narcotics.

     5.     This affidavit is based on a joint investigation conducted by the

DEA RDO TFG-1 which includes members from the Palm Springs Police

Department, Riverside County Sheriff's Department, Coachella Valley Narcotics

Task Force (the "CVNTF"), as well as the Palm Springs Police Department Patrol

Division. I have been the lead investigator involved in the investigation of this

case. This affidavit is based upon, among other things, my personal

observations, my professional training and experience, information obtained

from other law enforcement agents and officers and my review of their reports,

and my review of the evidence. This affidavit is made for the sole purpose of

demonstrating probable cause for the issuance of the requested arrest warrants

and knowledge of or investigation into this matter. I have not set forth each and every fact learned during the course of this investigation, nor have I summarized each and every fact deemed pertinent to the case. Rather, I have set forth only those facts that I believe are necessary to establish probable cause for the requested arrest warrants. All statements contained herein are set forth in sum and substance and not necessarily in the exact words in which they were made.

6.      In addition, for all intercepted telephone calls which are summarized in this affidavit, the summaries were prepared by wire room monitors, are not transcriptions, but instead are merely summaries prepared by wire room monitors who are familiar with this investigation and with drug trafficking organization investigations generally.

## II.      Purposes of this Affidavit

7.      This affidavit is made in support of an application for a criminal complaint that charges Matthew HERNANDEZ ("M. HERNANDEZ"), Dylon HERNANDEZ ("D. HERNANDEZ"), Nancy HERNANDEZ ("N. HERNANDEZ"), and Raphael CERVANTES ("CERVANTES") with violating Title 21, United States Code, Sections 841(a)(1) (possession with intent to distribute controlled substances), 843(b) (use of communication facility in furtherance of drug offense), and 846 (conspiracy to distribute or to possess with intent to distribute controlled substances).

8.     This affidavit is made for the purpose of establishing probable cause for the requested complaint and does not purport to set forth all that I know regarding this investigation.  I make this affidavit based upon my training, education, and experience as a DEA Special Agent, personal knowledge derived from my participation in this investigation, information obtained from other law enforcement agents, review of investigative reports and documents, review of intercepted communications over Target Telephones, and summaries thereof, and other investigative techniques.

## III.   Statement of Probable Cause

   *A.*   *Summary of probable cause*

9.     Based on an, ongoing law enforcement narcotics investigation, multiple controlled purchases of methamphetamine, multiple seizures of methamphetamine from locations and persons associated with the above identified participants, seizures of firearms and other contraband, law enforcement surveillance (including review of wire–intercepted calls and summaries thereof), as well as my training and experience and other investigative techniques, I believe that beginning on an unknown date, and continuing through today, the HERNANDEZ DTO is a distributor of narcotics, including but not limited to methamphetamine, in the Coachella Valley area, located in Riverside County.

B.      *Background of investigation*

10.      The RDO TFG-1 has been investigating M. HERNANDEZ,

D. HERNANDEZ, N. HERNANDEZ, and CERVANTES as well as other known

and unknown co-conspirators and associates of the HERNANDEZ DTO since

approximately August, 2011.

11.      During the course of this investigation, based on ongoing

conversations with law enforcement officers, several sources of information

("SOIs") interviewed between in or about November, 2011, and May, 2012, and

the recent and current wire and electronic interception of Target Telephones

used by M. HERNANDEZ, D. HERNANDEZ, and Norma Mendoza-ESCOBEDO

("Mendoza-ESCOBEDO"), among other investigative techniques, I have learned

about the methods of operation of the HERNANDEZ DTO, and some of the

individuals involved in the HERNANDEZ DTO, such as couriers, managers, and

others.  Specifically, I learned, among other things, the following:

12.      The HERNANDEZ DTO, run by M. HERNANDEZ and

D. HERNANDEZ, is believed to traffic in multi-pound quantities of

methamphetamine in Cathedral City, as well as other locations in California.

The HERNANDEZ DTO is believed to be a direct supplier of large quantities of

methamphetamine.  Also, the HERNANDEZ DTO is believed to use couriers,

including CERVANTES and others, to deliver one to two ounce quantities of methamphetamine to several different locations on a daily basis.

C.      *Reliability of confidential informant*

13.      Special Agents and Task Force Officers of RDO TFG-1 have received information concerning the illegal drug trafficking activities of the HERNANDEZ DTO from a DEA confidential informant ("CI"). The CI has been providing information since in or about May 2012.

14.      Specifically, the CI has provided information about the membership, structure, and customs of the HERNANDEZ DTO. CI has positively identified M. HERNANDEZ, D. HERNANDEZ, and Christopher HINSON, also known as "Corrupt" ("HINSON") (as members of the HERNANDEZ DTO through driver's license and booking photographs. The CI has conducted several, consensually-recorded conversations with members and associates of the HERNANDEZ DTO, including M. HERNANDEZ, D. HERNANDEZ, C. HINSON, and CERVANTES and has spoken in person with M. HERNANDEZ during the course of this investigation. The CI has conducted controlled purchases of methamphetamine from several members of the HERNANDEZ DTO during the course of this investigation.

15.      The CI is assisting the DEA in connection with a cooperation agreement issued through the Riverside County District Attorney's Office

wherein the CI is a criminal defendant in a California State narcotics and firearms case for which the CI pleaded guilty. The CI agreed to cooperate with law enforcement to receive leniency consideration in regard to sentencing. More specifically the CI's cooperation agreement provided that the CI would receive a suspended multiple year jail sentence and additional criminal charges would not be filed should the CI fulfill the terms of the contract.

16.     I previously reviewed the Riverside County Superior Court online database and learned, among other things, that the CI pleaded guilty to multiple felony charges and received a lengthy sentence suspended and a term of probation provided the CI successfully completes the contract as specified above.

17.     The CI has an extensive criminal history and criminal conviction record dating back to when he/she was a juvenile.

18.     As an adult, since 1998, the CS has been arrested for numerous offenses including, but not limited to, disorderly conduct, numerous drug-related crimes, providing false information to a police officer, terrorist threats, battery of a spouse, obstructing/resisting a police officer, and robbery and burglary, many of which the CI has either pleaded or was found guilty.

19.     The CI's information concerning the HERNANDEZ DTO has been corroborated by other sources of information ("SOI"), including various public databases including but not limited to, "Clear Choice Point," and "Google," law

enforcement database queries, physical surveillance, controlled narcotics purchases and consensually-recorded conversations and phone calls that the CI has had with other members of the HERNANDEZ DTO. Based on the foregoing, and the information contained herein, I believe the information provided by the CI to be reliable as to this investigation thus far.

D.    *Previous searches and controlled buys*

20.    In or about September, 2012, along with SA Scott Hawkins and TFO Kelly Fieux, I met with a CI who provided information regarding the trafficking of methamphetamine by the HERNANDEZ DTO.

21.    As summarized below, the CI conducted several controlled purchases of narcotics from the HERNANDEZ DTO at the direction of the DEA:

a.    On or about September 2012, the CI arranged to buy one ounce of methamphetamine for $650 with D. HERNANDEZ and CERVANTES over several telephone calls. Later that evening, after having been searched by law enforcement and provided with $650 to purchase the methamphetamine, the CI met an unidentified male who was the passenger of a 2002 white Buick sedan registered to CERVANTES (the "CERVANTES sedan"). The unidentified male passenger provided the methamphetamine to the CI at the designated meeting location. I monitored the exchange and reviewed a DEA investigative report by TFO Fieux regarding the surveillance of the narcotics exchange. TFO Buenting

recovered approximately one ounce of suspected methamphetamine from the
CI's person.  The suspected narcotics and were tested by a DEA laboratory and
found to contain 27.2 grams of actual methamphetamine (27.7 grams with a
purity of 98.5%).

        b.      On or about September 2012, the CI arranged to buy three
ounces of methamphetamine for $2,000 with D. HERNANDEZ and
CERVANTES over several telephone calls.  Later that evening, after having been
searched by law enforcement and provided with $2,000 to purchase the
methamphetamine, the CI met an unidentified male at the designated meeting
location, which was being surveilled by law enforcement.  I monitored the
exchange and reviewed a DEA investigative report by TFO Fieux regarding the
surveillance of the narcotics exchange and the CERVANTES sedan driven by
CERVANTES during the drug meeting was believed to be the delivery vehicle.
TFO Buenting recovered approximately three ounces of suspected
methamphetamine from the CI's person.  The suspected narcotics and were
tested by a DEA laboratory and found to contain 82 grams of actual
methamphetamine (83.3 grams with a purity of 98.5%).

        c.      On or about October 2012, the CI arranged to buy two
ounces of methamphetamine for $1,400 with D. HERNANDEZ and M.
HERNANDEZ over several telephone calls.  Later that evening, after having

been searched by law enforcement and provided with $1,400 to purchase the

methamphetamine, the CI met M. HERNANDEZ at the designated meeting

location, which was being surveilled by law enforcement.  I monitored the

exchange and reviewed a DEA investigative report by TFO Fieux regarding the

surveillance of the narcotics exchange.  TFO Buenting recovered approximately

two ounces of suspected methamphetamine from the CI's person.  The suspected

narcotics and were tested by a DEA laboratory and found to contain 54.4 grams

of actual methamphetamine (55.6 grams with a purity of 98%).

     E.    *Prior wire interception*

    22.    On March 6, 2013, the Honorable Virginia A. Phillips, United States

District Judge, issued a wire interception order pursuant to 18 U.S.C. § 2518

authorizing interception of the following telephone line, in Case No. ED CR

Misc. 13-8-VAP:

    a.    (760) 408-8732, international mobile subscriber identification

("IMSI") number 310410526528790, ("Target Telephone #1"), subscribed to by

"RED POCKET MOBILE," 4712 Admiralty Way, Suite 627, Marina Del Rey,

California 90292, and believed to be used by M. HERNANDEZ and

D. HERNANDEZ.

    F.    *Communications intercepted on the wire*

    <u>Intercepted Communications on March 11, 2013</u>

23.     On March 11, 2013, at approximately 5:42 p.m., M. HERNANDEZ

made an outgoing call from Target Telephone #1 to (760) 449-0979 and spoke

with BOUCHARD[1].  The call is summarized, in part, as follows[2]:

| M. HERNANDEZ | Asked what was going on. |
| BOUCHARD | Said he needed to see M. HERNANDEZ and added that he had 115 but had no car. |
| M. HERNANDEZ | Said, okay, and would meet BOUCHARD at Food4Less. |
| BOUCHARD | Said, okay, and would be right there. |
| M. HERNANDEZ | Said he would meet BOUCHARD within half an hour at the Food4Less. |

24.     On March 11, 2013, at approximately 5:43 p.m., M. HERNANDEZ

received an incoming call on Target Telephone #1 from (817) 223-0993 and spoke

with an individual otherwise identified as UM0993[3].  The call is summarized, in

part, as follows:

---

[1] Kent David BOUCHARD is a methamphetamine drug customer of the HERNANDEZ DTO.

[2] Information contained in parentheticals represents summaries or descriptions from the wire room monitors and other law enforcement personnel who are familiar with this investigation and with investigations into drug trafficking organizations. They are not transcripts.

[3] There are several phone calls described in this affidavit, and in the calls intercepted in general, where the caller was not identified and instead, has only been identified as an Unknown Male "UM[NUMBER]," or Unknown Female "UF[NUMBER]."

| UM0993 | Asked if he could meet M. HERNANDEZ for six. |
|---|---|
| M. HERNANDEZ | Said, "Yes, of course." |
| UM0993 | Asked when would be good for M. HERNANDEZ. |
| M. HERNANDEZ | Said he could meet UM0993 in one half hour or 45 minutes. |
| UM0993 | Said in 45 (minutes). |
| M. HERNANDEZ | Said, okay, and at Food4Less. |
| UM0993 | Said, okay, and would see M. HERNANDEZ there. |

25.     On March 11, 2013, at approximately 5:52 p.m., M. HERNANDEZ made an outgoing call from Target Telephone #1 to (760) 898-0720 and spoke with YOUNGBLOOD[4].  The call is summarized, in part, as follows: M. HERNANDEZ told YOUNGBLOOD to make him a "child's plate" and bring it out front.

26.     I believe based on my training and experience, knowledge of the investigation, surveillance observations, and review of intercepted communications that BOUCHARD and UM0993 were ordering narcotics from M. HERNANDEZ.  M. HERNANDEZ then directed YOUNGBLOOD to have the requested narcotics ready, which he referred to as a "child's plate" to avoid law

---

[4] Shawna YOUNGBLOOD is the girlfriend of Matthew HERNDANDEZ.

- 13 -

enforcement detection.

27.     I know based on my involvement in this investigation that BOUCHARD was arrested on March 15, 2013, as further described below, for possession of methamphetamine after BOUCHARD met with D. HERNANDEZ. Based on my review of the intercepted calls between BOUCHARD, M. HERNANDEZ, and D. HERNANDEZ, surveillance and other law enforcement techniques, and my knowledge of this investigation, I believe that BOUCHARD is a narcotics customer of the HERNANDEZ DTO.  Furthermore, I believe BOUCHARD was ordering methamphetamine during the above-described calls over Target Telephone #1 on March 11, 2013.

28.     On March 11, 2013, at approximately 6:00 p.m., M. HERNANDEZ received an incoming call on Target Telephone #1 from (760) 219-1147 and spoke with an individual otherwise identified as UM1147[5].  The call is summarized, in part, as follows:  M. HERNANDEZ asked if UM1147 was almost there.  UM1147 said, "I'll be there in 15 minutes, at you."  M. HERNANDEZ said all right. UM1147 said he was already leaving.  M. HERNANDEZ said all right.

29.     At approximately 6:00 p.m., I observed the Ford Mustang leave M. HERNANDEZ'S residence; however, I did not directly follow the vehicle.

30.     On March 11, 2013, at approximately 6:03 p.m., M. HERNANDEZ

_____

[5] "UM1147" is an unidentified male using a telephone ending in "1147."

received an incoming call on Target Telephone #1 from (760) 449-0979 and spoke with BOUCHARD. The call is summarized, in part, as follows: M. HERNANDEZ told BOUCHARD that he could see him and he was coming out of the car wash so for BOUCHARD to relax.

31.     TFO Fieux observed M. HERNANDEZ'S Mustang arrive and park in a parking space. TFO Fieux saw a white compact vehicle, believed to be driven by BOUCHARD, park behind M. HERNANDEZ. TFO Fieux observed the subject, believed to be BOUCHARD, exit his vehicle. BOUCHARD then walked to M. HERNANDEZ'S Mustang and entered the passenger door.

32.     TFO Fieux saw M. HERNANDEZ and BOUCHARD talking and after approximately 20-30 seconds, BOUCHARD exited M. HERNANDEZ'S vehicle. BOUCHARD re-entered his vehicle and drove away. TFO Fieux then observed M. HERNANDEZ drive away and head northbound through the parking lot.

33.     On March 11, 2013, at approximately 6:10 p.m., M. HERNANDEZ made an outgoing call from Target Telephone #1 to (760) 218-1425 and spoke with an individual otherwise identified as UM1425[6]. The call is summarized, in part, as follows:

M. HERNANDEZ    Told UM1425 to be at Food4Less in 15 minutes.

_____

[6] "UM1425" is an unidentified male using a telephone ending in "1425."

UM1425              Said okay.

34.     At approximately 6:33 p.m., TFO Fieux observed M. HERNANDEZ driving the Mustang arrive from the south entrance to the Food4Less parking lot. SA Ward saw the Mustang parked near SA Ward's surveillance vehicle. SA Ward observed M. HERNANDEZ inside the Mustang smoking a cigarette. SA Ward observed a white male adult, later identified as Gary Bowman, exit the driver's side of a red Ford Mustang convertible.

35.     SA Ward saw Bowman walk towards M. HERNANDEZ'S vehicle, carrying an unknown white object in his left hand. SA Ward saw Bowman enter the passenger side of M. HERNANDEZ'S vehicle. After approximately 30 seconds, SA Ward observed Bowman exit M. HERNANDEZ'S vehicle and walk back to the red Ford Mustang. SA Ward then saw the red Ford Mustang drive away.

36.     SA Ward then observed a second subject described as a white male adult walk up and enter the passenger door of M. HERNANDEZ'S vehicle. After approximately 30 seconds, SA Ward saw the subject exit M. HERNANDEZ'S vehicle. SA Ward did not see if the subject departed the area in a vehicle or left the area on foot.

37.     Based on my training and experience, knowledge of this investigation, surveillance conducted, and review of interceptions of Target

Telephone #1, I believe that M. HERNANDEZ was supplying narcotics to BOUCHARD and another drug customer, Bowman, who, based on the timing of the above calls and surveillance, could have been UM0993, UM1147, or UM1425, met in the Food4Less parking lot.  Furthermore, investigators continued to conduct surveillance in connection with M. HERNANDEZ as he conducted additional meetings with suspected methamphetamine customers until approximately 9:00 p.m. when surveillance was terminated.

<u>Intercepted Communications on March 15, 2013</u>

38.     On March 15, 2013, at approximately 5:59 p.m., Target Telephone #1 received an incoming text message from (760) 449-0979, the telephone number for BOUCHARD which read: "You out there?"

39.     On March 15, 2013, at approximately 6:02 p.m., Target Telephone #1 made an outgoing text message to BOUCHARD which read: "What up."

40.     On March 15, 2013, at approximately 6:05 p.m., Target Telephone #1 received an incoming text message from BOUCHARD which read: "450."

41.     On March 15, 2013, at approximately 6:13 p.m., D. HERNANDEZ made an outgoing call from Target Telephone #1 to (760) 449-0979 and spoke with BOUCHARD.  The call is summarized, in part, as follows:

| | |
|---|---|
| D. HERNANDEZ | Asked BOUCHARD, "What's my bro usually give you?" |
| BOUCHARD | Said, "Um, well it'd be a half and a quarter." |

D. HERNANDEZ    Said, "Okay, well, then I got you."

BOUCHARD    Said, "All right. Um, where would you (D. HERNANDEZ) like me to come?"

D. HERNANDEZ    Asked BOUCHARD for clarification.

BOUCHARD    Asked, "Where would you like me to meet you?"

D. HERNANDEZ    Said, "On Gerald Ford AM/PM."

BOUCHARD    Asked where.

D. HERNANDEZ    Said, "Gerald Ford AM/PM."

BOUCHARD    Said he (BOUCHARD) did not get where, on Gerald Ford and (what other street).

D. HERNANDEZ    Said, "At the AM/PM in Cat City (Cathedral City)."

BOUCHARD    Said, "Okay, all right. Um, I need about like maybe 20 minutes to get there."

D. HERNANDEZ    Said that was no problem.

42.    On March 15, 2013, at approximately 6:14 p.m., D. HERNANDEZ made an outgoing call from Target Telephone #1 to (760) 449-0979 and spoke with BOUCHARD. The call is summarized, in part, as follows:

D. HERNANDEZ    Said, "If you come up with 50 more, I'll give you a whole one."

BOUCHARD    Said, "Say it again."

D. HERNANDEZ    Said, "Just come up with 50 more and I'll give

- 18 -

you a whole one."

BOUCHARD          Said, "I'll try to do that."

D. HERNANDEZ      Asked, "Do you know what I mean?"

BOUCHARD          Said, yeah.

D. HERNANDEZ      Said "That way you can get ahead a little bit."

BOUCHARD          Said "Yeah, that would be great."

D. HERNANDEZ      Said, "Let me know. Later."

43.     On March 15, 2013, at approximately 6:21 p.m., Target Telephone #1 received an incoming text message from BOUCHARD which read: "Gonna get the other fifty. Won't be there in twenty min."

44.     On March 15, 2013, at approximately 6:23 p.m., Target Telephone #1 received an incoming text message from BOUCHARD which read: "Gonna get the other fifty. Won't be there in twenty min Maybe forty. I will call when on my way."

45.     On March 15, 2013, at approximately 6:45 p.m., D. HERNANDEZ received an incoming call on Target Telephone #1 from (760) 449-0979 and spoke with BOUCHARD.  The call is summarized, in part, as follows:

BOUCHARD          Asked if D. HERNANDEZ had called.

D. HERNANDEZ      Said, "Yes. Just bring that. I'll give you the whole one this one time."

BOUCHARD          Said he (BOUCHARD) would pick it up in

about five minutes then he (BOUCHARD) would be on his way.

D. HERNANDEZ    Said, all right.

46.    On March 15, 2013, at approximately 7:18 p.m., Target Telephone #1 made an outgoing text message to BOUCHARD which read: "Let me know I give you the full for the 450."

47.    On March 15, 2013, at approximately 7:20 p.m., Target Telephone #1 received an incoming text message from BOUCHARD which read: "On my way. Can you have your brother call me?"

48.    On March 15, 2013, at approximately 7:29 p.m., Target Telephone #1 received an incoming text message from BOUCHARD which read: "What are you driving?"

49.    On March 15, 2013, at approximately 7:31 p.m., Target Telephone #1 made an outgoing text message to BOUCHARD which read: "Silver one u there."

50.    On March 15, 2013, at approximately 7:36 p.m., Target Telephone #1 received an incoming text message from BOUCHARD which read: "I am over by the restaurants."

51.    At approximately 7:37 p.m., I, along with other law enforcement officers initiated surveillance at the AM/PM located at 36001 Date Palm Drive, Cathedral City, California.  Coachella Valley Narcotics Task Force (CVNTF) TFO

- 20 -

Bazanos observed D. HERNANDEZ driving his silver 2007 Lexus sedan with California license plate CRZTWIN and enter the parking lot.  CVNTF Sergeant Hoyt then observed BOUCHARD exit a white Honda sedan and walk toward D. HERNANDEZ'S Lexus.

52.     At approximately 7:38 p.m., CVNTF TFO Bazanos saw BOUCHARD enter D. HERNANDEZ'S Lexus and after approximately 30 seconds, CVNTF Bazanos saw BOUCHARD exit D. HERNANDEZ'S Lexus and get back into the white Honda sedan.

53.     I, along with participating surveillance officers, followed BOUCHARD until he eventually parked his vehicle behind the Boomer's amusement park located on Jones Road, just east of Cree Road, Cathedral City, California.

54.     Based on my request, at approximately 7:58 p.m., Riverside County Sheriff's (RSO) Deputy Telles, who is also familiar with the details of this investigation, made contact with BOUCHARD and conducted a search of BOUCHARD and his vehicle based on probable cause that BOUCHARD bought narcotics from D. HERNANDEZ and was possessing it at the time.  Deputy Telles recovered approximately one ounce of methamphetamine in BOUCHARD's left front shorts pocket.  BOUCHARD was arrested but later released.  BOUCHARD did not provide any relevant post-arrest statements.  No

charges have been filed against BOUCHARD in order to protect the integrity of this investigation.

55.     Based on my training and experience, review of intercepted communications, surveillance observations and other investigative techniques I believe, among other things, that D. HERNANDEZ was using Target Telephone #1 during this time frame because M. HERNANDEZ, the primary user of Target Telephone #1, was at Disneyland for the day.  Further, that D. HERNANDEZ sold BOUCHARD one ounce of methamphetamine.

<u>Intercepted Communications on March 23, 2013</u>

56.     On March 23, 2013, at approximately 6:29 p.m., M. HERNANDEZ made an outgoing call from Target Telephone #1 to (760) 449-0979 and spoke with BOUCHARD.  The call is summarized, in part, as follows:

| | |
|---|---|
| M. HERNANDEZ | Asked BOUCHARD what was going on. |
| BOUCHARD | Said, "Hey, dude. Um, well, we need to talk for sure." |
| M. HERNANDEZ | Asked BOUCHARD, "Where you been at?" |
| BOUCHARD | Said, "I've been in the pokey (jail)." |
| M. HERNANDEZ | Asked BOUCHARD what was going on. |
| BOUCHARD | Said, "Nothing is going on. They (police) didn't file anything 'cause they didn't arraign me in time, but they let me, uh, you know, they had to, uh . . . over the next year and if they wanted to change their mind, they could do that. |

| | |
|---|---|
| M. HERNANDEZ | Asked, "What they catch you with?" |
| BOUCHARD | Said, "That, what I got from your brother (D. HERNANDEZ)." |
| M. HERNANDEZ | Said, "Oh, not about that." |
| BOUCHARD | Said, "I had a, I had an ounce." |
| M. HERNANDEZ | Said, "I have no idea what you're talking about now." |
| BOUCHARD | Said, "Of course you do but, uh, uh ..." |
| M. HERNANDEZ | Said, "No, I don't. I have no idea what you're talking about." |
| BOUCHARD | Said, "Let's have dinner or something somewhere, uh, tomorrow or the next day, or whenever you say, and uh, talk." |
| M. HERNANDEZ | Said, all right. |
| M. HERNANDEZ | Said, "They (police) didn't file charges on an ounce? That's crazy." |
| BOUCHARD | Said, "They (police) did not. Um, they, you know, said they could change their minds if they wanted over the next year. There's a lot of opinions about that and, um, I'll share them all with you." |
| M. HERNANDEZ | Said, "Oh, no, they'll (police) file them if it's an ounce. I'm going to call my (unintelligible) and ask him." |
| BOUCHARD | Said, yes, probably. |
| M. HERNANDEZ | Said, "They (police) won't let you out over an |

|  | ounce. They won't unless you, unless . . ." |
|---|---|
| BOUCHARD | Said, "But if it was a DA (District Attorney) reject or there was not proper conduct or something like that, that would, uh, you know, take care of the filing thing." |
| M. HERNANDEZ | Asked, "Where did they catch you (BOUCHARD) at?" |
| BOUCHARD | Said, "Behind the, um, miniature golf place. Behind that, um, where the, um, what's that miniature golf place? It's on Jones. It's called Jones Road by (audio glitch). I was, uh, waiting for my friend to come (audio glitch) haven't been to the spot where he lives. I wasn't even there three minutes, dude. I have, uh, you know, theories. I have my, uh, you know . . . there was some bullshit there. Let me tell you that." |
| M. HERNANDEZ | Said, "Okay, well I'll call you later. We'll meet up or something to talk." |
| BOUCHARD | Said, all right and thanked M. HERNANDEZ for calling. |

57.     On March 23, 2013, at approximately 7:45 p.m., M. HERNANDEZ

made an outgoing call from Target Telephone #1 to (760) 449-0979 and spoke

with BOUCHARD.  The call is summarized, in part, as follows:

| M. HERNANDEZ | Asked BOUCHARD, "So which police department arrested you?" |
|---|---|
| BOUCHARD | Said, "Oh, it's a whole, uh, um, actually it was the Sheriff." |
| M. HERNANDEZ | Asked, "The Sheriff's?" |

BOUCHARD            Said, "Yeah. I'm telling you (audio glitch) the
                    Sheriff at Cathedral City (call disconnected).

58.     Based on my review of the aforementioned calls, involvement in

this case, and my training and experience, I believe that M. HERNANDEZ and

BOUCHARD are discussing BOUCHARD's arrest after the narcotics transaction

between BOUCHARD and D. HERNANDEZ.  M. HERNANDEZ and

BOUCHARD are discussing the potential charges and why the case was not

charged.

     G.     *Current Wire Interceptions*

59.     On May 16, 2013, the Honorable Virginia A. Phillips, United States

District Judge, issued a wire interception order pursuant to 18 U.S.C. § 2518

authorizing interceptions of the following telephone lines, in Case No. ED CR

Misc. 13-8(A)-VAP:

     a.     (760) 408-8732, international mobile subscriber identification

("IMSI") number 310410526528790, ("Target Telephone #1"), subscribed to by

"RED POCKET MOBILE," 4712 Admiralty Way, Suite 627, Marina Del Rey,

California 90292, and believed to be used by M. HERNANDEZ and

D. HERNANDEZ;

     b.     (760) 424-6418,  IMSI number 310410549279051, ("Target

Telephone #2"), subscribed to by "RED POCKET MOBILE," 4712 Admiralty

Way, Suite 627, Marina Del Rey, California 90292, and believed to be used by

D. HERNANDEZ;

        c.     (760) 464-2441, IMSI number 310410526577398, ("Target

Telephone #3"), subscribed to by "RED POCKET MOBILE," 4712 Admiralty

Way, Suite 627, Marina Del Rey, California 90292, and believed to be used by M.

HERNANDEZ; and

        d.     (760) 660-0278, IMSI number 310410549280513, ("Target

Telephone #4" and collectively with Target Telephones #1, #2, and #3, the "Target

Telephones"), subscribed to by "RED POCKET MOBILE," 4712 Admiralty Way,

Suite 627, Marina Del Rey, California 90292, and believed to be used by

MENDOZA.

     *H.*    *Communications intercepted on the wires*

    60.    Based on my training and experience, knowledge of this

investigation, and review of intercepted communications over the Target

Telephones, surveillance observations and other investigative techniques, I

believe, among other things, that the below-described drug pertinent phone calls

between members of the HERNANDEZ DTO establish probable cause for the

requested search warrant.

<u>Intercepted Communications on May 20, 2013</u>

61.     On May 20, 2013, at approximately 5:47 p.m., D. HERNANDEZ received an incoming call on Target Telephone #1 from (760) 218-5284 and spoke with an individual otherwise identified as WIGGY LNU ("WIGGY").  The call is summarized, in part, as follows:

| | |
|---|---|
| WIGGY | Asked D. HERNANDEZ what he was doing. |
| D. HERNANDEZ | Said he was swimming. |
| WIGGY | Asked D. HERNANDEZ if this was his brother's (M. HERNANDEZ) phone. |
| D. HERNANDEZ | Said, yes, that he (D. HERNANDEZ) was taking care of it and that M. HERNANDEZ was on vacation right now. |
| WIGGY | Said he had something for D. HERNANDEZ. |
| D. HERNANDEZ | Laughed. |
| WIGGY | Said that he (WIGGY) had a buddy coming down from Aspen with 1700. |
| D. HERNANDEZ | Confirmed 17 and said he (D. HERNANDEZ) would "hook them up." |
| WIGGY | Said, "This could be an every day thing, too." |
| D. HERNANDEZ | Said he would give them a "qp" (possibly quarter pound). |
| WIGGY | Said he would call D. HERNANDEZ right back. |

62.     On May 20, 2013, at approximately 6:50 p.m., D. HERNANDEZ

received an incoming call on Target Telephone #1 from (760) 218-5284 and spoke

with an individual otherwise identified as WIGGY.  The call is summarized, in

part, as follows:

| | |
|---|---|
| WIGGY | Asked if D. HERNANDEZ was ready. |
| D. HERNANDEZ | Said, yeah, and asked where WIGGY was located. |
| WIGGY | Said he was at his mother's house. |
| D. HERNANDEZ | Told WIGGY to come over to his (D. HERNANDEZ) house. |
| WIGGY | Said, all right, and that he would come alone. |
| D. HERNANDEZ | Said that was cool and told WIGGY not to trip, that he (D. HERNANDEZ) was not tripping. |

63.     On May 20, 2013, at approximately 6:52 p.m., D. HERNANDEZ

made an outgoing call from Target Telephone #2 to (760) 219-1147 and spoke

with CERVANTES.  The call is summarized, in part, as follows:

| | |
|---|---|
| D. HERNANDEZ | Told CERVANTES that he needed him "as soon as possible.  I think I might have enough to cover but I am not too sure." |
| CERVANTES | Said, okay, and that he would be there. |

64.     Based on intercepted calls over Target Telephones between D.

HERNANDEZ, CERVANTES, and WIGGY, myself and other law enforcement

officers initiated surveillance at 68745 Minerva Road, Cathedral City, California

(the "Minerva Road residence")  on May 20, 2013, and, among other things, I

observed the following: at approximately 7:38 p.m., surveillance

officers observed two vehicles known to be associated with D. HERNANDEZ

parked at or near the Minerva Road residence.  At approximately 7:50 p.m.,

surveillance officers observed a 2005 gray/black Nissan truck registered to

CERVANTES (the "CERVANTES truck") arrive and park in front of the Minerva

Road residence.  At approximately 8:52 p.m., I observed an unidentified

individual arrive at the Minerva Road residence who appeared to be dropped off

by a Jeep SUV and was carrying a bag and walked up the driveway to the

residence and out of view.  It is believed the same unknown individual later

departed the residence as a passenger in the same Jeep SUV that had previously

arrived, departed, and later returned to the Minerva Road residence.  Based on

the totality of intercepted communications and surveillance observations, I

believe the unknown individual to be WIGGY.

65.     Based on my training and experience, knowledge of this

investigation, review of intercepted communications over Target Telephones,

and summaries thereof, surveillance observations, and other investigative

techniques, I believe, among other things, the following regarding the activities

of May 20, 2013: D. HERNANDEZ, who was using Target Telephone #1 of which

M. HERNANDEZ is the primary user, agreed to supply WIGGY with one

quarter pound of methamphetamine at the Minerva Road residence due to the

unavailability of M. HERNANDEZ.  D. HERNANDEZ requested that

CERVANTES respond to the Minerva Road residence to supply additional

methamphetamine to cover the quarter pound deal with WIGGY.  CERVANTES

responded to the Minerva Road residence driving the CERVANTES truck and

transported an undetermined amount of methamphetamine to complete the

quarter pound sale which was ultimately supplied to WIGGY by D.

HERNANDEZ.

### Intercepted Communications on May 22, 2013

66.    On May 22, 2013, at approximately 11:32 a.m., D. HERNANDEZ

received an incoming text message on Target Telephone #1 from (760) 905-1691

and exchanged text messages with an individual otherwise identified as

UM1691[7].  The text message exchange, in part, reads as follows (and may not

include the entirety of the text messages during this exchange):

UM1691            im getting some ....u gonna want some if i
                  didnt get bak to u its cause i save the last of it
                  for me ..but i got neww ones coming today

D. HERNANDEZ      Yes for sure I m ready when you are

67.    On May 22, 2013, at approximately 12:35 a.m., D. HERNANDEZ

received an incoming text message on Target Telephone #1 from (760) 905-1691

---

[7] "UM1691" is an unidentified male using a telephone ending in "1691."

and exchanged text messages with an individual otherwise identified as

UM1691.  The text message exchange, in part, reads as follows (and may not

include the entirety of the text messages during this exchange):

| UM1691 | got tree on deck shit got hektik 3600 a picec it was hard to take care my route and sperqte yurs |
| D. HERNANDEZ | Cool just let me know when your ready . |
| UM1691 | ready |

68.    On May 22, 2013, at approximately 12:37:07 p.m., D. HERNANDEZ

made an outgoing call from Target Telephone #1 to (760) 905-1691 and spoke

with an individual otherwise identified as UM1691.  The call is summarized, in

part, as follows:

| D. HERNANDEZ | Asked, "Do you know where is my pad, right?" |
| UM1691 | Said, yes. |
| D. HERNANDEZ | Said, "Come by." |

On May 22, 2013, at approximately 12:37:50 p.m., D. HERNANDEZ made

an outgoing call from Target Telephone #2 to (760) 219-1147 and spoke

with CERVANTES.  The call is summarized, in part, as follows:

| D. HERNANDEZ | Said, "Bring a clean, clean fucking pizzle (phonetic) and come over." |
| CERVANTES | Said, "Oh, we're doing one of those, huh? I have one ready to bring to you." |

| | |
|---|---|
| D. HERNANDEZ | Said he (D. HERNANDEZ) did not need it right now. Said his (D. HERNANDEZ) boy was coming through again. |
| CERVANTES | Said he (CERVANTES) was in Cat City (Cathedral City) so D. HERNANDEZ could call him (CERVANTES) at the last minute. |
| D. HERNANDEZ | Asked where CERVANTES was in Cat City. |
| CERVANTES | Said he (CERVANTES) was at work. |
| D. HERNANDEZ | Asked CERVANTES to come over in 45 minutes. Said, bye. |

69.     On May 22, 2013, at approximately 12:51 p.m., D. HERNANDEZ made an outgoing call from Target Telephone #2 to (760) 219-1147 and spoke with CERVANTES.  The call is summarized, in part, as follows:

| | |
|---|---|
| D. HERNANDEZ | Said, "Pick me up some big ziplos, ziplocs." |
| CERVANTES | Said, "I got you, I got you." |
| D. HERNANDEZ | Said he (D. HERNANDEZ) told him (CERVANTES) last time and you didn't. |
| CERVANTES | Said, okay. |

70.     On May 22, 2013, at approximately 1:32 p.m., D. HERNANDEZ received an incoming call on Target Telephone #1 from (760) 905-1691 and spoke with an individual otherwise identified as UM1691.  The call is summarized, in part, as follows:

| | |
|---|---|
| UM1691 | Asked what street it was. |

D. HERNANDEZ    Said, "Minerva."

UM1691          Said he was on Monrovia from Portula (phonetic).

D. HERNANDEZ    Told UM1691 to come down La Vista or come down to the park.

UM1691          Said he could see the park from right here and it was called Tachevah.

D. HERNANDEZ    Said, "Turn right. If you are heading away from the park, you are heading the right way. Then you'd come to a stop and then turn right, you'll see my pad right there."

UM1691          Said, all right, cool.

71.    On May 22, 2013, at approximately 1:35 p.m., D. HERNANDEZ made an outgoing call from Target Telephone #2 to (760) 219-1147 and spoke with CERVANTES.  The call is summarized, in part, as follows:

D. HERNANDEZ    Said, "Where you at dog?"

CERVANTES       Said, "I'm on my way."

D. HERNANDEZ    Said, "It's been an hour dog, dude's already here."

CERVANTES       Said, "I'm coming now."

D. HERNANDEZ    Said, okay.

72.    On May 22, 2013, at approximately 2:13 p.m., D. HERNANDEZ made an outgoing call from Target Telephone #2 to (760) 660-5855 and spoke with N. HERNANDEZ.  The call is summarized, in part, as follows:

| D. HERNANDEZ | Said, "Where is my vacuum sealer at?" |
| N. HERNANDEZ | Asked, what? |
| D. HERNANDEZ | Said, "The food saver." |
| N. HERNANDEZ | Said, "Oh, the food saver is up, you know, where the plates are and all that is, at the very top." |
| D. HERNANDEZ | Said, "The bags are up there but where is the ..." |
| N. HERNANDEZ | Said "Where the rice is, where the pots and pans are, where I keep that Mexican rice." |
| D. HERNANDEZ | Said, "Oh, okay." |
| N. HERNANDEZ | Said, "That little drawer." |
| D. HERNANDEZ | Said, okay. |
| N. HERNANDEZ | Said, "You are not giving it away, are you?" |
| D. HERNANDEZ | Said, "No, I'm doing work. I gotta go." |
| N. HERNANDEZ | Said, okay. |

73.     On May 22, 2013, at approximately 3:13 p.m., D. HERNANDEZ made an outgoing call from Target Telephone #2 to (760) 660-5855 and spoke with N. HERNANDEZ.  The call is summarized, in part, as follows:

| N. HERNANDEZ | Said she (N. HERNANDEZ) was trying to get a hold of D. HERNANDEZ. |
| D. HERNANDEZ | Said the old man left the phone in the car and he (D. HERNANDEZ) came back to get it. |

| | |
|---|---|
| N. HERNANDEZ | Said nobody was at the house and she did not know if he (D. HERNANDEZ) locked it or shut the office because the kids were going to be at the house. |
| D. HERNANDEZ | Said they (the kids) all went to the park. |
| N. HERNANDEZ | Said, "I just want you to make sure everything was put away." |
| D. HERNANDEZ | Said, "Yeah, I know. Everything is put away." |
| D. HERNANDEZ | Said she (N. HERNANDEZ) was just letting D. HERNANDEZ know that no one was at the house. |
| D. HERNANDEZ | Said he (D. HERNANDEZ) was about to be there right now. |

74.     On May 22, 2013, at approximately 9:23 p.m., D. HERNANDEZ received an incoming call on Target Telephone #2 from (760) 219-1147 and spoke with CERVANTES.  The call is summarized, in part, as follows:

| | |
|---|---|
| CERVANTES | Asked if D. HERNANDEZ could meet up. |
| D. HERNANDEZ | Asked what was going on. |
| CERVANTES | Asked, "So I can get something?" |
| D. HERNANDEZ | Asked, "What you got? Myself don't (unintelligible) unless I know what the dollar amount is." |
| CERVANTES | Said, "Just make me a quart … a quarter and I'll cover the rest." |

D. HERNANDEZ      Said, okay, that he that he would call CERVANTES and asked where CERVANTES was.

CERVANTES      Said at his house.

D. HERNANDEZ      Said he was in the hood and would be right there.

75.      On May 22, 2013, at approximately 10: 15 p.m., D. HERNANDEZ made an outgoing call from Target Telephone #2 to (760) 219-1147 and spoke with CERVANTES.

D. HERNANDEZ      Asked if CERVANTES wanted to come by the house.

CERVANTES      Said not really but he (CERVANTES) would.

D. HERNANDEZ      Told CERVANTES to come back and that he (D. HERNANDEZ) had put some chicken kabob on the grill.

CERVANTES      Said, all right.

76.      On May 22, 2013, at approximately 10:25 p.m., D. HERNANDEZ received an incoming call on Target Telephone #2 from (760) 660-5855 and spoke with N. HERNANDEZ.  The call is summarized, in part, as follows:

N. HERNANDEZ      Said she (N. HERNANDEZ) was going to bed and that D. HERNANDEZ could eat by himself.

D. HERNANDEZ      Said he was two minutes away.

N. HERNANDEZ      Said she thought D. HERNANDEZ was on his way.

D. HERNANDEZ      Said, "I'm on my way, babe. I gotta meet someone with a quarter. I did it on my way."

N. HERNANDEZ      Said she had to go to work tomorrow and did not want to stay up.

77.      On May 22, 2013, at approximately 10:53 p.m., D. HERNANDEZ received an incoming call on Target Telephone #2 from (760) 219-1147 and spoke with CERVANTES.  The call is summarized, in part, as follows:

CERVANTES      Said he was there.

D. HERNANDEZ      Told CERVANTES to come to the back.

78.      Based on intercepted calls over Target Telephones between D. HERNANDEZ, CERVANTES, and UM1691, I initiated surveillance at the Minerva Road residence on May 22, 2013, and, among other things, observed the following: at approximately 1:44 p.m., I observed two vehicles known to be associated with D. HERNANDEZ parked at the Minerva Road residence.  I additionally observed a 2002 tan Ford truck registered to Alfredo MARTINEZ (the "A. MARTINEZ truck") parked on the roadway just east of the Minerva Road residence driveway.  At approximately 1:53 p.m., I observed the CERVANTES sedan parked across the street from the Minerva Road residence.  At approximately 2:08 p.m., I observed an unidentified Hispanic male adult wearing an orange in color shirt walk from the driveway area of the Minerva

Road residence and enter the A. MARTINEZ truck and eventually drive southbound out of the area.

79.     At approximately 2:39 p.m., I observed CERVANTES walking from the Minerva Road residence and open the trunk of the CERVANTES sedan and place a large bag into the trunk and then close the trunk and enter the driver's side of the vehicle and drive away.  It is believed that D. HERNANDEZ additionally left the Minerva Road residence driving a known associated vehicle at about the same time as CERVANTES departed.  Myself and participating investigators maintained surveillance on CERVANTES as he made a stop at a nearby department store at approximately 2:42 p.m.  CERVANTES, who was shopping inside, eventually left the department store at approximately 3:09 p.m. and placed a shopping bag from the store inside the trunk of the CERVANTES sedan.  Surveillance followed CERVANTES as he drove southbound out of the area.  Surveillance followed CERVANTES to an industrial area in Cathedral City, California, where his vehicle was lost by surveillance as it traveled into the industrial area at approximately 3:18 p.m.  At approximately 4:25 p.m., surveillance officers located the CERVANTES sedan unoccupied and parked at a business identified as the New World Trading Company in Cathedral City, California (the "business").

80.     I recently reviewed a Cathedral City Police Department ("CCPD") police report, dated July 27, 2008, wherein the CCPD conducted a burglary investigation at the business and CERVANTES identified himself as the business manager.

81.     At approximately 5:23 p.m., CERVANTES met with an unidentified female driving a white California plated Mazda sedan in the west side parking lot of the business.  Surveillance officers observed CERVANTES retrieve a red backpack from the trunk of the CERVANTES sedan.  Surveillance officers noted that CERVANTES was looking around the surrounding area more than normal and determined that he may be conducting counter-surveillance consistent with narcotics traffickers involved in drug trafficking.  Both CERVANTES and the female then walked eastbound generally toward the business front door and out of view of surveillance.  However, surveillance officers were not in a position to view if CERVANTES actually entered the business.

82.     At approximately 5:42 p.m., surveillance observed the unidentified female return to her vehicle carrying a white food container and a purple/black in color backpack.  Surveillance observed CERVANTES toss a backpack, possibly darker in color, into the driver's compartment area of the CERVANTES sedan.  Surveillance officers noted that CERVANTES continued to look around the area more than normal during this time which participating investigators believed

was counter-surveillance.  Surveillance was continued on CERVANTES and the

unidentified female as they drove in tandem out of the area at approximately

5:49 pm.

83.     Surveillance was maintained on CERVANTES and after making

additional stops at other locations, CERVANTES eventually arrived at 2010 N.

San Clemente Road, Palm Springs, California (the "CERVANTES residence") at

approximately 6:34 p.m. and he parked in the driveway.  At approximately 6:38

p.m., surveillance officers observed CERVANTES exit the CERVANTES sedan

and open the trunk.  CERVANTES obtained a bag from the trunk which

resembled a "pink re-usable grocery bag" and eventually walked into the

CERVANTES residence through the main garage door and then the garage door

closed behind CERVANTES.  Surveillance lost sight of the unknown female in

Cathedral City, California, at approximately 6:26 p.m.

84.     Based on my training and experience, knowledge of this

investigation, review of intercepted communications over Target Telephones,

and summaries thereof, surveillance observations, discussions with other

officers, and other investigative techniques, I believe, among other things, the

following regarding the activities of May 22, 2013: UM1691 is a

methamphetamine source of supply to the HERNANDEZ DTO.  UM1691 offered

a three pound quantity of methamphetamine to D. HERNANDEZ.  Further, D.

HERNANDEZ agreed to accept the methamphetamine and that UM1691 wanted to sell three pounds of methamphetamine for $3,600 per pound.  D. HERNANDEZ directed UM1691 to come to the Minerva Road residence and later provided UM1691 with directions to the Minerva Road residence.  In addition, that D. HERNANDEZ told CERVANTES to also come by the Minerva Road residence to assist with processing the methamphetamine obtained from UM1691 by instructing CERVANTES to bring "big ziplos, ziplocs."  Based on my training and experience, I know that drug traffickers commonly package methamphetamine and other illegal narcotics within ziploc bags.  CERVANTES agreed to meet with D. HERNANDEZ and UM1691 at the Minerva Road residence to conduct the drug transaction and process the methamphetamine. Further, D. HERNANDEZ called his wife, N. HERNANDEZ, to determine where the "vacuum sealer" was located within the Minerva Road residence.  Based on my training and experience, I know that vacuum sealers are commonly used by drug traffickers to package methamphetamine.  Based on the totality of the facts outlined above, I believe that UM1691 provided D. HERNANDEZ with approximately three pounds of methamphetamine, that CERVANTES assisted with packaging the methamphetamine, and that CERVANTES transported a portion of that methamphetamine from the Minerva Road residence.  Because D. HERNANDEZ received a large shipment of methamphetamine at the Minerva

Road residence earlier that day, N. HERNANDEZ later spoke with D. HERNANDEZ to see if D. HERNANDEZ had secured the methamphetamine and/or related contraband because children were going to be at the residence. D. HERNANDEZ was later contacted by CERVANTES who was looking to acquire "a quarter" (undetermined amount) of methamphetamine and CERVANTES agreed to come to D. HERNANDEZ's residence. D. HERNANDEZ later spoke with N. HERNANDEZ regarding the above-referenced drug transaction involving CERVANTES. CERVANTES later came to D. HERNANDEZ's and N. HERNANDEZ's residence to obtain the methamphetamine.

### Execution of Search Warrants on May 24, 2013

85.     In the latter part of May, based on intercepted communications over Target Telephones, I believed that D. HERNANDEZ and Mendoza-ESCOBEDO were engaged in ongoing narcotics activity and possibly shared a residence at 67150 Hacienda Avenue, Apartment 803, Desert Hot Springs, California (the "Hacienda Avenue residence"). On May 24, 2013, the Honorable Sheri Pym, United States Magistrate Judge, signed search warrants for the Hacienda Avenue residence and, among other vehicles, a 2012 Mercedes known to be driven by D. HERNANDEZ (the "D. HERNANDEZ Mercedes"). On May 24, 2013, D. HERNANDEZ and his girlfriend, Mendoza-ESCOBEDO, were

arrested at the Hacienda Avenue residence in connection with the execution of the search warrants.

86.    During the execution of the search warrants, a stolen .40 caliber handgun with a loaded magazine clip containing .40 caliber round ammunition next to it were found on an upper shelf in a master bedroom closet, and a nearby safe found in a separate master bedroom closet contained, among other things, 80 gross grams of methamphetamine and a drug scale.  Further, residue crystal methamphetamine was seized from the console of the D. HERNANDEZ Mercedes.   Presumptive field tests of the substances identified above revealed positive results for methamphetamine.  No charges were filed with regard to the seized evidence and both D. HERNANDEZ and Mendoza-ESCOBEDO were released from custody after signing a magistrate waiver.

<u>Intercepted Communications between May 24 and May 26, 2013</u>

87.    On May 24, 2013, at approximately 2:10 p.m., D. HERNANDEZ made an outgoing call from Target Telephone #2 to (760) 660-5855 and spoke with N. HERNANDEZ.  The call is summarized, in part, as follows:

| | |
|---|---|
| N. HERNANDEZ | Asked if D. HERNANDEZ was okay. |
| D. HERNANDEZ | Said, "No, I need you to arrange pick up for Dylon. Have him go to Jake's house or something. |
| N. HERNANDEZ | Said, okay. |

D. HERNANDEZ    Said, "I'm detained right now so just ... arrange pick up for Dylon and that's it. Make sure he goes to Jake's house."

N. HERNANDEZ    Asked, "Is it in a bad way?"

D. HERNANDEZ    Said, yeah.

N. HERNANDEZ    Asked, (unintelligible).

D. HERNANDEZ    Said, "No, call my attorney."

N. HERNANDEZ    Asked, "Call your attorney?"

D. HERNANDEZ    Said, "Yeah, have him get a hold of me right away."

N. HERNANDEZ    Asked, "What's your attorney's number?"

D. HERNANDEZ    Said, "Josh has it."

N. HERNANDEZ    Asked where D. HERNANDEZ was.

D. HERNANDEZ    Said, "Desert Hot Springs."

N. HERNANDEZ    Asked, "Are you serious?"

D. HERNANDEZ    Said, "Just arrange pick up for Dylon, call the attorney, we're gonna find out what's going on 'cause right now I can't leave. I'm not under arrest but I'm detained so I need to know my rights and what we're gonna do."

N. HERNANDEZ    Said, all right.

88.    On May 24, 2013, at approximately 9:17 p.m., D. HERNANDEZ

received an incoming text message on Target Telephone #1 from (760) 905-1691

and exchanged text messages with an individual otherwise identified as

UM1691.  The text message exchange, in part, reads as follows (and may not include the entirety of the text messages during this exchange):

> UM1691          I got two left u want jump on them

89.     On May 25, 2013, at approximately 1:07 a.m., D. HERNANDEZ made an outgoing text message from Target Telephone #1 to (760) 905-1691 and exchanged text messages with an individual otherwise identified as UM1691. The text message exchange, in part, reads as follows (and may not include the entirety of the text messages during this exchange):

> D. HERNANDEZ    Tomorrow dawg passed out

90.     On May 25, 2013, at approximately 10:31 a.m., D. HERNANDEZ made an outgoing call from Target Telephone #2 to (760) 219-1147 and spoke with CERVANTES.  The call is summarized, in part, as follows:

| | |
|---|---|
| D. HERNANDEZ | Asked what was going on. |
| CERVANTES | Said, "We're running on empty here. We're having a garage sale. We're having a big yard sale over here." |
| D. HERNANDEZ | Asked what was cracking. |
| CERVANTES | Said, "I need to see you. At 100." |
| D. HERNANDEZ | Said, "Man, you give me 30 bucks every time I see you." |
| CERVANTES | Asked why he (CERVANTES) was on standby all day and said D. HERNANDEZ had him (CERVANTES) on standby all day. |

| | |
|---|---|
| D. HERNANDEZ | Said, "(Unintelligible) standby." |
| CERVANTES | Laughed. |
| D. HERNANDEZ | Said, "(Unintelligible) Nene (phonetic)." |
| CERVANTES | Said, Nene (phonetic) was the "last resort, standby guy." Said to let him (CERVANTES) know so he (CERVANTES) could get that from his "auntie" (phonetic) right here. Said they (CERVANTES and others) had crowds of people right here. |
| D. HERNANDEZ | Said CERVANTES should come by because he (D. HERNANDEZ) had his "guys coming by for lunch." |
| CERVANTES | Said, okay, and asked if he (CERVANTES) needed to be on standby right now. |
| D. HERNANDEZ | Said, yeah. |
| CERVANTES | Said, okay. |

91.     On May 25, 2013, at approximately 10:34 a.m., D. HERNANDEZ made an outgoing call from Target Telephone #1 to (760) 905-1691 and spoke with an individual otherwise identified as UM1691.  The call is summarized, in part, as follows:

| | |
|---|---|
| D. HERNANDEZ | Asked what was up. |
| UM1691 | Said, "Nothing, you guys want that or not?" |
| D. HERNANDEZ | Said, "Yeah, I'm right here." |
| UM1691 | Said, "All right, I'll go over there now." |

92.     On May 25, 2013, at approximately 10:43 a.m., D. HERNANDEZ

made an outgoing call from Target Telephone #2 to (760) 660-5855 and spoke

with N. HERNANDEZ.  The call is summarized, in part, as follows:

| | |
|---|---|
| N. HERNANDEZ | Asked if D. HERNANDEZ had stuff to do and if that was why he was up already. |
| D. HERNANDEZ | Said, yeah. |
| N. HERNANDEZ | Asked if D. HERNANDEZ wanted her to bring the "belongings" later with her. |
| D. HERNANDEZ | Said, yeah, and asked when. |
| N. HERNANDEZ | Said when she got out, around four o'clock if she did not take a lunch. |
| D. HERNANDEZ | Said, okay. |
| N. HERNANDEZ | Said she did not want to leave it in the car because of the heat, but said she just left it. |
| D. HERNANDEZ | Said he would call somebody else then. |
| N. HERNANDEZ | Said, all right, and told D. HERNANDEZ to let her know what she needed to do. |
| D. HERNANDEZ | Said, all right. |
| N. HERNANDEZ | Told D. HERNANDEZ to call her throughout the day. |
| D. HERNANDEZ | Said, okay. |

93.    On May 25, 2013, at approximately 10:51 a.m., D. HERNANDEZ

made an outgoing call from Target Telephone #2 to (760) 219-1147 and spoke

with CERVANTES.  The call is summarized, in part, as follows:

| | |
|---|---|
| D. HERNANDEZ | Said he needed a "steezy" (phonetic). |
| CERVANTES | Asked, what? |
| D. HERNANDEZ | Said a "scale" and asked if CERVANTES had one. |
| CERVANTES | Said he had a "chinida" (phonetic) but that it "only goes up to 100 g's (possibly grams)." |
| D. HERNANDEZ | Repeated that he needed one. |
| CERVANTES | Asked, "Any one?" |
| D. HERNANDEZ | Said, yes. |
| CERVANTES | Asked what D. HERNANDEZ wanted him to do. |
| D. HERNANDEZ | Told CERVANTES to "go get a pizza from the place and bring that here." |
| CERVANTES | Said, okay. |
| D. HERNANDEZ | Said he (D. HERNANDEZ) would (unintelligible) "these other pizzas in the box." |
| CERVANTES | Said, okay. |

94.    On May 25, 2013, at approximately 11:14 a.m., D. HERNANDEZ

made an outgoing call from Target Telephone #2 to (760) 660-5855 and spoke

with N. HERNANDEZ.  The call, in part, is summarized as follows:

- 48 -

| | |
|---|---|
| D. HERNANDEZ | Said, "I need that money." |
| N. HERNANDEZ | Said, "Okay, like, uh, right now, now or ...?" |
| D. HERNANDEZ | Said, yeah. |
| N. HERNANDEZ | Asked, "Can you wait until 12:30?" |
| D. HERNANDEZ | Said, "Um, what time is it? I guess. Not really, people are coming by." |
| N. HERNANDEZ | Said, "So ... well, give me until 12:00. Can I have until 12 or no?" |
| D. HERNANDEZ | Said, "I guess they are on their way." |
| N. HERNANDEZ | Asked, "oh, they are?" |
| D. HERNANDEZ | Said, "Yeah, I want them in and out of here." |
| N. HERNANDEZ | Said that was okay. |
| D. HERNANDEZ | Told N. HERNANDEZ to grab it all and asked what car N. HERNANDEZ would drive. |
| N. HERNANDEZ | Said, "the one you have been driving. |
| D. HERNANDEZ | Said, okay. |
| N. HERNANDEZ | Said, but it was up to him. |
| D. HERNANDEZ | Asked if he could get the white car (call disconnected). |

95.     On May 25, 2013, at approximately 11:22 a.m., D. HERNANDEZ

received an incoming call on Target Telephone #2 from (760) 660-5855 and spoke

with N. HERNANDEZ.  The call is summarized, in part, as follows:

| D. HERNANDEZ | Said, "Tell me where to go." |
| N. HERNANDEZ | Asked, "Now what?" |
| D. HERNANDEZ | Asked, "Where do I go?" |
| N. HERNANDEZ | Asked, "Well, want me to meet you somewhere? I'm at the post office right now." |
| D. HERNANDEZ | Asked, "Should I just come get the white car?" |
| N. HERNANDEZ | Said, "It's up to you. Want to switch cars?" |
| D. HERNANDEZ | Said, yeah. |
| N. HERNANDEZ | Said, "All right. I'll put it, put it in the trunk." |
| D. HERNANDEZ | Said, all right. |

96.     On May 25, 2013, at approximately 11:53 a.m., D. HERNANDEZ made an outgoing call from Target Telephone #2 to (760) 219-1147 and spoke with CERVANTES.  The call is summarized, in part, as follows:

| D. HERNANDEZ | Asked what was up. |
| CERVANTES | Said, "I'm right here." |
| D. HERNANDEZ | Asked, "Where?  My pad?" |
| CERVANTES | Said, yeah. |
| D. HERNANDEZ | Said, "All right, come in." |
| CERVANTES | Said, all right. |

97.     On May 25, 2013, at approximately 5:05 p.m., D. HERNANDEZ made an outgoing call from Target Telephone #2 to (760) 449-6801 and spoke with HINSON.  The call is summarized, in part, as follows:

D. HERNANDEZ     Said, "Hey, uh, get the skeevies, it's in the office and the cups in the … in the bathroom."

HINSON     Said, okay.

D. HERNANDEZ     Said, "Weigh out a qp."

HINSON     Asked, "The skeevie in the office? Where at?"

D. HERNANDEZ     Said, "Should be up top or right there. Should be where I set it."

HINSON     Said, "Okay, I don't see it."

D. HERNANDEZ     Said, "That little cup I left in the bathroom."

HINSON     Said, "Okay. All right, I got it. All right. No problem."

D. HERNANDEZ     Said, "The white Lexus broke down. I'll be there in a minute."

98.     On May 26, 2013, at approximately 7:33 p.m., D. HERNANDEZ made an outgoing call from Target Telephone #1 to (760) 409-9429 and spoke with UF9429[8].  The call is summarized, in part, as follows:

D. HERNANDEZ     Said, "I just kept saying, could I have my lawyer present when this warrant comes in so we can fucking film this shit? Like, no, you

---

[8] "UF9429" is an unidentified female using a telephone ending in "9429."

can't use the phone. I was, like, my son needed
to be picked up at two o'clock. So I called the
old lady, you know what I mean?"

UM9429          Said, yeah.

D. HERNANDEZ      Said, "But, yeah, it's all good. We're good."

99.      On May 24, 2013, while D. HERNANDEZ was under arrest in

Desert Hot Springs, California, law enforcement officers were actively surveilling

the Minerva Road residence.  Shortly thereafter, D. HERNANDEZ asked

investigators if he could place a call to his wife, N. HERNANDEZ, so that his

child, whom he identified as "Dylon" could be picked up from school.  At

approximately 2:22 p.m.,  surveillance officers observed a hispanic female who fit

the description of N. HERNANDEZ, a U.S. Postal Service employee, who arrived

at the Minerva Road residence in a U.S. Postal Service mail truck.  The female

believed to be N. HERNANDEZ exited the truck carrying what appeared to be a

shoulder strap bag, walked to the east side of the residence toward the back yard

where there is an entry door, and out of view.  Approximately six minutes later,

the subject believed to be N. HERNANDEZ returned to the postal truck

appeared to be carrying a large bag, entered it, and drove away.  Surveillance

officers subsequently observed another U.S. Postal Service mail truck delivering

mail at Minerva Road residence and in the area.

100.    Based on intercepted calls over Target Telephones between D. HERNANDEZ, N. HERNANDEZ, CERVANTES, and UM1691, I initiated intermittent surveillance at the Minerva Road residence on May 25, 2013, at approximately 11:09 a.m.  During the intermittent surveillance I observed, among other things, the following: at approximately 11:09 a.m., I observed two vehicles known to be associated with D. HERNANDEZ parked at the Minerva Road residence.

101.    At approximately 11:54 a.m., I observed a 2012 maroon/red Ford SUV registered to Hugo MARTINEZ (the "H. MARTINEZ SUV") parked just east of the Minerva Road residence driveway.  At approximately 11:57 a.m., I observed the CERVANTES sedan parked in front of the Minerva Road residence. At approximately 12:13 p.m., I observed the H. MARTINEZ SUV driving southbound from the direction of the Minerva Road residence and then northbound out of the immediate area. I observed two unidentified Hispanic males inside the H. MARTINEZ SUV and noted that the driver was wearing a baseball cap.  Further, I noted that the driver resembled both Alfredo and Hugo MARTINEZ, the owners of the A. MARTINEZ truck and the H. MARTINEZ SUV, respectively, and believed to be used by UM1691, the suspected methamphetamine drug source of supply to the HERNANDEZ DTO.  Based on my review of Alfredo and Hugo MARTINEZ's California Department of Motor

Vehicle ("DMV") driver's license photos, I believe them to be relatives as they strongly resemble one another, although Hugo MARTINEZ appears to be significantly heavier based on his DMV weight description.

102.    At approximately 12:19 p.m., I drove by the Minerva Road residence and noted that the CERVANTES sedan was no longer parked at the Minerva Road residence.  At approximately 12:41 p.m., I located the CERVANTES sedan parked at the business.  I noted the business appeared to be closed and the CERVANTES sedan was the only vehicle I observed parked at the business.  The CERVANTES sedan was parked on the west side of the business. At approximately 12:53 p.m., I observed the CERVANTES sedan travel southbound from the business and drive out of my immediate view.

103.    At approximately 2:02 p.m., I drove by the Minerva Road residence and observed a gray Honda parked east of the Minerva Road residence driveway.  I identified the license plate of the Honda as California 4ASN345. At approximately 5:35 p.m., I observed HINSON driving southbound on Minerva Road coming from the direction of the Minerva Road residence.

Based on my training and experience, knowledge of this investigation, review of intercepted communications over Target Telephones, and summaries thereof, surveillance observations, and other investigative techniques, I believe, among other things, the following regarding the activities of May 24 through May 26,

2013: D. HERNANDEZ, while detained, notified his wife, N. HERNANDEZ, during a ruse phone call that he was detained by police and requested in code that she remove suspected incriminating items from the Minerva Road residence, i.e., among other things, suspected illegal narcotics and drug proceeds. Further, that D. HERNANDEZ had been negotiating with a methamphetamine source of supply, identified as UM1691, who had agreed to supply D. HERNANDEZ with two pounds of methamphetamine. Realizing that N. HERNANDEZ had removed, among other things, drug proceeds from the Minerva Road residence on May 24, 2013, D. HERNANDEZ told N. HERNANDEZ that he needed those monies to purchase suspected methamphetamine from UM1691. In addition, that N. HERNANDEZ told D. HERNANDEZ how to retrieve the suspected incriminating items which she had secured in the trunk of her vehicle parked at the U.S. Postal Service parking lot.

104.    D. HERNANDEZ told CERVANTES to come by for lunch because the methamphetamine source of supply was coming to the Minerva Road residence to supply three pounds of methamphetamine. UM1691 and D. HERNANDEZ agreed to meet at the Minerva Road residence and, among other things, D. HERNANDEZ told CERVANTES to bring a scale to the Minerva Road residence in which CERVANTES agreed and later arrived at the Minerva Road residence to assist with the drug transaction. After completing the drug

transaction, CERVANTES, a known drug distributor of the HERNANDEZ DTO, drove to the business.  D. HERNANDEZ later called HINSON who was present at the Minerva Road residence and asked him in coded language to obtain a scale to weigh out a "qp."  Based on my training and experience, I know that narcotics traffickers commonly utilize digital scales when weighing out different quantities of illegal narcotics for sale.  Further, that "qp" can be an abbreviation for a "quarter pound" and in this case I believe that D. HERNANDEZ and HINSON are referencing weighing out a quarter pound of methamphetamine at the Minerva Road residence.  On May 26, 2013, D. HERNANDEZ told UF9429 that during his arrest on May 24, 2013, he was able to make a ruse phone call to his wife, N. HERNANDEZ, by saying that his son needed to be picked up at 2:00 p.m., thereby requesting in code that N. HERNANDEZ remove suspected incriminating evidence from the Minerva Road residence.

<u>Intercepted Communications between June 1 and June 3, 2013</u>

105.   On June 1, 2013, at approximately 4:18 p.m., M. HERNANDEZ made an outgoing call from Target Telephone #1 to (760) 902-7440 and spoke with an individual otherwise identified as UM7440[9].  The call is summarized, in part, as follows:

---

[9] "UM7440" is an unidentified male using a telephone ending in "7440."

| | |
|---|---|
| UM7440 | Said people started hitting him (UM7440) because it got slow. |
| M. HERNANDEZ | Said everybody else was moving it just fine. |
| UM7440 | Said he was moving it but that everybody's got so much of it, that he was trying to get something better. |
| M. HERNANDEZ | Said he would see what was up but that he did not know if it was the same one they (M. HERNANDEZ and others) had open right now.  Asked UM7440 if he was ready. |
| UM7440 | Said, yeah, and asked if M. HERNANDEZ wanted to head out there. |
| M. HERNANDEZ | Said, yeah, and to let him (M. HERNANDEZ) call his brother (D. HERNANDEZ) and see where he was located. |
| UM7440 | Said, all right. |
| M. HERNANDEZ | Said he (D. HERNANDEZ) would probably meet UM7440 in the park or something. |

106.    On June 1, 2013, at approximately 4:20 p.m., M. HERNANDEZ made an outgoing call from Target Telephone #1 to Target Telephone #2 and spoke with D. HERNANDEZ.  The call is summarized, in part, as follows:

| | |
|---|---|
| M. HERNANDEZ | Asked, "What's up?" |
| D. HERNANDEZ | Said, "Nothing. Right here." |
| M. HERNANDEZ | Asked, "You got two of them right there?" |
| D. HERNANDEZ | Said, "Probably." |

M. HERNANDEZ     Said Joey (UM7440) was ready.

D. HERNANDEZ     Said, yup.

M. HERNANDEZ     Said Joey (UM7440) would meet D. HERNANDEZ at the park.

107.     On June 1, 2013, at approximately 4:32 p.m., M. HERNANDEZ made an outgoing call from Target Telephone #1 to (760) 902-7440 and spoke with an individual otherwise identified as UM7440. The call is summarized, in part, as follows:

M. HERNANDEZ     Told UM7440 that he would meet him at the park in 45 minutes to an hour.

UM7440     Said, okay.

108.     On June 1, 2013, at approximately 6:04 p.m., M. HERNANDEZ made an outgoing call from Target Telephone #1 to Target Telephone #2 and spoke with D. HERNANDEZ. The call is summarized, in part, as follows:

M. HERNANDEZ     Asked, "Can you have two ready? I'm grabbing them right now."

D. HERNANDEZ     Said, yeah.

109.     On June 2, 2013, at approximately 12:46 p.m., M. HERNANDEZ made an outgoing call from Target Telephone #1 to Target Telephone #2 and spoke with D. HERNANDEZ. The call is summarized, in part, as follows:

M. HERNANDEZ     Asked what D. HERNANDEZ was doing.

D. HERNANDEZ     Said, "My house, walking."

M. HERNANDEZ     Asked, "Want me to come watch the battle station?"

D. HERNANDEZ     Said, "No, just right here. I'm not spending no money. I only have $40 extra."

M. HERNANDEZ     Said, "That's good. I got Joey's (UM7440) money with me."

D. HERNANDEZ     Said, "All right, good. I'll talk to you when you get here."

110.     On June 2, 2013, at approximately 9:39 p.m., M. HERNANDEZ received an incoming text message on Target Telephone from (760) 902-7440 and exchanged text messages with an individual otherwise identified as UM7440. The text message exchange, in part, reads as follows (and may not include the entirety of the text messages during this exchange):

UM7440        Hey bro I need to see you

111.     On June 2, 2013, at approximately 9:40:12 p.m., M. HERNANDEZ made an outgoing text message to (760) 902-7440 and exchanged text messages with an individual otherwise identified as UM7440. The text message exchange, in part, reads as follows (and may not include the entirety of the text messages during this exchange):

M. HERNANDEZ     Ok

112.     On June 2, 2013, at approximately 9:40:25 p.m., M. HERNANDEZ made an outgoing text message to (760) 902-7440 and exchanged text messages with an individual otherwise identified as UM7440. The text message exchange, in part, reads as follows (and may not include the entirety of the text messages during this exchange):

M. HERNANDEZ    Got some new product

113.     On June 2, 2013, at approximately 9:45:17 p.m., M. HERNANDEZ received an incoming text message on Target Telephone from (760) 902-7440 and exchanged text messages with an individual otherwise identified as UM7440. The text message exchange, in part, reads as follows (and may not include the entirety of the text messages during this exchange):

UM7440             Where you want me sosas

114.     On June 2, 2013, at approximately 9:45:41 p.m., M. HERNANDEZ made an outgoing text message to (760) 902-7440 and exchanged text messages with an individual otherwise identified as UM7440. The text message exchange, in part, reads as follows (and may not include the entirety of the text messages during this exchange):

M. HERNANDEZ    Valero

115.     On June 2, 2013, at approximately 10:01:12 p.m., M. HERNANDEZ received an incoming text message on Target Telephone from (760) 902-7440 and

exchanged text messages with an individual otherwise identified as UM7440.

The text message exchange, in part, reads as follows (and may not include the

entirety of the text messages during this exchange):

> UM7440            I m leaving my house now

116.    In June 2, 2013, at approximately 10:01:37 p.m., M. HERNANDEZ

made an outgoing text message to (760) 902-7440 and exchanged text messages

with an individual otherwise identified as UM7440.  The text message exchange,

in part, reads as follows (and may not include the entirety of the text messages

during this exchange):

> M. HERNANDEZ    Sossas them you fucking lag

117.    On June 2, 2013, at approximately 10:21 p.m., M. HERNANDEZ

received an incoming text message on Target Telephone from (760) 902-7440 and

exchanged text messages with an individual otherwise identified as UM7440.

The text message exchange, in part, reads as follows (and may not include the

entirety of the text messages during this exchange):

> UM7440            I m here

118.    On June 3, 2013, at approximately 12:05 p.m., D. HERNANDEZ

made an outgoing text message from Target Telephone #2 to (760) 625-6947 and

exchanged text messages with an individual otherwise identified as UM6947[10].

---

[10] "UM6947" is an unidentified male using a telephone ending in "6947."

The text message exchange, in part, reads as follows (and may not include the entirety of the text messages during this exchange):

> D. HERNANDEZ     What s cracking got some new let me know when your ready

119.    Based on my training and experience, knowledge of this investigation, review of intercepted communications over Target Telephones, and summaries thereof, surveillance observations, and other investigative techniques, I believe, among other things, the following regarding the activities of June 1 and June 2, 2013: M. HERNANDEZ and UM7440 discussed the quality of methamphetamine available and that there was a significant amount on the streets for sale. M. HERNANDEZ asked if UM7440 was ready to conduct a drug transaction and that M. HERNANDEZ needed to contact his brother D. HERNANDEZ to determine his availability. M. HERNANDEZ then spoke with D. HERNANDEZ regarding the impending drug sale with UM7440 and asked if D. HERNANDEZ had an undetermined quantity of methamphetamine in his possession that could be supplied to UM7440. M. HERNANDEZ and D. HERNANDEZ spoke about the logistics of supplying UM7440 with methamphetamine and M. HERNANDEZ agreed to obtain the methamphetamine from D. HERNANDEZ and then conduct an exchange later that day with UM7440. On June 2, 2013, M. HERNANDEZ told D. HERNANDEZ that he had the money from the methamphetamine sale involving

UM7440 and that he agreed to meet D. HERNANDEZ.  M. HERNANDEZ then communicated by text message with UM7440 wherein M. HERNANDEZ told UM7440 that he had a new shipment of methamphetamine and that the two agreed to meet later that day.  On June 3, 2013, D. HERNANDEZ communicated by text message with UM7440 that he recently received a new shipment of methamphetamine and wanted to determine if UM7440 was interested in purchasing the methamphetamine.

I.      *Training and experience regarding drug trafficking*

120.    Based on my training, experience, and participation in this investigation, as well as numerous other investigations involving the trafficking of narcotics, and my consultation with the other law enforcement personnel described herein, I know:

a.      That drug traffickers maintain on hand large amounts of U.S. currency in order to maintain and finance their ongoing drug business, or as proceeds from their illicit trafficking activities.  That drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, cashier check receipts and other papers relating to the transportation, ordering, sale and distribution of controlled substance, even though such documents may be in code.

b.      That drug traffickers commonly "front" drugs (provide controlled substances on consignment) to their clients, and that records are maintained by such dealers so they can account for their drugs and the monies owed for these illegal drugs.

c.      That the aforementioned books, records, receipts, notes, ledgers, etc., are commonly maintained where drug traffickers have ready access to them, including but not limited to homes, offices, automobiles, storage places and locations used by traffickers to store and sell narcotics, commonly called "stash houses."

d.      That drug traffickers commonly secrete contraband, proceeds of drug and firearms sales and/or records of transactions, sources, and customers in secure locations within residences, businesses, offices, garages, storage buildings, safes, vaults, safe deposit boxes, vehicles, and obscure locations such as storage containers buried underground, in order to conceal such items from law enforcement authorities.

e.      That persons involved in drug trafficking conceal caches of drugs, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug transactions, in their residences, garages, freestanding structures on their property (including sheds, storage buildings, etc.), safes, vaults, and/or vehicles.

f.      That persons illegally engaged in the business of selling drugs keep lists of and contact information for persons whom they buy firearms and drugs from and sell firearms and drugs to, including amounts paid to or owed by these persons (commonly referred to as "pay/owe sheets").  They also tend to keep for long periods of time receipts related to the purchase, sale, and repair of firearm parts and accessories.

g.      That drug traffickers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses, and/or telephone numbers for their associates in drug and firearm trafficking, even if said items may be in code, and that these types of records are sometimes maintained in computers or other electronic data storage devices, including telephones.

h.      That drug traffickers frequently take, or cause to be taken, photographs and/or videos of themselves, their associates, their property, and their product, and that these traffickers usually maintain these photographs and/or videos, in their residences, offices or other places under their control.

i.      That drug traffickers frequently use two-way radios, police scanners, video surveillance systems, and other counter-surveillance equipment to detect the presence of law enforcement attempting to conduct surveillance or

drug offense), and 846 (conspiracy to distribute or to possess with intent to

distribute controlled substances), as alleged in the criminal complaint.


SEAN ZELKA
Special Agent, DEA


Subscribed to and sworn before me
This 4th day of June, 2013.

HONORABLE DAVID T. BRISTOW
United States Magistrate Judge