NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
ABIGAIL W. EVANS (Cal. Bar No. 2249629)
Assistant United States Attorney
Riverside Branch Office
      3403 Tenth Street, Suite 200
      Riverside, California 92501
      Telephone: (951) 276-6086
      Facsimile: (951) 276-6237
      E-mail:   abigail.w.evans@usdoj.gov


Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>                 v.<br><br>DYLON ROBERT HERNANDEZ,<br><br>            Defendant. | No. CR 13-00122-VAP<br><br>UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A); DECLARATION OF JAMES C. LECLAIR; EXHIBITS |

     Plaintiff United States of America, by and through its counsel
of record, the United States Attorney for the Central District of
California and Assistant United States Attorney Abigail W. Evans,
hereby files this response to defendant's motion to reduce his
sentence pursuant to 18 U.S.C. § 3582(c)(1)(A).

     This response is based upon the attached memorandum of points

///

///

and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: August 7, 2020          Respectfully submitted,

NICOLA T. HANNA
United States Attorney

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division


              /s/
ABIGAIL W. EVANS
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                                PAGE

I.   INTRODUCTION..................................................1

II.  STATEMENT OF FACTS............................................2

     A.   Defendant's Crimes and Sentence.........................2

     B.   Incarceration and Projected Release Date................3

     C.   BOP Denial of Defendant's Request for Reduction in
          Sentence and Current Motion for Compassionate Release.....3

     D.   The Bureau of Prisons' and Congress's Response to
          COVID-19................................................3

          1.   COVID-19-specific safety precautions...............4

          2.   Specific precautions at defendant's facility........8

          3.   Administrative options available to inmates.........9

III. LEGAL FRAMEWORK FOR COMPASSIONATE RELEASE....................12

IV.  ARGUMENT.....................................................15

     A.   Defendant Has Failed to Demonstrate an "Extraordinary
          and Compelling" Reason to Allow Release in His Case......15

          1.   Defendant's serious, chronic health conditions--
               identified by the CDC as a high-risk factor for
               COVID-19--potentially satisfy USSG § 1B1.13; but
               that is not enough.................................16

          2.   Defendant's continuing danger makes him/her
               ineligible for compassionate release...............18

     B.   Even If Defendant Were Otherwise Eligible, the 18
          U.S.C. § 3553(a) Factors Do Not Support a Shorter
          Sentence................................................20

V.   CONCLUSION...................................................22

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                    PAGE(S)

**FEDERAL CASES**

Dillon v. United States,
        560 U.S. 817 (2010)...................................11, 12, 15

Reeb v. Thomas,
        636 F.3d 1224 (9th Cir. 2011)................................8

Shaw v. Bank of America Corp.,
        946 F.3d 533 (9th Cir. 2019)................................12

United States v. Alam,
        --- F.3d ---,
        2020 WL 2845694 (6th Cir. Jun. 2, 2020).......................3

United States v. Applewhite,
        No. 08-CR-60037,
        2020 WL 137452 (D. Or. Jan. 13, 2020)....................17, 19

United States v. Ayon-Nunez,
        No. 16-CR-130-DAD,
        2020 WL 704785 (E.D. Cal. Feb. 12, 2020).....................20

United States v. Butler,
        970 F.2d 1017 (2d Cir. 1992)................................13

United States v. Chambliss,
        948 F.3d 691 (5th Cir. 2020)................................13

United States v. Ebbers,
        --- F. Supp. 3d. ---,
        2020 WL 91399 (S.D.N.Y. Jan. 8, 2020)....................14, 15

United States v. Gotti,
        No. 02-CR-743,
        2020 WL 497987 (S.D.N.Y. 2020)..............................17

United States v. Grass,
        561 F. Supp. 2d 535 (E.D. Pa. 2008)..........................8

United States v. Greenhut,
        No. 18-CR-48-CAS,
        2020 WL 509385 (C.D. Cal. Jan. 31, 2020)....................13

United States v. Hamilton,
        715 F.3d 328 (11th Cir. 2013)...............................13

United States v. Hir,
        517 F.3d 1081 (9th Cir. 2008)...............................18

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                          PAGE

United States v. Mangarella,
    No. 06-CR-151,
    2020 WL 1291835 (W.D.N.C. Mar. 16, 2020).....................14

United States v. Nasirun,
    No. 99-CR-367,
    2020 WL 686030 (M.D. Fla. Feb. 11, 2020)....................15

United States v. Raia,
    954 F.3d 594 (3d Cir. 2020)......................1, 12, 14, 16

United States v. Rodriguez,
    CR 11-148-JVS,
    ECF No. 2021 (C.D. Cal. Mar. 21, 2020).........................1

United States v. Urso,
    No. 03-CR-1382,
    2019 WL 5423431 (E.D.N.Y. Oct. 23, 2019)....................17

United States v. Wages,
    271 F. App'x 726 (10th Cir. 2008)...........................14

United States v. Weidenhamer,
    No. CR16-01072-001-PHX-ROS,
    2019 WL 6050264 (D. Az. Nov. 8, 2019).......................12

United States v. Willingham,
    No. CR113-010,
    2019 WL 6733028 (S.D. Ga. Dec. 10, 2019)....................15

United States v. Willis,
    382 F. Supp. 3d 1185 (D.N.M. 2019)..........................14

**STATUTES**

18 U.S.C. § 3142(g).......................................22, 23

18 U.S.C. § 3582(c)..................................passim

18 U.S.C. § 3621(b).............................................8

18 U.S.C. § 3622............................................8, 10

18 U.S.C. § 3624...............................................8

28 U.S.C. § 994(t).......................................12, 23

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                    PAGE

**OTHER AUTHORITIES**

Attorney General, Memorandum for Director of Bureau of Prisons
    Re: Increasing Use of Home Confinement at Institutions Most
    Affected by COVID-19 (April 3, 2020),
    available at https://www.justice.gov/file/1266661/download.....8

California Executive Order N-33-20 (March 19, 2020),
    available at https://covid19.ca.gov/img/Executive-Order-N-
    33-20.pdf...................................................23

Coronavirus Aid, Relief, and Economic Security Act ("CARES
    Act"),
    Pub. L. No. 116-136,
    134 Stat. 281 (March 27, 2020).................................8

Department of Justice, Statement of BOP Director and Medical
    Director Before the Senate Committee on the Judiciary (Jun.
    2, 2020),
    available at
    https://www.bop.gov/resources/news/pdfs/06022020_written_st
    atement.pdf.............................................3, 4, 8

Federal Bureau of Prisons Health Services Division, Pandemic
    Influenza Plan---Module 1: Surveillance and Infection
    Control (Oct. 2012),
    available at
    https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf........4

Federal Bureau of Prisons Health Services Division, Pandemic
    Influenza Plan---Module 3: Health Care Delivery (Oct.
    2012),
    available at
    https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf........5

Federal Bureau of Prisons Program Statement No. 5050.50,
    Compassionate Release/Reduction in Sentence: Procedures for
    Implementation of 18 U.S.C. §§ 3582 and 4205(g) (January
    17, 2019),
    available at
    https://www.bop.gov/policy/progstat/5050_050_EN.pdf...10, 26, 27

Federal Bureau of Prisons Program Statement No. 5280.09, Inmate
    Furloughs (January 20, 2011),
    available at
    https://www.bop.gov/policy/progstat/5280_009.pdf..............10

Federal Bureau of Prisons Program Statement No. 6190.04,
    Infectious Disease Management (Jun. 3, 2014),
    available at
    https://www.bop.gov/policy/progstat/6190_004.pdf..............5

iv

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                 PAGE

Federal Bureau of Prisons,
      Correcting Myths About BOP and COVID-19,
      available at
      https://www.bop.gov/coronavirus/docs/correcting_myths_and_m
      isinformation_bop_covid19.pdf................................6, 9

Federal Bureau of Prisons, Action Plan Phase V (Mar. 31, 2020),
      available at
      https://www.bop.gov/resources/news/20200331_covid19_action_
      plan_5.jsp.................................................5, 6

Federal Bureau of Prisons, COVID-19 Action Plan: Agency-Wide
      Modified Operations (Mar. 13, 2020),
      available at
      https://www.bop.gov/resources/news/20200313_covid-19.jsp.......5

Federal Bureau of Prisons, Home Confinement (Apr. 5, 2020),
      available at
      https://www.bop.gov/resources/news/20200405_covid19_home_co
      nfinement.jsp................................................9

Federal Bureau of Prisons, Statement from BOP Director (Mar. 26,
      2020),
      available at
      https://www.bop.gov/resources/news/20200326_statement_from_
      director.jsp..............................................4, 7

Federal Bureau of Prisons, Update on COVID-19 (Mar. 24, 2020),
      available at
      https://www.bop.gov/resources/news/pdfs/20200324_bop_press_
      release_covid19_update.pdf...................................5

Federal Bureau of Prisons, Updates to BOP COVID-19 Action Plan:
      Inmate Movement (Mar. 19, 2020),
      available at
      https://www.bop.gov/resources/news/20200319_covid19_update.
      jsp   3

**REGULATIONS**

USSG § 1B1.13...............................................passim

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

**I.    INTRODUCTION**

3        On June 4, 2013, after a two-year investigation conducted by the

4   Drug Enforcement Administration ("DEA"), the government filed a

5   complaint in this case charging defendant Dylon Robert Hernandez

6   ("defendant") with being a leader of a drug trafficking organization

7   distributing multi-pound quantities of methamphetamine in the

8   Coachella Valley area of Riverside County, California.  (Dkt. 1; Exh.

9   A.)  He subsequently pled and was sentenced to 120 years in prison on

10  November 17. 2017.  Having served less than half of his sentence,

11  defendant now moves for permanent release based on COVID-19.

12        "The COVID-19 pandemic is gripping the nation.  But that is a

13  fate that affects all citizens, . . . not simply those incarcerated."

14  Order, United States v. Rodriguez, CR 11-148-JVS, ECF No. 2021 (C.D.

15  Cal. Mar. 21, 2020).  Thus, the "mere existence of COVID-19 in

16  society and the possibility that it may spread to a particular prison

17  alone cannot independently justify compassionate release."  United

18  States v. Raia, 954 F.3d 594, 597 (3d Cir. 2020).  Despite his

19  continuing danger to the community, and having served only

20  approximately 57 months of his 120-month sentence, defendant seeks

21  immediate--and permanent--release from custody.  (Dkt. 107,

22  "Motion.")[1]  Neither statutory authority nor public health demands

23  such a windfall.  Moreover, defendant's logic would endorse the mass,

24  permanent release of convicted criminals into a pandemic, without

25  regard for the factors justifying their sentences or for the Bureau

26

27        [1] "Dkt." refers to the clerk's record in United States v. Dylon
    Robert Hernandez, 13-00122-VAP, and is followed by a docket entry
28  number.  "Exh." refers to the exhibits attached hereto. "Mot. Exh."
    refers to exhibits attached to defendant's Motion.

1  of Prisons' (BOP's) aggressive efforts to address COVID-19.

2  Defendant has not met his burden of establishing that he is eligible

3  or entitled to a sentence reduction, and the Motion should be denied.

4  **II.   STATEMENT OF FACTS**

5        **A.   Defendant's Crimes and Sentence**

6            During the DEA investigation, defendant was intercepted on

7  multiple recorded telephone conversations arranging drug deals, and

8  was observed by law enforcement while he conducted the transactions.

9  During the execution of a search warrant at his residence, law

10  enforcement found a loaded, stolen handgun, methamphetamine and drug

11  trafficking paraphernalia in defendant's bedroom and in his car.

12  Despite being detained and released after the search, defendant

13  continued to conduct his drug trafficking business.  (Exh. A, ¶¶ 20-

14  119; Dkt. 57, PSR ¶¶ 9-20.)  Defendant was arrested on the complaint

15  on and made his initial appearance on June 6, 2013, where he was

16  detained based on the court's findings that he was a flight risk and

17  danger to the community. (Dkt. 3, 6.)  Several months later, he was

18  released on bond. (Dkt. 20.)

19        On March 10, 2014, defendant pled guilty pursuant to a plea

20  agreement, to a single-count information charging him with

21  distribution of 82 grams of methamphetamine, in violation of 21

22  U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) and aiding and abetting in

23  violation of 18 U.S.C. § 2(b).  (Dkt. 50.)  Defendant was found to be

24  in Criminal History Category VI with 17 criminal history points.

25  (Dkt. 57, PSR ¶ 50.)  His criminal history includes convictions for

26  evasion of law enforcement, including recklessly endangering others

27  during a high-speed chase, as well as grand theft of a firearm,

28  several burglaries, possession of methamphetamine, and multiple

parole violations and returns to prison. (Dkt. 57, PSR ¶ 41-48.)  On

November 17, 2015, this Court sentenced defendant to 120 months'

imprisonment. (Dkt. 84.)

### B. Incarceration and Projected Release Date

Defendant is currently serving his sentence at United States

Penitentiary in Marion, Illinois ("USP-Marion").  His projected

release date is March 26, 2024. (Exh. B.)  As of the date of his

motion, defendant had served 56 months, less than 47% of his 120-

month sentence.  Defendant tested negative for COVID-19 on July 16,

2020, July 22, 2020, and July 27, 2020.  (Exh. C.)

### C. BOP Denial of Defendant's Request for Reduction in Sentence and Current Motion for Compassionate Release

Defendant submitted a Request for Reduction in Sentence to the

Warden at USP-Marion on May 26, 2020.  (Mot. Exh. 8.)  The Warden

denied defendant's Request on July 31, 2020.  (Exh. D.)

Defendant claims he is entitled to release based on conditions

of obesity, diabetes, and hypertension, magnified by the risk of

COVID-19.[2]  At the foundation of defendant's compassionate-release

motion, however, are allegations about the <u>potential</u> for an

uncontained COVID-19 outbreak at USP-Marion.

### D. The Bureau of Prisons' and Congress's Response to COVID-19

The political branches have not been "insensitive in responding

to the COVID-19 pandemic."  <u>United States v. Alam</u>, --- F.3d ---, 2020

WL 2845694, at *5 (6th Cir. Jun. 2, 2020).  To the contrary, BOP has

---

[2] Defendant's back pain, which is not a heightened risk factor
for COVID, and his bout of hepatitis C, which was resolved in 2018,
are not relevant to this motion.  (Mot. at 2.)  Similarly, defendant
provides no support for his contentions that he "may have [] long-
term damage to his liver and his immune system" or "compromised liver
function and inflammation." (Mot. at 1, 6.)

3

1   taken aggressive steps to protect inmates' health and to resist the
2   spread of COVID-19.   DOJ, Statement of BOP Director and Medical
3   Director Before the Senate Committee on the Judiciary (Jun. 2, 2020)
4   ("BOP Senate Testimony"), <u>available at</u>
5   <u>https://www.bop.gov/resources/news/pdfs/06022020_written_statement.pd</u>
6   <u>f</u>.

7              1.   <u>COVID-19-specific safety precautions</u>

8        "[M]aintaining safety and security of BOP institutions is [the
9   BOP's] highest priority."   BOP, Updates to BOP COVID-19 Action Plan:
10  Inmate Movement (Mar. 19, 2020), <u>available at</u>
11  <u>https://www.bop.gov/resources/news/20200319_covid19_update.jsp</u>.
12  Thus, the BOP Director recently emphasized that the "response [to
13  COVID-19] is the Bureau's top priority."   BOP, Statement from BOP
14  Director (Mar. 26, 2020) (Statement from BOP Director), <u>available at</u>
15  <u>https://www.bop.gov/resources/news/20200326_statement_from_director.j</u>
16  <u>sp</u>.

17       The BOP has never underestimated the threat of infectious
18  disease.   To the contrary, the BOP has a "well-established history of
19  managing and responding to communicable disease outbreaks."   BOP
20  Senate Testimony at 2.   Specifically, the BOP has had a Pandemic
21  Influenza Plan in place since 2012.   BOP, Pandemic Influenza Plan---
22  Module 1: Surveillance and Infection Control (Oct. 2012), <u>available</u>
23  <u>at</u> <u>https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf</u>.   That
24  protocol is astoundingly detailed, establishing a six-phase framework
25  requiring BOP facilities to begin preparations when there is first a
26  "suspected human outbreak <u>overseas</u>."   <u>Id.</u> at i (emphasis added).

27       At extremely early stages, the Pandemic Influenza Protocol
28  requires BOP facilities to ensure inmates' access to soap, to train

                                   4

them on hand-hygiene practices, and to ensure adequate infection-control supplies.  Id. at 9.  For every phase thereafter (from preliminary preparation, to a response to active pandemic, to recovery), it includes detailed procedures required of every BOP facility.  Id. at 9-11.  These include policies for creating "social distance" and for requiring "frequent environmental cleaning of 'high-touch' surfaces."  Id. at 2-3, 6.  Facilities must follow protocols on how to identify sick inmates, track their interactions, and quarantine the exposed.  Id. at 4-5.  They must also establish contingency plans to ensure that medical care is not disrupted, even when faced with an influx of sick inmates.  BOP, Pandemic Influenza Plan---Module 3: Health Care Delivery (October 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_3.pdf.  (The BOP has similar protocols for a wide range of diseases.  See BOP Program Statement No. 6190.04, Infectious Disease Management (June 3, 2014), available at https://www.bop.gov/policy/progstat/6190_004.pdf.)

The BOP implemented its Pandemic Influenza Protocol in January 2020, modified as a COVID-19 Action Plan.  BOP, Action Plan Phase V (Mar. 31, 2020) ("Action Plan Phase V"), available at https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp In Phase 1 of that plan, the BOP began developing policies in consultation with the Centers for Disease Control.  See BOP, COVID-19 Action Plan: Agency-Wide Modified Operations (March 13, 2020) ("BOP Action Plan"), available at https://www.bop.gov/resources/news/20200313_covid-19.jsp.

Since then, the BOP has serially escalated its response.  BOP, Bureau of Prisons Update on COVID-19 (Mar. 24, 2020), available at https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_co

1    vid19_update.pdf.   On March 13, the BOP moved to Phase 2 of its

2    Action Plan, taking steps to "mitigate the spread of COVID-19" in

3    prisons, for the protection of both inmates and staff.   See BOP

4    Action Plan, supra.   The BOP suspended social and legal visits,

5    curtailed inmate movement, established enhanced screening procedures

6    for inmates and staff, and curtailed staff travel.   Id.   Consistent

7    with the Pandemic Flu Protocol, facilities adopted "modified

8    operations"---including staggered meal and recreation times---to

9    promote social distancing.   Id.   Just five days later, the BOP

10   escalated to Phase 3--taking additional steps, including ensuring

11   that "all cleaning, sanitation, and medical supplies" had been

12   inventoried and were adequately stocked.   Id.

13        Phases 4 and 5 followed in late March; Phase 6 followed in mid-

14   April; the BOP is now in Phase 7.   Beginning March 26, the BOP

15   required all newly admitted inmates to be quarantined or isolated for

16   a minimum of 14 days "or until cleared by medical staff." See Action

17   Plan Phase V, supra.   On April 1, the BOP instituted a nationwide

18   lockdown.   Id.   For at least a two-week period, "inmates in every

19   institution will be secured in their assigned cells/quarters to

20   decrease the spread of the virus."   Id.   The BOP has also

21   "significantly decreas[ed] incoming movement.   Id.   Modified

22   operations will continue, for all institutions, until at least May

23   18, 2020.   Federal Bureau of Prisons, Bureau of Prisons COVID-19

24   Action Plan: Phase Six (April 14, 2020), available at

25   https://www.bop.gov/resources/news/pdfs/20200414_press_release_action

26   _plan_6.pdf.

27        Meanwhile, the BOP has continued working with the CDC,

28   confirming that its approach aligns with current CDC guidance for

COVID management in correctional facilities.  Federal Bureau of
Prisons, Correcting Myths About BOP and COVID-19, at 1, <u>available at</u>
<u>https://www.bop.gov/coronavirus/docs/correcting_myths_and_misinformat</u>
<u>ion_bop_covid19.pdf</u> ("Correcting Myths").  Currently, BOP medical
staff are "conducting rounds and checking inmate temperatures at
least once a day"--twice a day where inmates are quarantined or in
isolation.  <u>Id.</u>  All BOP staff and inmates have been issued cloth
masks to wear on a daily basis--with staff required to wear masks,
gloves, and potentially gowns when dealing with isolated and
quarantined inmates.  <u>Id.</u> at 1, 3.  "Cleaning supplies have been
provided to inmates," and the BOP has provided training on CDC best
practices regarding disease transmission and prevention (including
sanitation).  <u>Id.</u> at 2.  Common areas are sanitized multiple times a
day.  <u>Id.</u> at 3.

        The gravity and severity of these measures reflect BOP's
commitment to fighting COVID-19 and protecting inmates.  However, BOP
of course has not been immune from the pandemic.  Currently, at
defendant's facility, 79 inmates have tested positive for COVID-19.
An additional 61 inmates have recovered.  Across the country, 1,442
BOP inmates in BOP custody---out of a total of about 142,000---have
tested positive for COVID-19; an additional 9,375 have recovered.
BOP, COVID-19 Coronavirus (updated daily at 12:00 p.m. Pacific),
<u>available at</u> <u>https://www.bop.gov/coronavirus/index.jsp</u> (last visited
August 7, 2020.)  COVID-19-positive inmates are (or were) isolated
from fellow inmates and receiving medical treatment.  Correcting
Myths, <u>supra</u>, at 2.  "Inmates whose conditions cannot be managed
within the institution are sent to the local hospital[.]"  <u>Id.</u>

Of course, "as warned by the Surgeon General of the United States, [the BOP] expect[s] to have more cases as the virus continues to spread in the general community," but they "will continue to diligently support all persons system-wide while doing everything [they] can to do [their] part in mitigating the spread of the virus." Statement from BOP Director, <u>supra</u>.

### 2.   Specific precautions at defendant's facility

As set forth in the attached declaration of James C. Leclair, USP Marion conforms to all of the BOP's protocols for the management of COVID-19.  These protocols include the monitoring of all inmates for COVID-19 symptoms, placement of inmates in isolation or quarantine when warranted and the ongoing institution of safety and hygiene requirements for all inmates and staff. For example, all inmates at USP Marion have been provided with cloth masks that they are required to wear when they are out of their cells.  The institution has also instituted a regular sanitation schedule for the cleaning of all areas and the frequent and repeated cleaning of the facility, including a continuous cleaning/disinfection schedule for all high traffic/touch areas such as doors, door handles, and lights, as well as telephone and computer use areas.

As part of these protocols, the institution has implemented a testing regime in conformance with the BOP's national guidance. Housing unit C is composed of four ranges of single man, open grill cells arranged on two levels.  On July 16, 2020, one of the inmates assigned to this housing unit tested positive for COVID-19.  This inmate was immediately removed from the housing unit and placed in isolation. Meanwhile, the rest of the housing unit was immediately placed under quarantine.  On July 16, 2020, the defendant and all of the other

inmates housed in Housing Unit C were as tested for COVID-19 because of their possible exposure to the inmate with a confirmed positive case of COVID-19.  Defendant was tested for COVID-19 on July 17, 2020, July 22, 2020, July 27, 2020 and August 3, 2020.  All of his tests results were negative.

With the regular re-testing of the entire housing unit, several more inmates were identified as positive, most recently on July 27, 2020. Each time an inmate was identified as positive, they were removed from the housing unit and placed in isolation.   The inmates that remained in Housing Unit C then had their  quarantine period reset to "Day 1," to ensure that the entire housing unit passed through a full 14 days of quarantine without having developed symptoms or tested positive for COVID-19.  The current quarantine in Housing Unit C is presently set to terminate on August 10, 2020, provided that no more inmates in the unit test positive before then.

### 3.   Administrative options available to inmates

Inmates with COVID-19-based concerns also have a variety of administrative options they can pursue through the BOP itself. Although not reviewable by courts, these options include far more flexible remedies than permanent reduction of a sentence under 18 U.S.C. § 3582(c)(2)--remedies better suited to a temporary (if dire) pandemic.  See generally 18 U.S.C. § 3621(b) (precluding judicial review of BOP placement decisions); Reeb v. Thomas, 636 F.3d 1224, 1226-28 (9th Cir. 2011) (courts lack jurisdiction to review BOP's placement decisions under 18 U.S.C. §§ 3622-24); United States v. Grass, 561 F. Supp. 2d 535, 537 (E.D. Pa. 2008) (same).

First, the BOP can transfer vulnerable inmates to home confinement--and it is doing so aggressively, devoting all available

resources to identifying and processing eligible inmates quickly.
BOP Senate Testimony at 6-7.  The CARES Act, which Congress passed to
address the COVID-19 crisis, vastly increased BOP's statutory home-
confinement authority.  See Coronavirus Aid, Relief, and Economic
Security Act ("CARES Act"), Pub. L. No. 116-136, § 12003(b)(2), 134
Stat. 281, 516 (March 27, 2020) (suspending eligibility limitations
imposed by 18 U.S.C. § 3624(c)(2)).

In his April 3, 2020, memorandum authorizing the BOP to exercise
its expanded CARES Act authority, the Attorney General emphasized
that "time is of the essence," and he directed the BOP to focus on
facilities that have significant numbers of COVID-19 cases within
their inmate population.  Attorney General, Memorandum for Director
of Bureau of Prisons Re: Increasing Use of Home Confinement at
Institutions Most Affected by COVID-19 (April 3, 2020), available at
https://www.justice.gov/file/1266661/download.  Thus, the BOP is
"urgently reviewing all inmates" to determine their eligibility,
increasing resources to "review and make appropriate decisions as
soon as possible."  Federal Bureau of Prisons, Home Confinement (Apr.
5, 2020) ("BOP, Home Confinement"), available at
https://www.bop.gov/resources/news/20200405_covid19_home_confinement.
jsp.  Inmates "do not need to apply to be considered[.]"  Id. "The
Department has also increased resources to review and make
appropriate determinations as soon as possible."  Correcting Myths,
supra, at 3.

BOP's release of inmates to home confinement must take into
account, among other factors, whether a home is available where the
inmate could be confined, whether the inmate could receive
appropriate food and medical care there, the comparative risk to the

1    inmate in home confinement in the identified location versus

2    remaining in prison, the inmate's risk to the public through

3    recidivism, and the availability of supervision during home

4    confinement or risk to the public if supervision is lacking.  BOP

5    also seeks to ensure that the inmates it releases to home confinement

6    are not already ill and therefore spreading infection to others--

7    including to the individuals necessary to make home confinement

8    successful.  To help accomplish that goal, BOP is requiring a 14-day

9    period of quarantine before any inmate is released to home

10   confinement.

11        Since the release of the Attorney General's March 26, 2020,

12   memorandum instructing BOP to prioritize home confinement as an

13   appropriate response to the COVID-19 pandemic, the BOP has placed an

14   additional 7,444 inmates on home confinement.  BOP, COVID-19

15   Coronavirus (updated regularly), available at

16   https://www.bop.gov/coronavirus/index.jsp (last visited August 7,

17   2020).  Indeed, the Attorney General's memorandum instructed the BOP

18   to exercise pre-CARES-Act authority as broadly as possible to protect

19   "the people in [their] custody," taking into consideration prisoners'

20   age, vulnerability to COVID-19, and other factors.  See Attorney

21   General, Memorandum for Director of Bureau of Prisons Re:

22   Prioritization of Home Confinement as Appropriate in Response to

23   COVID-19 Pandemic (March 26, 2020), available at

24   https://www.justice.gov/file/1262731/download.  As noted above, the

25   BOP now has additional authority under the CARES Act to place

26   prisoners on home confinement.

27        Second, the BOP has authority to grant an inmate a temporary

28   furlough from custody, under 18 U.S.C. § 3622, for "obtaining medical

11

treatment not otherwise available," "visiting a relative who is dying," or "any other significant activity consistent with the public interest."  See BOP Program Statement No. 5280.09, Inmate Furloughs (January 20, 2011), available at https://www.bop.gov/policy/progstat/5280_009.pdf.  Certain COVID-19-related conditions would potentially satisfy the BOP's requirements for such a furlough.  Id.

Finally, under 18 U.S.C. § 3582(c)(1)(A), the BOP has initial authority to assess inmates' applications for compassionate release. Only the original sentencing judge may ultimately authorize a reduction in an inmate's sentence.  However, the BOP, which has decades of experience diligently assessing such applications, has detailed regulations setting forth relevant procedures and considerations.  See BOP Program Statement No. 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g) (January 17, 2019), available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf.  As noted above, the BOP denied defendant's request based on its assessment of these factors. (Exh. D.)

## III. LEGAL FRAMEWORK FOR COMPASSIONATE RELEASE

A compassionate-release motion is a request for a permanent reduction in a defendant's federal sentence.  A district court generally "may not modify a term of imprisonment once it has been imposed."  18 U.S.C. § 3582(c); see Dillon v. United States, 560 U.S. 817, 824–25 (2010).  Compassionate release is one of the few exceptions to this rule, allowing a court to "reduce the term of imprisonment (and . . . impose a term of probation or supervised release with or without conditions that does not exceed the unserved

12

portion of the original term of imprisonment)[.]"  18 U.S.C.

§ 3582(c)(1).  Because this relief is both drastic and permanent, it

is subject to strict statutory conditions.

First, a district court can evaluate a defendant's request for

compassionate release only "after the defendant has fully exhausted

all administrative rights" before the BOP.  Specifically:

> after the defendant has fully exhausted all administrative
> rights to appeal a failure of the Bureau of Prisons to
> bring a motion on the defendant's behalf or the lapse of 30
> days from the receipt of such a request by the warden of
> the defendant's facility, whichever is earlier[.]

18 U.S.C. § 3582(c)(1)(A).  This requirement is mandatory.  Raia, 954

F.3d at 597; Alam, --- F.3d at ---, 2020 WL 2845694, at *3.  Indeed,

in the government's view, it is jurisdictional.  See generally Shaw

v. Bank of America Corp., 946 F.3d 533, 541 (9th Cir. 2019)

("statutorily-provided exhaustion requirements deprive the court of

jurisdiction"); United States v. Weidenhamer, No. CR 16-1072-1-PHX-

ROS, 2019 WL 6050264, at *2 (D. Az. Nov. 8, 2019) (citing cases).

Second, in evaluating compassionate-release requests, courts

must follow both the statute and relevant, binding policy statements.

See id.; 28 U.S.C. § 994(t); USSG § 1B1.13.  Pursuant to those

authorities, to be eligible for compassionate release, a defendant

must demonstrate: (1) the existence of extraordinary and compelling

reasons, within the meaning of the statute; and (2) that he is not a

danger to the community.  18 U.S.C. § 3582(c)(1)(A).  Specifically,

the statute requires that any reduction be "consistent with

applicable policy statements issued by the Sentencing Commission"--in

this case, USSG § 1B1.13.  Id.  As the Supreme Court recognized in

Dillon, 560 U.S. at 827, because § 3582(c) permits a sentencing

reduction only where it is "consistent with applicable policy

statements issued by the Sentencing Commission," such policy

statements are binding on a court determining eligibility.

USSG § 1B1.13 explicitly defines the "extraordinary and

compelling reasons" that make a defendant eligible for compassionate

release.  See 28 U.S.C. § 994(t).  They include, as relevant here,

(1) a "terminal illness"; (2) a serious medical condition "that

substantially diminishes the ability of the defendant to provide

self-care within the environment of a correctional facility and from

which he or she is not expected to recover"; or (3) a defendant who

is at least 65 years old, is experiencing a serious deterioration in

physical or mental health because of the aging process, and "has

served at least 10 years or 75 percent of his or her term of

imprisonment, whichever is less."  USSG § 1B1.13 (other grounds

omitted).  USSG § 1B1.13, comment. (n.1(A)-(B)).  "[R]ehabilitation

of the defendant is not, by itself, an extraordinary and compelling

reason for purposes of this policy statement."  Id., comment. (n.3).

Other bases for compassionate release include defendant's age, family

circumstances, and other factors.  See USSG § 1B1.13.

Defendant bears the burden to prove both that he has "exhausted

all administrative rights" and that "extraordinary and compelling

reasons" exist to support his motion.  18 U.S.C. § 3582(c)(1)(A); see

United States v. Greenhut, No. 18-CR-48-CAS,

2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020) (defendant bears the

burden of establishing entitlement to sentencing reduction); United

States v. Hamilton, 715 F.3d 328, 337 (11th Cir. 2013) ("defendant,

as the § 3582(c)(2) movant, bears the burden of establishing"

eligibility); see generally  United States v. Butler, 970 F.2d 1017,

1026 (2d Cir. 1992) ("A party with an affirmative goal and

14

1  presumptive access to proof on a given issue normally has the burden
2  of proof as to that issue.").

3      <u>Third</u>, even for defendants who are statutorily eligible,
4  compassionate release is a "rare" and "extraordinary" remedy, within
5  district courts' discretion to deny.  <u>United States v. Chambliss</u>, 948
6  F.3d 691, 693-94 (5th Cir. 2020); <u>United States v. Mangarella</u>, No.
7  06-CR-151, 2020 WL 1291835, at *2-*3 (W.D.N.C. Mar. 16, 2020).
8  Specifically, "it is a rare case in which health conditions present
9  an 'exceptional reason'" to allow for release where detention would
10 otherwise be warranted.  <u>See, e.g.</u>, <u>United States v. Wages</u>, 271 F.
11 App'x 726, 728 (10th Cir. 2008) (collecting pre-trial detention
12 cases); <u>accord</u> <u>United States v. Willis</u>, 382 F. Supp. 3d 1185, 1188
13 (D.N.M. 2019) ("most courts treat compassionate release 'due to
14 medical conditions [a]s ... a rare event.").  This reluctance to
15 expansively apply compassionate release is grounded in a concern that
16 any less narrow application would yield significant sentencing
17 disparities.  <u>United States v. Ebbers</u>, --- F. Supp. 3d. ---, 2020 WL
18 91399, at *6 (S.D.N.Y. Jan. 8, 2020).

19 **IV.  ARGUMENT**

20     Defendant's motion must be denied.  Despite his medical
21 conditions, he is not eligible for compassionate release because he
22 remains a danger to the community.  Moreover, under the 18 U.S.C. §
23 3553(a) factors, the COVID-19 crisis does not justify a permanent,
24 irrevocable reduction in his sentence.

25     **A.   Defendant Has Failed to Demonstrate an "Extraordinary and
           Compelling" Reason to Allow Release in His Case**
26
27     Defendant has failed to establish his eligibility for
28 compassionate release.  As the Third Circuit recently held, "[w]e do

15

not mean to minimize the risks that COVID-19 poses in the federal prison system," but the "mere existence of COVID-19 in society and the possibility that it may spread to a particular prison cannot independently justify compassionate release"--particularly given "BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." Raia, 954 F.3d at 597.  Here, notwithstanding defendant's health condition, his continuing danger to the community makes him ineligible for compassionate release.

> 1.  Defendant's serious, chronic health conditions--identified by the CDC as a high-risk factor for COVID-19--potentially satisfy USSG § 1B1.13; but that is not enough

"The First Step Act did not revise the substantive criteria for compassionate release"--criteria that is set forth in the Sentencing Commission's binding "policy statement," USSG 1B1.13.  Ebbers, 2020 WL 91399, at *4—*5; 18 U.S.C. § 3582(c)(1)(A).  As courts have recognized, Congress intended that the "Sentencing Commission, not the judiciary, determine what constitutes an appropriate use of the 'compassionate release' provision."  United States v. Willingham, No. CR113-010, 2019 WL 6733028, at *2 (S.D. Ga. Dec. 10, 2019) (noting split in authority).  The Sentencing Commission's policy statement--USSG § 1B.1.13--is thus binding on this Court.  See Dillon, 560 U.S. at 827; see, e.g., United States v. Nasirun, No. 8:99-CR-367, 2020 WL 686030, at *2 (M.D. Fla. Feb. 11, 2020).

Thus, as noted above, a defendant seeking compassionate release must establish that his condition falls within one of the categories listed in the policy statement.  Those categories include, as relevant here, (i) any terminal illness, and (ii) any "serious physical or medical condition . . . that substantially diminishes the

16

1    ability of the defendant to provide self-care within the environment

2    of a correctional facility and from which he or she is not expected

3    to recover."   USSG § 1B1.13, comment. (n.1(A)).

4         The general threat of COVID-19--which poses a threat to every

5    non-immune person in the country--does not satisfy these conditions.

6    "[T]he mere existence of COVID-19 in society and the possibility that

7    it may spread to a particular prison alone cannot independently

8    justify compassionate release."   Raia, 954 F.3d at 597; see also

9    Eberhart, 2020 WL 1450745 at *2 ("a reduction of sentence due solely

10   to concerns about the spread of COVID-19 is not consistent with the

11   applicable policy statement of the Sentencing Commission as required

12   by § 3582(c)(1)(A).").   To classify COVID-19 as an extraordinary and

13   compelling reason, by itself, would be inconsistent with the text of

14   the statute and the policy statement.   Moreover, it would have

15   detrimental real-world effects: interfering with BOP's organized

16   anti-COVID-19 efforts, resulting in the inequitable treatment of

17   inmates, and undercutting the strict criteria BOP employs to

18   determine inmates' eligibility for sentence reductions and home

19   confinement.   Section 3582(c)(1)(A) contemplates sentence reductions

20   for specific individuals, not the widespread prophylactic release of

21   inmates and the modification of lawfully imposed sentences to deal

22   with a viral pandemic.

23        However, defendant's Type-2 diabetes and his obesity are

24   serious, chronic health conditions that potentially qualify under the

25   policy statement, in light of their recognition by the Centers for

26   Disease Control as high-risk factors for COVID-19 complications.   See

27   generally Centers for Disease Control, Coronavirus Disease 2019

28   (COVID-19)--People Who Are At Higher Risk, available at

1  https://www.cdc.gov/coronavirus/2019-ncov/need-extra-

2  precautions/people-at-higher-risk.html (last accessed August 5,

3  2020).  Contrary to defendant's assertion, none of these conditions

4  "do not have a cure," or are conditions from which defendant "is not

5  expected to recover." (Mot. at 4.)  Defendant's prison medical

6  records indicate that his diabetes and obesity are caused by his poor

7  control of diet and exercise, as well as chronic non-compliance with

8  his insulin regime.  (Mot. Exh 3 at 2; Exh. E, filed under seal

9  concurrently herewith.)  Given that, at the age of 39, he could

10 alleviate these conditions with adherence to his doctors'

11 instructions, they cannot be characterized as "conditions from which

12 he is not expected to recover."  Nonetheless, they may -- in the

13 presence of COVID-19 -- be "serious" and "substantially diminish[]

14 the ability of the defendant to provide self-care" in a correctional

15 environment.  USSG § 1B1.13, comment (n.1(A)(ii)(I)).

16       2.   <u>Defendant's continuing danger makes him/her ineligible
            for compassionate release</u>

17

18     Serious illness is not the only requirement for compassionate-

19 release eligibility; a defendant must also demonstrate that he is

20 "not a danger to the safety of any other person or to the community."

21 USSG § 1B1.13(2).  Defendant cannot make that showing, and thus he is

22 ineligible for a reduced sentence.

23     Specifically, this Court may not reduce a defendant's sentence

24 unless it finds that "the defendant is not a danger to the safety of

25 any other person or to the community, as provided in 18 U.S.C.

26 § 3142(g)."  USSG § 1B1.13; <u>see</u> <u>United States v. Gotti</u>, No. 02-CR-

27 743, 2020 WL 497987, at *6 (S.D.N.Y. 2020) (release was inappropriate

28 regardless of extraordinary and compelling circumstances; defendant

posed a continuing danger to the public); accord United States v. Urso, No. 03-CR-1382, 2019 WL 5423431, at *3 (E.D.N.Y. Oct. 23, 2019); United States v. Applewhite, No. 08-CR-60037, 2020 WL 137452, at *2 (D. Or. Jan. 13, 2020) (denying compassionate release for seriously ill 80-year-old inmate based on danger).

Nothing about the COVID-19 pandemic reduces defendant's danger. His long criminal history, and the serious drug trafficking offense for which he is currently incarcerated, demonstrate the danger he has posed to the public throughout his adult life.  His history is particularly replete with violations of parole, and repeated flight from law enforcement, recklessly endangering the public.  Moreover, he has received a classification of High Risk Recidivism on the Prisoner Assessment Tool Targeting Estimated Risk and Needs ("PATTERN") system devised by the Department of Justice and implemented as the result of the First Step Act.  (Exh. F.)  Finally, his prison disciplinary record documents refusals to comply with work and/or program assignments.  (Exh. G.)

In the current climate, irresponsible social habits also gravely endanger the community.  United States v. Hir, 517 F.3d 1081, 1088 (9th Cir. 2008) ("community," within the meaning of 18 U.S.C. § 3142, is not necessarily confined to local geography).  All California residents are currently required to shelter in place and "heed the current State public health directives" to avoid the spread of COVID-19.  California Executive Order N-33-20 (March 19, 2020), available at https://covid19.ca.gov/img/Executive-Order-N-33-20.pdf.  Such rules, though enforceable by peace officers, rely largely on voluntary compliance.  A person who ignores such rules could increase infection rates, leading to citizens' severe illness and death.

19

1   Defendant's history in and out of prison reflects an
2   unwillingness to follow rules on every level, and a disregard for the
3   welfare of others.   Indeed, even his own welfare is not a sufficient
4   motivation to follow rules – as evidenced by his chronic
5   noncompliance with basic instructions that would alleviate the very
6   conditions he relies upon as the basis for his motion.   His criminal
7   history and even his own medical history demonstrate that this Court
8   should have no confidence that defendant will conduct himself
9   responsibly out of concern for the public welfare.

10   Finally, defendant's motion is not saved by his claims of
11   rehabilitation in prison.   The standard for compassionate release is
12   not just whether someone has performed well in prison.   To the
13   contrary, "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the
14   defendant is not, by itself, an extraordinary and compelling reason
15   for purposes of this policy statement."   USSG § 1B1.13, comment.
16   (n.3).   Even being a "model inmate" does not warrant an "abrupt
17   departure from [a defendant's] current sentence."   <u>Applewhite</u>, 2020
18   WL 137452, at *2.   Moreover, because there is a significant
19   difference between doing well in prison and doing well in society,
20   this Court, in evaluating the danger posed by defendant, cannot
21   ignore the nature and circumstances of the offense, his criminal
22   history, and his continuing refusal to comply with rules and
23   instructions, even in his own interest.   18 U.S.C. § 3142(g).   An
24   examination of those factors weighs against early release.

25   **B.   Even If Defendant Were Otherwise Eligible, the 18 U.S.C.**
         **§ 3553(a) Factors Do Not Support a Shorter Sentence**
26

27   Any compassionate-release decision--even for a statutorily
28   eligible defendant--must also consider the factors under 18 U.S.C.

20

1  § 3553(a).  See 18 U.S.C. § 3582(c)(1)(A)(i).  Those factors--which

2  this Court already considered when imposing defendant's 120-month

3  sentence--do not support his request for premature, permanent

4  release.  They support his original sentence.

5       Although defendant's obesity and diabetes are plausibly

6  qualifying under USSG § 1B1.13, he provides no evidence that the BOP

7  is unable to manage those conditions – especially in light of his

8  refusal to do his part in managing them.  Particularly considering

9  both how the BOP has addressed COVID-19 generally, defendant's

10 circumstances are not sufficiently extraordinary and compelling to

11 justify a modified sentence.  Indeed, defendant's arguments totally

12 overlook the BOP's ability to treat infectious disease.  Even chronic

13 conditions "that can be managed in prison are not a sufficient basis

14 for compassionate release."  United States v. Ayon-Nunez, No. 16-cR-

15 130-DAD, 2020 WL 704785, at *2-3 (E.D. Cal. Feb. 12, 2020).  Thus,

16 the Court "cannot assume that the Bureau of Prisons will be unable to

17 manage [any] outbreak or adequately treat [defendant] should it

18 emerge at his correctional facility while he is still incarcerated."

19 Gileno, 2020 WL 1307108, at *4 (denying compassionate-release motion

20 in COVID-19-related case involving a defendant who raised specific

21 health concerns); accord Shah, No. 10-70-CJC, ECF No. 329, at 3.  By

22 defendant's logic, such conditions would universally qualify

23 convicted inmates for shorter sentences given the present pandemic.

24 That is and cannot be the case.  To grant defendant a sentence

25 reduction based such facts would not satisfy the 18 U.S.C. § 3553(a)

26 factors; it would result in a windfall.

27      At bottom, granting compassionate release would undermine the 18

28 U.S.C. § 3553(a) factors, resulting in an effective sentence of just

57 months – well below the mandatory minimum sentence for defendant's crime of conviction.  The law, and the specific facts of defendant's case, neither demand nor endorse that result.

**V.   CONCLUSION**

Defendant's motion for compassionate release should be denied for the reasons set forth above.  The government requests that, if this Court ultimately grants relief, the government be given an opportunity to brief appropriate conditions--including a release plan, a mandatory quarantine, and a period of home confinement as a condition of supervised release.  See 18 U.S.C. § 3582(c)(1)(A).

# EXHIBIT A



# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA <br><br> Dylon Hernandez <br> v. <br> ~~Matthew Hernandez et al.~~ | **ED13-0288M** <br><br> MAGISTRATE'S CASE NO. <br><br> FILED <br> CLERK, U.S. DISTRICT COURT <br> JUN - 4 2013 <br> CENTRAL DISTRICT OF CALIFORNIA <br> BY _____ DEPUTY |

Complaint for violation of Title 21, U.S.C., §§ 841(a)(1),(b)(1)(A), and 846

| NAME OF MAGISTRATE JUDGE <br> HONORABLE DAVID T. BRISTOW | TITLE <br> UNITED STATES <br> MAGISTRATE JUDGE | LOCATION <br> Riverside, CA |
|---|---|---|

| DATE OF OFFENSE <br><br> Various | PLACE OF OFFENSE <br> Riverside County | Address of ACCUSED (IF KNOWN) |
|---|---|---|

**COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:**

Beginning on a date unknown, and continuing to on or about June 4, 2013, in Riverside County, within the Central District of California, defendants Matthew Hernandez, Dylon Hernandez, Nancy Hernandez, and Raphael Cervantes knowingly and intentionally conspired to and possessed with the intent to distribute methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1),(b)(1)(A), and 846.

**BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:**

*See* attached affidavit which is incorporated as part of this Complaint.

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: Not Applicable.

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT <br> Sean Zelka |
|---|---|
|  | Official Title <br> SPECIAL AGENT, <br> Drug Enforcement Administration |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE | DATE <br> 6/4/13 |
|---|---|

\* *See* Rules 3 and 4 of the Federal Rules of Criminal Procedure.
AUSA:DA:fga

# A F F I D A V I T

I, Sean R. Zelka, being duly sworn, declare and state as follows:

## I.        Introduction

1.        I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code Section 2510(7), and I am empowered to conduct investigations and to make arrests for the offenses enumerated in Title 18, United States Code Section 2516. I am a Special Agent ("SA") of the United States Drug Enforcement Administration ("DEA") and have been employed with the DEA since June 1999. I am currently assigned to the DEA's Riverside District Office, Task Force Group 1 ("RDO TFG-1"), investigating large-scale drug trafficking organizations operating in the Southern California area, and elsewhere.

2.        During my employment with the DEA, I have participated in a number of narcotics investigations that involved the possession, possession for sale, transportation and sales of controlled substances. While working these assignments, I have participated in numerous physical surveillances, execution of search warrants, and arrests of numerous drug traffickers resulting in the seizure of over 500 kilograms of controlled substances and over $1,000,000 in drug related proceeds. I have also spoken on numerous occasions to informants, suspects, and other experienced narcotics investigators concerning the methods

and practices of drug traffickers. I have participated in Title III wiretap investigations involving the domestic and international distribution of illegal drugs and their proceeds. I have also been the affiant in support of numerous search warrants which have resulted in the seizure of illegal narcotics and other evidence of drug violations. I have also received 640 hours of narcotics law enforcement training while attending DEA Basic Agent Training at the Federal Bureau of Investigation Academy, Quantico, Virginia.

3.      Prior to joining the DEA, I was employed as a probation/parole officer with the Washington State Department of Corrections, Seattle, Washington. I was employed by the Washington State Department of Corrections for approximately seven years. During my tenure with the Washington State Department of Corrections, I supervised adult felony offenders on probation and parole for approximately one year. During the remainder of my tenure, I conducted fugitive investigations for the Washington State Department of Corrections and for approximately five of those years I was on special assignment to the Federal Bureau of Investigation, Federal Fugitive Task Force, as a Criminal Investigator and held special deputizations as a Police Officer and United States Marshal.

4.      Based on my training and over 20 total years of working in the criminal justice field, I am familiar with drug traffickers' methods of operation

including the distribution, storage, transportation of drugs and the collection of

drug proceeds, and methods of money laundering used to conceal the nature of

the proceeds.  I have received training and have collaborated with other law

enforcement officers about investigations regarding the unlawful importation,

possession, and distribution of controlled substances, as well as related money

laundering statutes involving the proceeds of specified unlawful activities and

conspiracies associated with criminal narcotics, in violation of Titles 18 and 21 of

the United States Code.  I also speak regularly with narcotics investigators at the

federal, state and local level, drug traffickers, and informants, regarding the

manner in which drug traffickers store, sell, and transport narcotics.

     5.     This affidavit is based on a joint investigation conducted by the

DEA RDO TFG-1 which includes members from the Palm Springs Police

Department, Riverside County Sheriff's Department, Coachella Valley Narcotics

Task Force (the "CVNTF"), as well as the Palm Springs Police Department Patrol

Division.  I have been the lead investigator involved in the investigation of this

case.  This affidavit is based upon, among other things, my personal

observations, my professional training and experience, information obtained

from other law enforcement agents and officers and my review of their reports,

and my review of the evidence.  This affidavit is made for the sole purpose of

demonstrating probable cause for the issuance of the requested arrest warrants

and knowledge of or investigation into this matter.  I have not set forth each and every fact learned during the course of this investigation, nor have I summarized each and every fact deemed pertinent to the case.  Rather, I have set forth only those facts that I believe are necessary to establish probable cause for the requested arrest warrants.  All statements contained herein are set forth in sum and substance and not necessarily in the exact words in which they were made.

6.    In addition, for all intercepted telephone calls which are summarized in this affidavit, the summaries were prepared by wire room monitors, are not transcriptions, but instead are merely summaries prepared by wire room monitors who are familiar with this investigation and with drug trafficking organization investigations generally.

## II.    Purposes of this Affidavit

7.    This affidavit is made in support of an application for a criminal complaint that charges Matthew HERNANDEZ ("M. HERNANDEZ"), Dylon HERNANDEZ ("D. HERNANDEZ"), Nancy HERNANDEZ ("N. HERNANDEZ"), and Raphael CERVANTES ("CERVANTES") with violating Title 21, United States Code, Sections 841(a)(1) (possession with intent to distribute controlled substances), 843(b) (use of communication facility in furtherance of drug offense), and 846 (conspiracy to distribute or to possess with intent to distribute controlled substances).

8.     This affidavit is made for the purpose of establishing probable cause for the requested complaint and does not purport to set forth all that I know regarding this investigation.  I make this affidavit based upon my training, education, and experience as a DEA Special Agent, personal knowledge derived from my participation in this investigation, information obtained from other law enforcement agents, review of investigative reports and documents, review of intercepted communications over Target Telephones, and summaries thereof, and other investigative techniques.

## III.    Statement of Probable Cause

*A.     Summary of probable cause*

9.     Based on an, ongoing law enforcement narcotics investigation, multiple controlled purchases of methamphetamine, multiple seizures of methamphetamine from locations and persons associated with the above identified participants, seizures of firearms and other contraband, law enforcement surveillance (including review of wire–intercepted calls and summaries thereof), as well as my training and experience and other investigative techniques, I believe that beginning on an unknown date, and continuing through today, the HERNANDEZ DTO is a distributor of narcotics, including but not limited to methamphetamine, in the Coachella Valley area, located in Riverside County.

B.    *Background of investigation*

10.    The RDO TFG-1 has been investigating M. HERNANDEZ,

D. HERNANDEZ, N. HERNANDEZ, and CERVANTES as well as other known

and unknown co-conspirators and associates of the HERNANDEZ DTO since

approximately August, 2011.

11.    During the course of this investigation, based on ongoing

conversations with law enforcement officers, several sources of information

("SOIs") interviewed between in or about November, 2011, and May, 2012, and

the recent and current wire and electronic interception of Target Telephones

used by M. HERNANDEZ, D. HERNANDEZ, and Norma Mendoza-ESCOBEDO

("Mendoza-ESCOBEDO"), among other investigative techniques, I have learned

about the methods of operation of the HERNANDEZ DTO, and some of the

individuals involved in the HERNANDEZ DTO, such as couriers, managers, and

others.  Specifically, I learned, among other things, the following:

12.    The HERNANDEZ DTO, run by M. HERNANDEZ and

D. HERNANDEZ, is believed to traffic in multi-pound quantities of

methamphetamine in Cathedral City, as well as other locations in California.

The HERNANDEZ DTO is believed to be a direct supplier of large quantities of

methamphetamine.  Also, the HERNANDEZ DTO is believed to use couriers,

including CERVANTES and others, to deliver one to two ounce quantities of methamphetamine to several different locations on a daily basis.

C.      *Reliability of confidential informant*

13.      Special Agents and Task Force Officers of RDO TFG-1 have received information concerning the illegal drug trafficking activities of the HERNANDEZ DTO from a DEA confidential informant ("CI"). The CI has been providing information since in or about May 2012.

14.      Specifically, the CI has provided information about the membership, structure, and customs of the HERNANDEZ DTO. CI has positively identified M. HERNANDEZ, D. HERNANDEZ, and Christopher HINSON, also known as "Corrupt" ("HINSON") (as members of the HERNANDEZ DTO through driver's license and booking photographs. The CI has conducted several, consensually-recorded conversations with members and associates of the HERNANDEZ DTO, including M. HERNANDEZ, D. HERNANDEZ, C. HINSON, and CERVANTES and has spoken in person with M. HERNANDEZ during the course of this investigation. The CI has conducted controlled purchases of methamphetamine from several members of the HERNANDEZ DTO during the course of this investigation.

15.      The CI is assisting the DEA in connection with a cooperation agreement issued through the Riverside County District Attorney's Office

wherein the CI is a criminal defendant in a California State narcotics and firearms case for which the CI pleaded guilty. The CI agreed to cooperate with law enforcement to receive leniency consideration in regard to sentencing. More specifically the CI's cooperation agreement provided that the CI would receive a suspended multiple year jail sentence and additional criminal charges would not be filed should the CI fulfill the terms of the contract.

16.    I previously reviewed the Riverside County Superior Court online database and learned, among other things, that the CI pleaded guilty to multiple felony charges and received a lengthy sentence suspended and a term of probation provided the CI successfully completes the contract as specified above.

17.    The CI has an extensive criminal history and criminal conviction record dating back to when he/she was a juvenile.

18.    As an adult, since 1998, the CS has been arrested for numerous offenses including, but not limited to, disorderly conduct, numerous drug-related crimes, providing false information to a police officer, terrorist threats, battery of a spouse, obstructing/resisting a police officer, and robbery and burglary, many of which the CI has either pleaded or was found guilty.

19.    The CI's information concerning the HERNANDEZ DTO has been corroborated by other sources of information ("SOI"), including various public databases including but not limited to, "Clear Choice Point," and "Google," law

- 8 -

enforcement database queries, physical surveillance, controlled narcotics

purchases and consensually-recorded conversations and phone calls that the CI

has had with other members of the HERNANDEZ DTO. Based on the foregoing,

and the information contained herein, I believe the information provided by the

CI to be reliable as to this investigation thus far.

    D.    *Previous searches and controlled buys*

20.    In or about September, 2012, along with SA Scott Hawkins and

TFO Kelly Fieux, I met with a CI who provided information regarding the

trafficking of methamphetamine by the HERNANDEZ DTO.

21.    As summarized below, the CI conducted several controlled

purchases of narcotics from the HERNANDEZ DTO at the direction of the DEA:

    a.    On or about September 2012, the CI arranged to buy one

ounce of methamphetamine for $650 with D. HERNANDEZ and CERVANTES

over several telephone calls. Later that evening, after having been searched by

law enforcement and provided with $650 to purchase the methamphetamine, the

CI met an unidentified male who was the passenger of a 2002 white Buick sedan

registered to CERVANTES (the "CERVANTES sedan"). The unidentified male

passenger provided the methamphetamine to the CI at the designated meeting

location. I monitored the exchange and reviewed a DEA investigative report by

TFO Fieux regarding the surveillance of the narcotics exchange. TFO Buenting

recovered approximately one ounce of suspected methamphetamine from the CI's person. The suspected narcotics and were tested by a DEA laboratory and found to contain 27.2 grams of actual methamphetamine (27.7 grams with a purity of 98.5%).

b.      On or about September 2012, the CI arranged to buy three ounces of methamphetamine for $2,000 with D. HERNANDEZ and CERVANTES over several telephone calls. Later that evening, after having been searched by law enforcement and provided with $2,000 to purchase the methamphetamine, the CI met an unidentified male at the designated meeting location, which was being surveilled by law enforcement. I monitored the exchange and reviewed a DEA investigative report by TFO Fieux regarding the surveillance of the narcotics exchange and the CERVANTES sedan driven by CERVANTES during the drug meeting was believed to be the delivery vehicle. TFO Buenting recovered approximately three ounces of suspected methamphetamine from the CI's person. The suspected narcotics and were tested by a DEA laboratory and found to contain 82 grams of actual methamphetamine (83.3 grams with a purity of 98.5%).

c.      On or about October 2012, the CI arranged to buy two ounces of methamphetamine for $1,400 with D. HERNANDEZ and M. HERNANDEZ over several telephone calls. Later that evening, after having

been searched by law enforcement and provided with $1,400 to purchase the

methamphetamine, the CI met M. HERNANDEZ at the designated meeting

location, which was being surveilled by law enforcement. I monitored the

exchange and reviewed a DEA investigative report by TFO Fieux regarding the

surveillance of the narcotics exchange. TFO Buenting recovered approximately

two ounces of suspected methamphetamine from the CI's person. The suspected

narcotics and were tested by a DEA laboratory and found to contain 54.4 grams

of actual methamphetamine (55.6 grams with a purity of 98%).

     E.    *Prior wire interception*

    22.    On March 6, 2013, the Honorable Virginia A. Phillips, United States

District Judge, issued a wire interception order pursuant to 18 U.S.C. § 2518

authorizing interception of the following telephone line, in Case No. ED CR

Misc. 13-8-VAP:

    a.    (760) 408-8732, international mobile subscriber identification

("IMSI") number 310410526528790, ("Target Telephone #1"), subscribed to by

"RED POCKET MOBILE," 4712 Admiralty Way, Suite 627, Marina Del Rey,

California 90292, and believed to be used by M. HERNANDEZ and

D. HERNANDEZ.

    F.    *Communications intercepted on the wire*

             <u>Intercepted Communications on March 11, 2013</u>

23.    On March 11, 2013, at approximately 5:42 p.m., M. HERNANDEZ

made an outgoing call from Target Telephone #1 to (760) 449-0979 and spoke

with BOUCHARD[1].  The call is summarized, in part, as follows[2]:

| | |
|---|---|
| M. HERNANDEZ | Asked what was going on. |
| BOUCHARD | Said he needed to see M. HERNANDEZ and added that he had 115 but had no car. |
| M. HERNANDEZ | Said, okay, and would meet BOUCHARD at Food4Less. |
| BOUCHARD | Said, okay, and would be right there. |
| M. HERNANDEZ | Said he would meet BOUCHARD within half an hour at the Food4Less. |

24.    On March 11, 2013, at approximately 5:43 p.m., M. HERNANDEZ

received an incoming call on Target Telephone #1 from (817) 223-0993 and spoke

with an individual otherwise identified as UM0993[3].  The call is summarized, in

part, as follows:

---

[1] Kent David BOUCHARD is a methamphetamine drug customer of the HERNANDEZ DTO.

[2] Information contained in parentheticals represents summaries or descriptions from the wire room monitors and other law enforcement personnel who are familiar with this investigation and with investigations into drug trafficking organizations. They are not transcripts.

[3] There are several phone calls described in this affidavit, and in the calls intercepted in general, where the caller was not identified and instead, has only been identified as an Unknown Male "UM[NUMBER]," or Unknown Female "UF[NUMBER]."

| UM0993 | Asked if he could meet M. HERNANDEZ for six. |
| M. HERNANDEZ | Said, "Yes, of course." |
| UM0993 | Asked when would be good for M. HERNANDEZ. |
| M. HERNANDEZ | Said he could meet UM0993 in one half hour or 45 minutes. |
| UM0993 | Said in 45 (minutes). |
| M. HERNANDEZ | Said, okay, and at Food4Less. |
| UM0993 | Said, okay, and would see M. HERNANDEZ there. |

25. On March 11, 2013, at approximately 5:52 p.m., M. HERNANDEZ made an outgoing call from Target Telephone #1 to (760) 898-0720 and spoke with YOUNGBLOOD[4]. The call is summarized, in part, as follows: M. HERNANDEZ told YOUNGBLOOD to make him a "child's plate" and bring it out front.

26. I believe based on my training and experience, knowledge of the investigation, surveillance observations, and review of intercepted communications that BOUCHARD and UM0993 were ordering narcotics from M. HERNANDEZ. M. HERNANDEZ then directed YOUNGBLOOD to have the requested narcotics ready, which he referred to as a "child's plate" to avoid law

---

[4] Shawna YOUNGBLOOD is the girlfriend of Matthew HERNDANDEZ.

enforcement detection.

27.     I know based on my involvement in this investigation that BOUCHARD was arrested on March 15, 2013, as further described below, for possession of methamphetamine after BOUCHARD met with D. HERNANDEZ. Based on my review of the intercepted calls between BOUCHARD, M. HERNANDEZ, and D. HERNANDEZ, surveillance and other law enforcement techniques, and my knowledge of this investigation, I believe that BOUCHARD is a narcotics customer of the HERNANDEZ DTO.  Furthermore, I believe BOUCHARD was ordering methamphetamine during the above-described calls over Target Telephone #1 on March 11, 2013.

28.     On March 11, 2013, at approximately 6:00 p.m., M. HERNANDEZ received an incoming call on Target Telephone #1 from (760) 219-1147 and spoke with an individual otherwise identified as UM1147[5].  The call is summarized, in part, as follows:  M. HERNANDEZ asked if UM1147 was almost there.  UM1147 said, "I'll be there in 15 minutes, at you."  M. HERNANDEZ said all right.  UM1147 said he was already leaving.  M. HERNANDEZ said all right.

29.     At approximately 6:00 p.m., I observed the Ford Mustang leave M. HERNANDEZ'S residence; however, I did not directly follow the vehicle.

30.     On March 11, 2013, at approximately 6:03 p.m., M. HERNANDEZ

_____

[5] "UM1147" is an unidentified male using a telephone ending in "1147."

received an incoming call on Target Telephone #1 from (760) 449-0979 and spoke with BOUCHARD.  The call is summarized, in part, as follows: M. HERNANDEZ told BOUCHARD that he could see him and he was coming out of the car wash so for BOUCHARD to relax.

31.     TFO Fieux observed M. HERNANDEZ'S Mustang arrive and park in a parking space.  TFO Fieux saw a white compact vehicle, believed to be driven by BOUCHARD, park behind M. HERNANDEZ.  TFO Fieux observed the subject, believed to be BOUCHARD, exit his vehicle.  BOUCHARD then walked to M. HERNANDEZ'S Mustang and entered the passenger door.

32.     TFO Fieux saw M. HERNANDEZ and BOUCHARD talking and after approximately 20-30 seconds, BOUCHARD exited M. HERNANDEZ'S vehicle.  BOUCHARD re-entered his vehicle and drove away.  TFO Fieux then observed M. HERNANDEZ drive away and head northbound through the parking lot.

33.     On March 11, 2013, at approximately 6:10 p.m., M. HERNANDEZ made an outgoing call from Target Telephone #1 to (760) 218-1425 and spoke with an individual otherwise identified as UM1425[6].  The call is summarized, in part, as follows:

M. HERNANDEZ    Told UM1425 to be at Food4Less in 15 minutes.

---

[6] "UM1425" is an unidentified male using a telephone ending in "1425."

UM1425          Said okay.

34.     At approximately 6:33 p.m., TFO Fieux observed M. HERNANDEZ

driving the Mustang arrive from the south entrance to the Food4Less parking lot.

SA Ward saw the Mustang parked near SA Ward's surveillance vehicle. SA

Ward observed M. HERNANDEZ inside the Mustang smoking a cigarette. SA

Ward observed a white male adult, later identified as Gary Bowman, exit the

driver's side of a red Ford Mustang convertible.

35.     SA Ward saw Bowman walk towards M. HERNANDEZ'S vehicle,

carrying an unknown white object in his left hand. SA Ward saw Bowman enter

the passenger side of M. HERNANDEZ'S vehicle. After approximately 30

seconds, SA Ward observed Bowman exit M. HERNANDEZ'S vehicle and walk

back to the red Ford Mustang. SA Ward then saw the red Ford Mustang drive

away.

36.     SA Ward then observed a second subject described as a white male

adult walk up and enter the passenger door of M. HERNANDEZ'S vehicle. After

approximately 30 seconds, SA Ward saw the subject exit M. HERNANDEZ'S

vehicle. SA Ward did not see if the subject departed the area in a vehicle or left

the area on foot.

37.     Based on my training and experience, knowledge of this

investigation, surveillance conducted, and review of interceptions of Target

- 16 -

Telephone #1, I believe that M. HERNANDEZ was supplying narcotics to
BOUCHARD and another drug customer, Bowman, who, based on the timing of
the above calls and surveillance, could have been UM0993, UM1147, or UM1425,
met in the Food4Less parking lot.  Furthermore, investigators continued to
conduct surveillance in connection with M. HERNANDEZ as he conducted
additional meetings with suspected methamphetamine customers until
approximately 9:00 p.m. when surveillance was terminated.

<u>Intercepted Communications on March 15, 2013</u>

38.    On March 15, 2013, at approximately 5:59 p.m., Target Telephone
#1 received an incoming text message from (760) 449-0979, the telephone number
for BOUCHARD which read: "You out there?"

39.    On March 15, 2013, at approximately 6:02 p.m., Target Telephone
#1 made an outgoing text message to BOUCHARD which read: "What up."

40.    On March 15, 2013, at approximately 6:05 p.m., Target Telephone
#1 received an incoming text message from BOUCHARD which read: "450."

41.    On March 15, 2013, at approximately 6:13 p.m., D. HERNANDEZ
made an outgoing call from Target Telephone #1 to (760) 449-0979 and spoke
with BOUCHARD.  The call is summarized, in part, as follows:

| D. HERNANDEZ | Asked BOUCHARD, "What's my bro usually give you?" |
| BOUCHARD | Said, "Um, well it'd be a half and a quarter." |

| | |
|---|---|
| D. HERNANDEZ | Said, "Okay, well, then I got you." |
| BOUCHARD | Said, "All right. Um, where would you (D. HERNANDEZ) like me to come?" |
| D. HERNANDEZ | Asked BOUCHARD for clarification. |
| BOUCHARD | Asked, "Where would you like me to meet you?" |
| D. HERNANDEZ | Said, "On Gerald Ford AM/PM." |
| BOUCHARD | Asked where. |
| D. HERNANDEZ | Said, "Gerald Ford AM/PM." |
| BOUCHARD | Said he (BOUCHARD) did not get where, on Gerald Ford and (what other street). |
| D. HERNANDEZ | Said, "At the AM/PM in Cat City (Cathedral City)." |
| BOUCHARD | Said, "Okay, all right. Um, I need about like maybe 20 minutes to get there." |
| D. HERNANDEZ | Said that was no problem. |

42.     On March 15, 2013, at approximately 6:14 p.m., D. HERNANDEZ

made an outgoing call from Target Telephone #1 to (760) 449-0979 and spoke

with BOUCHARD.  The call is summarized, in part, as follows:

| | |
|---|---|
| D. HERNANDEZ | Said, "If you come up with 50 more, I'll give you a whole one." |
| BOUCHARD | Said, "Say it again." |
| D. HERNANDEZ | Said, "Just come up with 50 more and I'll give |

you a whole one."

BOUCHARD        Said, "I'll try to do that."

D. HERNANDEZ    Asked, "Do you know what I mean?"

BOUCHARD        Said, yeah.

D. HERNANDEZ    Said "That way you can get ahead a little bit."

BOUCHARD        Said "Yeah, that would be great."

D. HERNANDEZ    Said, "Let me know. Later."

43.    On March 15, 2013, at approximately 6:21 p.m., Target Telephone #1 received an incoming text message from BOUCHARD which read: "Gonna get the other fifty. Won't be there in twenty min."

44.    On March 15, 2013, at approximately 6:23 p.m., Target Telephone #1 received an incoming text message from BOUCHARD which read: "Gonna get the other fifty. Won't be there in twenty min Maybe forty. I will call when on my way."

45.    On March 15, 2013, at approximately 6:45 p.m., D. HERNANDEZ received an incoming call on Target Telephone #1 from (760) 449-0979 and spoke with BOUCHARD.  The call is summarized, in part, as follows:

BOUCHARD        Asked if D. HERNANDEZ had called.

D. HERNANDEZ    Said, "Yes. Just bring that. I'll give you the
                whole one this one time."

BOUCHARD        Said he (BOUCHARD) would pick it up in

- 19 -

about five minutes then he (BOUCHARD)
would be on his way.

D. HERNANDEZ     Said, all right.

46.     On March 15, 2013, at approximately 7:18 p.m., Target Telephone
#1 made an outgoing text message to BOUCHARD which read: "Let me know I
give you the full for the 450."

47.     On March 15, 2013, at approximately 7:20 p.m., Target Telephone
#1 received an incoming text message from BOUCHARD which read: "On my
way. Can you have your brother call me?"

48.     On March 15, 2013, at approximately 7:29 p.m., Target Telephone
#1 received an incoming text message from BOUCHARD which read: "What are
you driving?"

49.     On March 15, 2013, at approximately 7:31 p.m., Target Telephone
#1 made an outgoing text message to BOUCHARD which read: "Silver one u
there."

50.     On March 15, 2013, at approximately 7:36 p.m., Target Telephone
#1 received an incoming text message from BOUCHARD which read: "I am over
by the restaurants."

51.     At approximately 7:37 p.m., I, along with other law enforcement
officers initiated surveillance at the AM/PM located at 36001 Date Palm Drive,
Cathedral City, California.  Coachella Valley Narcotics Task Force (CVNTF) TFO

Bazanos observed D. HERNANDEZ driving his silver 2007 Lexus sedan with California license plate CRZTWIN and enter the parking lot. CVNTF Sergeant Hoyt then observed BOUCHARD exit a white Honda sedan and walk toward D. HERNANDEZ'S Lexus.

52. At approximately 7:38 p.m., CVNTF TFO Bazanos saw BOUCHARD enter D. HERNANDEZ'S Lexus and after approximately 30 seconds, CVNTF Bazanos saw BOUCHARD exit D. HERNANDEZ'S Lexus and get back into the white Honda sedan.

53. I, along with participating surveillance officers, followed BOUCHARD until he eventually parked his vehicle behind the Boomer's amusement park located on Jones Road, just east of Cree Road, Cathedral City, California.

54. Based on my request, at approximately 7:58 p.m., Riverside County Sheriff's (RSO) Deputy Telles, who is also familiar with the details of this investigation, made contact with BOUCHARD and conducted a search of BOUCHARD and his vehicle based on probable cause that BOUCHARD bought narcotics from D. HERNANDEZ and was possessing it at the time. Deputy Telles recovered approximately one ounce of methamphetamine in BOUCHARD's left front shorts pocket. BOUCHARD was arrested but later released. BOUCHARD did not provide any relevant post-arrest statements. No

charges have been filed against BOUCHARD in order to protect the integrity of this investigation.

55.     Based on my training and experience, review of intercepted communications, surveillance observations and other investigative techniques I believe, among other things, that D. HERNANDEZ was using Target Telephone #1 during this time frame because M. HERNANDEZ, the primary user of Target Telephone #1, was at Disneyland for the day.  Further, that D. HERNANDEZ sold BOUCHARD one ounce of methamphetamine.

<u>Intercepted Communications on March 23, 2013</u>

56.     On March 23, 2013, at approximately 6:29 p.m., M. HERNANDEZ made an outgoing call from Target Telephone #1 to (760) 449-0979 and spoke with BOUCHARD.  The call is summarized, in part, as follows:

| | |
|---|---|
| M. HERNANDEZ | Asked BOUCHARD what was going on. |
| BOUCHARD | Said, "Hey, dude. Um, well, we need to talk for sure." |
| M. HERNANDEZ | Asked BOUCHARD, "Where you been at?" |
| BOUCHARD | Said, "I've been in the pokey (jail)." |
| M. HERNANDEZ | Asked BOUCHARD what was going on. |
| BOUCHARD | Said, "Nothing is going on. They (police) didn't file anything 'cause they didn't arraign me in time, but they let me, uh, you know, they had to, uh . . . over the next year and if they wanted to change their mind, they could do that. |

| | |
|---|---|
| M. HERNANDEZ | Asked, "What they catch you with?" |
| BOUCHARD | Said, "That, what I got from your brother (D. HERNANDEZ)." |
| M. HERNANDEZ | Said, "Oh, not about that." |
| BOUCHARD | Said, "I had a, I had an ounce." |
| M. HERNANDEZ | Said, "I have no idea what you're talking about now." |
| BOUCHARD | Said, "Of course you do but, uh, uh ..." |
| M. HERNANDEZ | Said, "No, I don't. I have no idea what you're talking about." |
| BOUCHARD | Said, "Let's have dinner or something somewhere, uh, tomorrow or the next day, or whenever you say, and uh, talk." |
| M. HERNANDEZ | Said, all right. |
| M. HERNANDEZ | Said, "They (police) didn't file charges on an ounce? That's crazy." |
| BOUCHARD | Said, "They (police) did not. Um, they, you know, said they could change their minds if they wanted over the next year. There's a lot of opinions about that and, um, I'll share them all with you." |
| M. HERNANDEZ | Said, "Oh, no, they'll (police) file them if it's an ounce. I'm going to call my (unintelligible) and ask him." |
| BOUCHARD | Said, yes, probably. |
| M. HERNANDEZ | Said, "They (police) won't let you out over an |

ounce. They won't unless you, unless . . ."

BOUCHARD            Said, "But if it was a DA (District Attorney)
                    reject or there was not proper conduct or
                    something like that, that would, uh, you know,
                    take care of the filing thing."

M. HERNANDEZ        Asked, "Where did they catch you
                    (BOUCHARD) at?"

BOUCHARD            Said, "Behind the, um, miniature golf place.
                    Behind that, um, where the, um, what's that
                    miniature golf place? It's on Jones. It's called
                    Jones Road by (audio glitch). I was, uh, waiting
                    for my friend to come (audio glitch) haven't
                    been to the spot where he lives. I wasn't even
                    there three minutes, dude. I have, uh, you
                    know, theories. I have my, uh, you know . . .
                    there was some bullshit there. Let me tell you
                    that."

M. HERNANDEZ        Said, "Okay, well I'll call you later. We'll meet
                    up or something to talk."

BOUCHARD            Said, all right and thanked M. HERNANDEZ
                    for calling.

57.     On March 23, 2013, at approximately 7:45 p.m., M. HERNANDEZ

made an outgoing call from Target Telephone #1 to (760) 449-0979 and spoke

with BOUCHARD.  The call is summarized, in part, as follows:

M. HERNANDEZ        Asked BOUCHARD, "So which police
                    department arrested you?"

BOUCHARD            Said, "Oh, it's a whole, uh, um, actually it was
                    the Sheriff."

M. HERNANDEZ        Asked, "The Sheriff's?"

BOUCHARD          Said, "Yeah. I'm telling you (audio glitch) the Sheriff at Cathedral City (call disconnected).

58.      Based on my review of the aforementioned calls, involvement in this case, and my training and experience, I believe that M. HERNANDEZ and BOUCHARD are discussing BOUCHARD's arrest after the narcotics transaction between BOUCHARD and D. HERNANDEZ. M. HERNANDEZ and BOUCHARD are discussing the potential charges and why the case was not charged.

   G.     *Current Wire Interceptions*

59.      On May 16, 2013, the Honorable Virginia A. Phillips, United States District Judge, issued a wire interception order pursuant to 18 U.S.C. § 2518 authorizing interceptions of the following telephone lines, in Case No. ED CR Misc. 13-8(A)-VAP:

         a.       (760) 408-8732, international mobile subscriber identification ("IMSI") number 310410526528790, ("Target Telephone #1"), subscribed to by "RED POCKET MOBILE," 4712 Admiralty Way, Suite 627, Marina Del Rey, California 90292, and believed to be used by M. HERNANDEZ and D. HERNANDEZ;

         b.       (760) 424-6418, IMSI number 310410549279051, ("Target Telephone #2"), subscribed to by "RED POCKET MOBILE," 4712 Admiralty

Way, Suite 627, Marina Del Rey, California 90292, and believed to be used by

D. HERNANDEZ;

        c.     (760) 464-2441, IMSI number 310410526577398, ("Target

Telephone #3"), subscribed to by "RED POCKET MOBILE," 4712 Admiralty

Way, Suite 627, Marina Del Rey, California 90292, and believed to be used by M.

HERNANDEZ; and

        d.     (760) 660-0278, IMSI number 310410549280513, ("Target

Telephone #4" and collectively with Target Telephones #1, #2, and #3, the "Target

Telephones"), subscribed to by "RED POCKET MOBILE," 4712 Admiralty Way,

Suite 627, Marina Del Rey, California 90292, and believed to be used by

MENDOZA.

     *H.*    *Communications intercepted on the wires*

    60.    Based on my training and experience, knowledge of this

investigation, and review of intercepted communications over the Target

Telephones, surveillance observations and other investigative techniques, I

believe, among other things, that the below-described drug pertinent phone calls

between members of the HERNANDEZ DTO establish probable cause for the

requested search warrant.

## Intercepted Communications on May 20, 2013

61.     On May 20, 2013, at approximately 5:47 p.m., D. HERNANDEZ received an incoming call on Target Telephone #1 from (760) 218-5284 and spoke with an individual otherwise identified as WIGGY LNU ("WIGGY").  The call is summarized, in part, as follows:

| | |
|---|---|
| WIGGY | Asked D. HERNANDEZ what he was doing. |
| D. HERNANDEZ | Said he was swimming. |
| WIGGY | Asked D. HERNANDEZ if this was his brother's (M. HERNANDEZ) phone. |
| D. HERNANDEZ | Said, yes, that he (D. HERNANDEZ) was taking care of it and that M. HERNANDEZ was on vacation right now. |
| WIGGY | Said he had something for D. HERNANDEZ. |
| D. HERNANDEZ | Laughed. |
| WIGGY | Said that he (WIGGY) had a buddy coming down from Aspen with 1700. |
| D. HERNANDEZ | Confirmed 17 and said he (D. HERNANDEZ) would "hook them up." |
| WIGGY | Said, "This could be an every day thing, too." |
| D. HERNANDEZ | Said he would give them a "qp" (possibly quarter pound). |
| WIGGY | Said he would call D. HERNANDEZ right back. |

62.     On May 20, 2013, at approximately 6:50 p.m., D. HERNANDEZ

received an incoming call on Target Telephone #1 from (760) 218-5284 and spoke

with an individual otherwise identified as WIGGY.  The call is summarized, in

part, as follows:

| | |
|---|---|
| WIGGY | Asked if D. HERNANDEZ was ready. |
| D. HERNANDEZ | Said, yeah, and asked where WIGGY was located. |
| WIGGY | Said he was at his mother's house. |
| D. HERNANDEZ | Told WIGGY to come over to his (D. HERNANDEZ) house. |
| WIGGY | Said, all right, and that he would come alone. |
| D. HERNANDEZ | Said that was cool and told WIGGY not to trip, that he (D. HERNANDEZ) was not tripping. |

63.     On May 20, 2013, at approximately 6:52 p.m., D. HERNANDEZ

made an outgoing call from Target Telephone #2 to (760) 219-1147 and spoke

with CERVANTES.  The call is summarized, in part, as follows:

| | |
|---|---|
| D. HERNANDEZ | Told CERVANTES that he needed him "as soon as possible.  I think I might have enough to cover but I am not too sure." |
| CERVANTES | Said, okay, and that he would be there. |

64.     Based on intercepted calls over Target Telephones between D.

HERNANDEZ, CERVANTES, and WIGGY, myself and other law enforcement

officers initiated surveillance at 68745 Minerva Road, Cathedral City, California

(the "Minerva Road residence") on May 20, 2013, and, among other things, I observed the following: at approximately 7:38 p.m., surveillance officers observed two vehicles known to be associated with D. HERNANDEZ parked at or near the Minerva Road residence. At approximately 7:50 p.m., surveillance officers observed a 2005 gray/black Nissan truck registered to CERVANTES (the "CERVANTES truck") arrive and park in front of the Minerva Road residence. At approximately 8:52 p.m., I observed an unidentified individual arrive at the Minerva Road residence who appeared to be dropped off by a Jeep SUV and was carrying a bag and walked up the driveway to the residence and out of view. It is believed the same unknown individual later departed the residence as a passenger in the same Jeep SUV that had previously arrived, departed, and later returned to the Minerva Road residence. Based on the totality of intercepted communications and surveillance observations, I believe the unknown individual to be WIGGY.

65. Based on my training and experience, knowledge of this investigation, review of intercepted communications over Target Telephones, and summaries thereof, surveillance observations, and other investigative techniques, I believe, among other things, the following regarding the activities of May 20, 2013: D. HERNANDEZ, who was using Target Telephone #1 of which M. HERNANDEZ is the primary user, agreed to supply WIGGY with one

quarter pound of methamphetamine at the Minerva Road residence due to the
unavailability of M. HERNANDEZ. D. HERNANDEZ requested that
CERVANTES respond to the Minerva Road residence to supply additional
methamphetamine to cover the quarter pound deal with WIGGY. CERVANTES
responded to the Minerva Road residence driving the CERVANTES truck and
transported an undetermined amount of methamphetamine to complete the
quarter pound sale which was ultimately supplied to WIGGY by D.
HERNANDEZ.

<u>Intercepted Communications on May 22, 2013</u>

66.     On May 22, 2013, at approximately 11:32 a.m., D. HERNANDEZ
received an incoming text message on Target Telephone #1 from (760) 905-1691
and exchanged text messages with an individual otherwise identified as
UM1691[7]. The text message exchange, in part, reads as follows (and may not
include the entirety of the text messages during this exchange):

> UM1691          im getting some ....u gonna want some if i
>                 didnt get bak to u its cause i save the last of it
>                 for me ..but i got neww ones coming today
>
> D. HERNANDEZ    Yes for sure I m ready when you are

67.     On May 22, 2013, at approximately 12:35 a.m., D. HERNANDEZ
received an incoming text message on Target Telephone #1 from (760) 905-1691

---

[7] "UM1691" is an unidentified male using a telephone ending in "1691."

and exchanged text messages with an individual otherwise identified as

UM1691.  The text message exchange, in part, reads as follows (and may not

include the entirety of the text messages during this exchange):

| | |
|---|---|
| UM1691 | got tree on deck shit got hektik 3600 a picec it was hard to take care my route and sperqte yurs |
| D. HERNANDEZ | Cool just let me know when your ready . |
| UM1691 | ready |

68.     On May 22, 2013, at approximately 12:37:07 p.m., D. HERNANDEZ

made an outgoing call from Target Telephone #1 to (760) 905-1691 and spoke

with an individual otherwise identified as UM1691.  The call is summarized, in

part, as follows:

| | |
|---|---|
| D. HERNANDEZ | Asked, "Do you know where is my pad, right?" |
| UM1691 | Said, yes. |
| D. HERNANDEZ | Said, "Come by." |

On May 22, 2013, at approximately 12:37:50 p.m., D. HERNANDEZ made

an outgoing call from Target Telephone #2 to (760) 219-1147 and spoke

with CERVANTES.  The call is summarized, in part, as follows:

| | |
|---|---|
| D. HERNANDEZ | Said, "Bring a clean, clean fucking pizzle (phonetic) and come over." |
| CERVANTES | Said, "Oh, we're doing one of those, huh? I have one ready to bring to you." |

| | |
|---|---|
| D. HERNANDEZ | Said he (D. HERNANDEZ) did not need it right now. Said his (D. HERNANDEZ) boy was coming through again. |
| CERVANTES | Said he (CERVANTES) was in Cat City (Cathedral City) so D. HERNANDEZ could call him (CERVANTES) at the last minute. |
| D. HERNANDEZ | Asked where CERVANTES was in Cat City. |
| CERVANTES | Said he (CERVANTES) was at work. |
| D. HERNANDEZ | Asked CERVANTES to come over in 45 minutes. Said, bye. |

69.     On May 22, 2013, at approximately 12:51 p.m., D. HERNANDEZ made an outgoing call from Target Telephone #2 to (760) 219-1147 and spoke with CERVANTES.  The call is summarized, in part, as follows:

| | |
|---|---|
| D. HERNANDEZ | Said, "Pick me up some big ziplos, ziplocs." |
| CERVANTES | Said, "I got you, I got you." |
| D. HERNANDEZ | Said he (D. HERNANDEZ) told him (CERVANTES) last time and you didn't. |
| CERVANTES | Said, okay. |

70.     On May 22, 2013, at approximately 1:32 p.m., D. HERNANDEZ received an incoming call on Target Telephone #1 from (760) 905-1691 and spoke with an individual otherwise identified as UM1691.  The call is summarized, in part, as follows:

| | |
|---|---|
| UM1691 | Asked what street it was. |

| D. HERNANDEZ | Said, "Minerva." |
|---|---|
| UM1691 | Said he was on Monrovia from Portula (phonetic). |
| D. HERNANDEZ | Told UM1691 to come down La Vista or come down to the park. |
| UM1691 | Said he could see the park from right here and it was called Tachevah. |
| D. HERNANDEZ | Said, "Turn right. If you are heading away from the park, you are heading the right way. Then you'd come to a stop and then turn right, you'll see my pad right there." |
| UM1691 | Said, all right, cool. |

71.     On May 22, 2013, at approximately 1:35 p.m., D. HERNANDEZ

made an outgoing call from Target Telephone #2 to (760) 219-1147 and spoke

with CERVANTES.  The call is summarized, in part, as follows:

| D. HERNANDEZ | Said, "Where you at dog?" |
|---|---|
| CERVANTES | Said, "I'm on my way." |
| D. HERNANDEZ | Said, "It's been an hour dog, dude's already here." |
| CERVANTES | Said, "I'm coming now." |
| D. HERNANDEZ | Said, okay. |

72.     On May 22, 2013, at approximately 2:13 p.m., D. HERNANDEZ

made an outgoing call from Target Telephone #2 to (760) 660-5855 and spoke

with N. HERNANDEZ.  The call is summarized, in part, as follows:

D. HERNANDEZ    Said, "Where is my vacuum sealer at?"

N. HERNANDEZ    Asked, what?

D. HERNANDEZ    Said, "The food saver."

N. HERNANDEZ    Said, "Oh, the food saver is up, you know, where the plates are and all that is, at the very top."

D. HERNANDEZ    Said, "The bags are up there but where is the ..."

N. HERNANDEZ    Said "Where the rice is, where the pots and pans are, where I keep that Mexican rice."

D. HERNANDEZ    Said, "Oh, okay."

N. HERNANDEZ    Said, "That little drawer."

D. HERNANDEZ    Said, okay.

N. HERNANDEZ    Said, "You are not giving it away, are you?"

D. HERNANDEZ    Said, "No, I'm doing work. I gotta go."

N. HERNANDEZ    Said, okay.

73.    On May 22, 2013, at approximately 3:13 p.m., D. HERNANDEZ made an outgoing call from Target Telephone #2 to (760) 660-5855 and spoke with N. HERNANDEZ.  The call is summarized, in part, as follows:

N. HERNANDEZ    Said she (N. HERNANDEZ) was trying to get a hold of D. HERNANDEZ.

D. HERNANDEZ    Said the old man left the phone in the car and he (D. HERNANDEZ) came back to get it.

| N. HERNANDEZ | Said nobody was at the house and she did not know if he (D. HERNANDEZ) locked it or shut the office because the kids were going to be at the house. |
| --- | --- |
| D. HERNANDEZ | Said they (the kids) all went to the park. |
| N. HERNANDEZ | Said, "I just want you to make sure everything was put away." |
| D. HERNANDEZ | Said, "Yeah, I know. Everything is put away." |
| D. HERNANDEZ | Said she (N. HERNANDEZ) was just letting D. HERNANDEZ know that no one was at the house. |
| D. HERNANDEZ | Said he (D. HERNANDEZ) was about to be there right now. |

74.     On May 22, 2013, at approximately 9:23 p.m., D. HERNANDEZ received an incoming call on Target Telephone #2 from (760) 219-1147 and spoke with CERVANTES.  The call is summarized, in part, as follows:

| CERVANTES | Asked if D. HERNANDEZ could meet up. |
| --- | --- |
| D. HERNANDEZ | Asked what was going on. |
| CERVANTES | Asked, "So I can get something?" |
| D. HERNANDEZ | Asked, "What you got? Myself don't (unintelligible) unless I know what the dollar amount is." |
| CERVANTES | Said, "Just make me a quart … a quarter and I'll cover the rest." |

| D. HERNANDEZ | Said, okay, that he that he would call CERVANTES and asked where CERVANTES was. |
| CERVANTES | Said at his house. |
| D. HERNANDEZ | Said he was in the hood and would be right there. |

75.     On May 22, 2013, at approximately 10: 15 p.m., D. HERNANDEZ made an outgoing call from Target Telephone #2 to (760) 219-1147 and spoke with CERVANTES.

| D. HERNANDEZ | Asked if CERVANTES wanted to come by the house. |
| CERVANTES | Said not really but he (CERVANTES) would. |
| D. HERNANDEZ | Told CERVANTES to come back and that he (D. HERNANDEZ) had put some chicken kabob on the grill. |
| CERVANTES | Said, all right. |

76.     On May 22, 2013, at approximately 10:25 p.m., D. HERNANDEZ received an incoming call on Target Telephone #2 from (760) 660-5855 and spoke with N. HERNANDEZ.  The call is summarized, in part, as follows:

| N. HERNANDEZ | Said she (N. HERNANDEZ) was going to bed and that D. HERNANDEZ could eat by himself. |
| D. HERNANDEZ | Said he was two minutes away. |
| N. HERNANDEZ | Said she thought D. HERNANDEZ was on his way. |

| D. HERNANDEZ | Said, "I'm on my way, babe. I gotta meet someone with a quarter. I did it on my way." |
| N. HERNANDEZ | Said she had to go to work tomorrow and did not want to stay up. |

77.     On May 22, 2013, at approximately 10:53 p.m., D. HERNANDEZ received an incoming call on Target Telephone #2 from (760) 219-1147 and spoke with CERVANTES.  The call is summarized, in part, as follows:

| CERVANTES | Said he was there. |
| D. HERNANDEZ | Told CERVANTES to come to the back. |

78.     Based on intercepted calls over Target Telephones between D. HERNANDEZ, CERVANTES, and UM1691, I initiated surveillance at the Minerva Road residence on May 22, 2013, and, among other things, observed the following: at approximately 1:44 p.m., I observed two vehicles known to be associated with D. HERNANDEZ parked at the Minerva Road residence.  I additionally observed a 2002 tan Ford truck registered to Alfredo MARTINEZ (the "A. MARTINEZ truck") parked on the roadway just east of the Minerva Road residence driveway.  At approximately 1:53 p.m., I observed the CERVANTES sedan parked across the street from the Minerva Road residence. At approximately 2:08 p.m., I observed an unidentified Hispanic male adult wearing an orange in color shirt walk from the driveway area of the Minerva

Road residence and enter the A. MARTINEZ truck and eventually drive

southbound out of the area.

79.     At approximately 2:39 p.m., I observed CERVANTES walking from

the Minerva Road residence and open the trunk of the CERVANTES sedan and

place a large bag into the trunk and then close the trunk and enter the driver's

side of the vehicle and drive away.  It is believed that D. HERNANDEZ

additionally left the Minerva Road residence driving a known associated vehicle

at about the same time as CERVANTES departed.  Myself and participating

investigators maintained surveillance on CERVANTES as he made a stop at a

nearby department store at approximately 2:42 p.m.  CERVANTES, who was

shopping inside, eventually left the department store at approximately 3:09 p.m.

and placed a shopping bag from the store inside the trunk of the CERVANTES

sedan.  Surveillance followed CERVANTES as he drove southbound out of the

area.  Surveillance followed CERVANTES to an industrial area in Cathedral City,

California, where his vehicle was lost by surveillance as it traveled into the

industrial area at approximately 3:18 p.m.  At approximately 4:25 p.m.,

surveillance officers located the CERVANTES sedan unoccupied and parked at a

business identified as the New World Trading Company in Cathedral City,

California (the "business").

80.     I recently reviewed a Cathedral City Police Department ("CCPD") police report, dated July 27, 2008, wherein the CCPD conducted a burglary investigation at the business and CERVANTES identified himself as the business manager.

81.     At approximately 5:23 p.m., CERVANTES met with an unidentified female driving a white California plated Mazda sedan in the west side parking lot of the business. Surveillance officers observed CERVANTES retrieve a red backpack from the trunk of the CERVANTES sedan. Surveillance officers noted that CERVANTES was looking around the surrounding area more than normal and determined that he may be conducting counter-surveillance consistent with narcotics traffickers involved in drug trafficking. Both CERVANTES and the female then walked eastbound generally toward the business front door and out of view of surveillance. However, surveillance officers were not in a position to view if CERVANTES actually entered the business.

82.     At approximately 5:42 p.m., surveillance observed the unidentified female return to her vehicle carrying a white food container and a purple/black in color backpack. Surveillance observed CERVANTES toss a backpack, possibly darker in color, into the driver's compartment area of the CERVANTES sedan. Surveillance officers noted that CERVANTES continued to look around the area more than normal during this time which participating investigators believed

was counter-surveillance. Surveillance was continued on CERVANTES and the unidentified female as they drove in tandem out of the area at approximately 5:49 pm.

83. Surveillance was maintained on CERVANTES and after making additional stops at other locations, CERVANTES eventually arrived at 2010 N. San Clemente Road, Palm Springs, California (the "CERVANTES residence") at approximately 6:34 p.m. and he parked in the driveway. At approximately 6:38 p.m., surveillance officers observed CERVANTES exit the CERVANTES sedan and open the trunk. CERVANTES obtained a bag from the trunk which resembled a "pink re-usable grocery bag" and eventually walked into the CERVANTES residence through the main garage door and then the garage door closed behind CERVANTES. Surveillance lost sight of the unknown female in Cathedral City, California, at approximately 6:26 p.m.

84. Based on my training and experience, knowledge of this investigation, review of intercepted communications over Target Telephones, and summaries thereof, surveillance observations, discussions with other officers, and other investigative techniques, I believe, among other things, the following regarding the activities of May 22, 2013: UM1691 is a methamphetamine source of supply to the HERNANDEZ DTO. UM1691 offered a three pound quantity of methamphetamine to D. HERNANDEZ. Further, D.

HERNANDEZ agreed to accept the methamphetamine and that UM1691 wanted

to sell three pounds of methamphetamine for $3,600 per pound.  D.

HERNANDEZ directed UM1691 to come to the Minerva Road residence and

later provided UM1691 with directions to the Minerva Road residence.  In

addition, that D. HERNANDEZ told CERVANTES to also come by the Minerva

Road residence to assist with processing the methamphetamine obtained from

UM1691 by instructing CERVANTES to bring "big ziplos, ziplocs."  Based on my

training and experience, I know that drug traffickers commonly package

methamphetamine and other illegal narcotics within ziploc bags.  CERVANTES

agreed to meet with D. HERNANDEZ and UM1691 at the Minerva Road

residence to conduct the drug transaction and process the methamphetamine.

Further, D. HERNANDEZ called his wife, N. HERNANDEZ, to determine where

the "vacuum sealer" was located within the Minerva Road residence.  Based on

my training and experience, I know that vacuum sealers are commonly used by

drug traffickers to package methamphetamine.  Based on the totality of the facts

outlined above, I believe that UM1691 provided D. HERNANDEZ with

approximately three pounds of methamphetamine, that CERVANTES assisted

with packaging the methamphetamine, and that CERVANTES transported a

portion of that methamphetamine from the Minerva Road residence.  Because D.

HERNANDEZ received a large shipment of methamphetamine at the Minerva

Road residence earlier that day, N. HERNANDEZ later spoke with D.

HERNANDEZ to see if D. HERNANDEZ had secured the methamphetamine

and/or related contraband because children were going to be at the residence.

D. HERNANDEZ was later contacted by CERVANTES who was looking to

acquire "a quarter" (undetermined amount) of methamphetamine and

CERVANTES agreed to come to D. HERNANDEZ's residence. D.

HERNANDEZ later spoke with N. HERNANDEZ regarding the above-

referenced drug transaction involving CERVANTES. CERVANTES later came to

D. HERNANDEZ's and N. HERNANDEZ's residence to obtain the

methamphetamine.

<u>Execution of Search Warrants on May 24, 2013</u>

85. In the latter part of May, based on intercepted communications

over Target Telephones, I believed that D. HERNANDEZ and Mendoza-

ESCOBEDO were engaged in ongoing narcotics activity and possibly shared a

residence at 67150 Hacienda Avenue, Apartment 803, Desert Hot Springs,

California (the "Hacienda Avenue residence"). On May 24, 2013, the Honorable

Sheri Pym, United States Magistrate Judge, signed search warrants for the

Hacienda Avenue residence and, among other vehicles, a 2012 Mercedes known

to be driven by D. HERNANDEZ (the "D. HERNANDEZ Mercedes"). On May

24, 2013, D. HERNANDEZ and his girlfriend, Mendoza-ESCOBEDO, were

arrested at the Hacienda Avenue residence in connection with the execution of the search warrants.

86.     During the execution of the search warrants, a stolen .40 caliber handgun with a loaded magazine clip containing .40 caliber round ammunition next to it were found on an upper shelf in a master bedroom closet, and a nearby safe found in a separate master bedroom closet contained, among other things, 80 gross grams of methamphetamine and a drug scale.  Further, residue crystal methamphetamine was seized from the console of the D. HERNANDEZ Mercedes.   Presumptive field tests of the substances identified above revealed positive results for methamphetamine.  No charges were filed with regard to the seized evidence and both D. HERNANDEZ and Mendoza-ESCOBEDO were released from custody after signing a magistrate waiver.

<u>Intercepted Communications between May 24 and May 26, 2013</u>

87.     On May 24, 2013, at approximately 2:10 p.m., D. HERNANDEZ made an outgoing call from Target Telephone #2 to (760) 660-5855 and spoke with N. HERNANDEZ.  The call is summarized, in part, as follows:

| N. HERNANDEZ | Asked if D. HERNANDEZ was okay. |
| D. HERNANDEZ | Said, "No, I need you to arrange pick up for Dylon. Have him go to Jake's house or something. |
| N. HERNANDEZ | Said, okay. |

| | |
|---|---|
| D. HERNANDEZ | Said, "I'm detained right now so just … arrange pick up for Dylon and that's it. Make sure he goes to Jake's house." |
| N. HERNANDEZ | Asked, "Is it in a bad way?" |
| D. HERNANDEZ | Said, yeah. |
| N. HERNANDEZ | Asked, (unintelligible). |
| D. HERNANDEZ | Said, "No, call my attorney." |
| N. HERNANDEZ | Asked, "Call your attorney?" |
| D. HERNANDEZ | Said, "Yeah, have him get a hold of me right away." |
| N. HERNANDEZ | Asked, "What's your attorney's number?" |
| D. HERNANDEZ | Said, "Josh has it." |
| N. HERNANDEZ | Asked where D. HERNANDEZ was. |
| D. HERNANDEZ | Said, "Desert Hot Springs." |
| N. HERNANDEZ | Asked, "Are you serious?" |
| D. HERNANDEZ | Said, "Just arrange pick up for Dylon, call the attorney, we're gonna find out what's going on 'cause right now I can't leave. I'm not under arrest but I'm detained so I need to know my rights and what we're gonna do." |
| N. HERNANDEZ | Said, all right. |

88.     On May 24, 2013, at approximately 9:17 p.m., D. HERNANDEZ

received an incoming text message on Target Telephone #1 from (760) 905-1691

and exchanged text messages with an individual otherwise identified as

UM1691.  The text message exchange, in part, reads as follows (and may not

include the entirety of the text messages during this exchange):

> UM1691          I got two left u want jump on them

89.     On May 25, 2013, at approximately 1:07 a.m., D. HERNANDEZ

made an outgoing text message from Target Telephone #1 to (760) 905-1691 and

exchanged text messages with an individual otherwise identified as UM1691.

The text message exchange, in part, reads as follows (and may not include the

entirety of the text messages during this exchange):

> D. HERNANDEZ    Tomorrow dawg passed out

90.     On May 25, 2013, at approximately 10:31 a.m., D. HERNANDEZ

made an outgoing call from Target Telephone #2 to (760) 219-1147 and spoke

with CERVANTES.  The call is summarized, in part, as follows:

| | |
|---|---|
| D. HERNANDEZ | Asked what was going on. |
| CERVANTES | Said, "We're running on empty here. We're having a garage sale. We're having a big yard sale over here." |
| D. HERNANDEZ | Asked what was cracking. |
| CERVANTES | Said, "I need to see you. At 100." |
| D. HERNANDEZ | Said, "Man, you give me 30 bucks every time I see you." |
| CERVANTES | Asked why he (CERVANTES) was on standby all day and said D. HERNANDEZ had him (CERVANTES) on standby all day. |

D. HERNANDEZ    Said, "(Unintelligible) standby."

CERVANTES    Laughed.

D. HERNANDEZ    Said, "(Unintelligible) Nene (phonetic)."

CERVANTES    Said, Nene (phonetic) was the "last resort, standby guy." Said to let him (CERVANTES) know so he (CERVANTES) could get that from his "auntie" (phonetic) right here. Said they (CERVANTES and others) had crowds of people right here.

D. HERNANDEZ    Said CERVANTES should come by because he (D. HERNANDEZ) had his "guys coming by for lunch."

CERVANTES    Said, okay, and asked if he (CERVANTES) needed to be on standby right now.

D. HERNANDEZ    Said, yeah.

CERVANTES    Said, okay.

91.    On May 25, 2013, at approximately 10:34 a.m., D. HERNANDEZ made an outgoing call from Target Telephone #1 to (760) 905-1691 and spoke with an individual otherwise identified as UM1691. The call is summarized, in part, as follows:

D. HERNANDEZ    Asked what was up.

UM1691    Said, "Nothing, you guys want that or not?"

D. HERNANDEZ    Said, "Yeah, I'm right here."

UM1691    Said, "All right, I'll go over there now."

92.     On May 25, 2013, at approximately 10:43 a.m., D. HERNANDEZ

made an outgoing call from Target Telephone #2 to (760) 660-5855 and spoke

with N. HERNANDEZ.  The call is summarized, in part, as follows:

| | |
|---|---|
| N. HERNANDEZ | Asked if D. HERNANDEZ had stuff to do and if that was why he was up already. |
| D. HERNANDEZ | Said, yeah. |
| N. HERNANDEZ | Asked if D. HERNANDEZ wanted her to bring the "belongings" later with her. |
| D. HERNANDEZ | Said, yeah, and asked when. |
| N. HERNANDEZ | Said when she got out, around four o'clock if she did not take a lunch. |
| D. HERNANDEZ | Said, okay. |
| N. HERNANDEZ | Said she did not want to leave it in the car because of the heat, but said she just left it. |
| D. HERNANDEZ | Said he would call somebody else then. |
| N. HERNANDEZ | Said, all right, and told D. HERNANDEZ to let her know what she needed to do. |
| D. HERNANDEZ | Said, all right. |
| N. HERNANDEZ | Told D. HERNANDEZ to call her throughout the day. |
| D. HERNANDEZ | Said, okay. |

93.     On May 25, 2013, at approximately 10:51 a.m., D. HERNANDEZ made an outgoing call from Target Telephone #2 to (760) 219-1147 and spoke with CERVANTES. The call is summarized, in part, as follows:

| | |
|---|---|
| D. HERNANDEZ | Said he needed a "steezy" (phonetic). |
| CERVANTES | Asked, what? |
| D. HERNANDEZ | Said a "scale" and asked if CERVANTES had one. |
| CERVANTES | Said he had a "chinida" (phonetic) but that it "only goes up to 100 g's (possibly grams)." |
| D. HERNANDEZ | Repeated that he needed one. |
| CERVANTES | Asked, "Any one?" |
| D. HERNANDEZ | Said, yes. |
| CERVANTES | Asked what D. HERNANDEZ wanted him to do. |
| D. HERNANDEZ | Told CERVANTES to "go get a pizza from the place and bring that here." |
| CERVANTES | Said, okay. |
| D. HERNANDEZ | Said he (D. HERNANDEZ) would (unintelligible) "these other pizzas in the box." |
| CERVANTES | Said, okay. |

94.     On May 25, 2013, at approximately 11:14 a.m., D. HERNANDEZ made an outgoing call from Target Telephone #2 to (760) 660-5855 and spoke with N. HERNANDEZ. The call, in part, is summarized as follows:

| D. HERNANDEZ | Said, "I need that money." |
| N. HERNANDEZ | Said, "Okay, like, uh, right now, now or …?" |
| D. HERNANDEZ | Said, yeah. |
| N. HERNANDEZ | Asked, "Can you wait until 12:30?" |
| D. HERNANDEZ | Said, "Um, what time is it? I guess. Not really, people are coming by." |
| N. HERNANDEZ | Said, "So … well, give me until 12:00. Can I have until 12 or no?" |
| D. HERNANDEZ | Said, "I guess they are on their way." |
| N. HERNANDEZ | Asked, "oh, they are?" |
| D. HERNANDEZ | Said, "Yeah, I want them in and out of here." |
| N. HERNANDEZ | Said that was okay. |
| D. HERNANDEZ | Told N. HERNANDEZ to grab it all and asked what car N. HERNANDEZ would drive. |
| N. HERNANDEZ | Said, "the one you have been driving. |
| D. HERNANDEZ | Said, okay. |
| N. HERNANDEZ | Said, but it was up to him. |
| D. HERNANDEZ | Asked if he could get the white car (call disconnected). |

95.     On May 25, 2013, at approximately 11:22 a.m., D. HERNANDEZ

received an incoming call on Target Telephone #2 from (760) 660-5855 and spoke

with N. HERNANDEZ.  The call is summarized, in part, as follows:

D. HERNANDEZ   Said, "Tell me where to go."

N. HERNANDEZ   Asked, "Now what?"

D. HERNANDEZ   Asked, "Where do I go?"

N. HERNANDEZ   Asked, "Well, want me to meet you somewhere? I'm at the post office right now."

D. HERNANDEZ   Asked, "Should I just come get the white car?"

N. HERNANDEZ   Said, "It's up to you. Want to switch cars?"

D. HERNANDEZ   Said, yeah.

N. HERNANDEZ   Said, "All right. I'll put it, put it in the trunk."

D. HERNANDEZ   Said, all right.

96.     On May 25, 2013, at approximately 11:53 a.m., D. HERNANDEZ made an outgoing call from Target Telephone #2 to (760) 219-1147 and spoke with CERVANTES.  The call is summarized, in part, as follows:

D. HERNANDEZ   Asked what was up.

CERVANTES   Said, "I'm right here."

D. HERNANDEZ   Asked, "Where?  My pad?"

CERVANTES   Said, yeah.

D. HERNANDEZ   Said, "All right, come in."

CERVANTES   Said, all right.

97.     On May 25, 2013, at approximately 5:05 p.m., D. HERNANDEZ

made an outgoing call from Target Telephone #2 to (760) 449-6801 and spoke

with HINSON.  The call is summarized, in part, as follows:

| | |
|---|---|
| D. HERNANDEZ | Said, "Hey, uh, get the skeevies, it's in the office and the cups in the … in the bathroom." |
| HINSON | Said, okay. |
| D. HERNANDEZ | Said, "Weigh out a qp." |
| HINSON | Asked, "The skeevie in the office? Where at?" |
| D. HERNANDEZ | Said, "Should be up top or right there. Should be where I set it." |
| HINSON | Said, "Okay, I don't see it." |
| D. HERNANDEZ | Said, "That little cup I left in the bathroom." |
| HINSON | Said, "Okay. All right, I got it. All right. No problem." |
| D. HERNANDEZ | Said, "The white Lexus broke down. I'll be there in a minute." |

98.     On May 26, 2013, at approximately 7:33 p.m., D. HERNANDEZ

made an outgoing call from Target Telephone #1 to (760) 409-9429 and spoke

with UF9429[8].  The call is summarized, in part, as follows:

| | |
|---|---|
| D. HERNANDEZ | Said, "I just kept saying, could I have my lawyer present when this warrant comes in so we can fucking film this shit? Like, no, you |

---

[8] "UF9429" is an unidentified female using a telephone ending in "9429."

can't use the phone. I was, like, my son needed
to be picked up at two o'clock. So I called the
old lady, you know what I mean?"

UM9429           Said, yeah.

D. HERNANDEZ      Said, "But, yeah, it's all good. We're good."

99.      On May 24, 2013, while D. HERNANDEZ was under arrest in

Desert Hot Springs, California, law enforcement officers were actively surveilling

the Minerva Road residence.  Shortly thereafter, D. HERNANDEZ asked

investigators if he could place a call to his wife, N. HERNANDEZ, so that his

child, whom he identified as "Dylon" could be picked up from school.  At

approximately 2:22 p.m.,  surveillance officers observed a hispanic female who fit

the description of N. HERNANDEZ, a U.S. Postal Service employee, who arrived

at the Minerva Road residence in a U.S. Postal Service mail truck.   The female

believed to be N. HERNANDEZ exited the truck carrying what appeared to be a

shoulder strap bag, walked to the east side of the residence toward the back yard

where there is an entry door, and out of view.  Approximately six minutes later,

the subject believed to be N. HERNANDEZ returned to the postal truck

appeared to be carrying a large bag, entered it, and drove away.   Surveillance

officers subsequently observed another U.S. Postal Service mail truck delivering

mail at Minerva Road residence and in the area.

100.    Based on intercepted calls over Target Telephones between D.
HERNANDEZ, N. HERNANDEZ, CERVANTES, and UM1691, I initiated
intermittent surveillance at the Minerva Road residence on May 25, 2013, at
approximately 11:09 a.m.  During the intermittent surveillance I observed,
among other things, the following: at approximately 11:09 a.m., I observed two
vehicles known to be associated with D. HERNANDEZ parked at the Minerva
Road residence.

101.    At approximately 11:54 a.m., I observed a 2012 maroon/red Ford
SUV registered to Hugo MARTINEZ (the "H. MARTINEZ SUV") parked just east
of the Minerva Road residence driveway.  At approximately 11:57 a.m., I
observed the CERVANTES sedan parked in front of the Minerva Road residence.
At approximately 12:13 p.m., I observed the H. MARTINEZ SUV driving
southbound from the direction of the Minerva Road residence and then
northbound out of the immediate area. I observed two unidentified Hispanic
males inside the H. MARTINEZ SUV and noted that the driver was wearing a
baseball cap.  Further, I noted that the driver resembled both Alfredo and Hugo
MARTINEZ, the owners of the A. MARTINEZ truck and the H. MARTINEZ
SUV, respectively, and believed to be used by UM1691, the suspected
methamphetamine drug source of supply to the HERNANDEZ DTO.  Based on
my review of Alfredo and Hugo MARTINEZ's California Department of Motor

Vehicle ("DMV") driver's license photos, I believe them to be relatives as they strongly resemble one another, although Hugo MARTINEZ appears to be significantly heavier based on his DMV weight description.

102.     At approximately 12:19 p.m., I drove by the Minerva Road residence and noted that the CERVANTES sedan was no longer parked at the Minerva Road residence.  At approximately 12:41 p.m., I located the CERVANTES sedan parked at the business.  I noted the business appeared to be closed and the CERVANTES sedan was the only vehicle I observed parked at the business.  The CERVANTES sedan was parked on the west side of the business. At approximately 12:53 p.m., I observed the CERVANTES sedan travel southbound from the business and drive out of my immediate view.

103.     At approximately 2:02 p.m., I drove by the Minerva Road residence and observed a gray Honda parked east of the Minerva Road residence driveway.  I identified the license plate of the Honda as California 4ASN345. At approximately 5:35 p.m., I observed HINSON driving southbound on Minerva Road coming from the direction of the Minerva Road residence.

Based on my training and experience, knowledge of this investigation, review of intercepted communications over Target Telephones, and summaries thereof, surveillance observations, and other investigative techniques, I believe, among other things, the following regarding the activities of May 24 through May 26,

2013: D. HERNANDEZ, while detained, notified his wife, N. HERNANDEZ, during a ruse phone call that he was detained by police and requested in code that she remove suspected incriminating items from the Minerva Road residence, i.e., among other things, suspected illegal narcotics and drug proceeds. Further, that D. HERNANDEZ had been negotiating with a methamphetamine source of supply, identified as UM1691, who had agreed to supply D. HERNANDEZ with two pounds of methamphetamine. Realizing that N. HERNANDEZ had removed, among other things, drug proceeds from the Minerva Road residence on May 24, 2013, D. HERNANDEZ told N. HERNANDEZ that he needed those monies to purchase suspected methamphetamine from UM1691. In addition, that N. HERNANDEZ told D. HERNANDEZ how to retrieve the suspected incriminating items which she had secured in the trunk of her vehicle parked at the U.S. Postal Service parking lot.

104.    D. HERNANDEZ told CERVANTES to come by for lunch because the methamphetamine source of supply was coming to the Minerva Road residence to supply three pounds of methamphetamine. UM1691 and D. HERNANDEZ agreed to meet at the Minerva Road residence and, among other things, D. HERNANDEZ told CERVANTES to bring a scale to the Minerva Road residence in which CERVANTES agreed and later arrived at the Minerva Road residence to assist with the drug transaction. After completing the drug

transaction, CERVANTES, a known drug distributor of the HERNANDEZ DTO, drove to the business. D. HERNANDEZ later called HINSON who was present at the Minerva Road residence and asked him in coded language to obtain a scale to weigh out a "qp." Based on my training and experience, I know that narcotics traffickers commonly utilize digital scales when weighing out different quantities of illegal narcotics for sale. Further, that "qp" can be an abbreviation for a "quarter pound" and in this case I believe that D. HERNANDEZ and HINSON are referencing weighing out a quarter pound of methamphetamine at the Minerva Road residence. On May 26, 2013, D. HERNANDEZ told UF9429 that during his arrest on May 24, 2013, he was able to make a ruse phone call to his wife, N. HERNANDEZ, by saying that his son needed to be picked up at 2:00 p.m., thereby requesting in code that N. HERNANDEZ remove suspected incriminating evidence from the Minerva Road residence.

<u>Intercepted Communications between June 1 and June 3, 2013</u>

105. On June 1, 2013, at approximately 4:18 p.m., M. HERNANDEZ made an outgoing call from Target Telephone #1 to (760) 902-7440 and spoke with an individual otherwise identified as UM7440[9]. The call is summarized, in part, as follows:

---

[9] "UM7440" is an unidentified male using a telephone ending in "7440."

| | |
|---|---|
| UM7440 | Said people started hitting him (UM7440) because it got slow. |
| M. HERNANDEZ | Said everybody else was moving it just fine. |
| UM7440 | Said he was moving it but that everybody's got so much of it, that he was trying to get something better. |
| M. HERNANDEZ | Said he would see what was up but that he did not know if it was the same one they (M. HERNANDEZ and others) had open right now.  Asked UM7440 if he was ready. |
| UM7440 | Said, yeah, and asked if M. HERNANDEZ wanted to head out there. |
| M. HERNANDEZ | Said, yeah, and to let him (M. HERNANDEZ) call his brother (D. HERNANDEZ) and see where he was located. |
| UM7440 | Said, all right. |
| M. HERNANDEZ | Said he (D. HERNANDEZ) would probably meet UM7440 in the park or something. |

106.    On June 1, 2013, at approximately 4:20 p.m., M. HERNANDEZ made an outgoing call from Target Telephone #1 to Target Telephone #2 and spoke with D. HERNANDEZ.  The call is summarized, in part, as follows:

| | |
|---|---|
| M. HERNANDEZ | Asked, "What's up?" |
| D. HERNANDEZ | Said, "Nothing. Right here." |
| M. HERNANDEZ | Asked, "You got two of them right there?" |
| D. HERNANDEZ | Said, "Probably." |

M. HERNANDEZ    Said Joey (UM7440) was ready.

D. HERNANDEZ    Said, yup.

M. HERNANDEZ    Said Joey (UM7440) would meet D.
HERNANDEZ at the park.

107.    On June 1, 2013, at approximately 4:32 p.m., M. HERNANDEZ

made an outgoing call from Target Telephone #1 to (760) 902-7440 and spoke

with an individual otherwise identified as UM7440.  The call is summarized, in

part, as follows:

M. HERNANDEZ    Told UM7440 that he would meet him at the
park in 45 minutes to an hour.

UM7440          Said, okay.

108.    On June 1, 2013, at approximately 6:04 p.m., M. HERNANDEZ

made an outgoing call from Target Telephone #1 to Target Telephone #2 and

spoke with D. HERNANDEZ.  The call is summarized, in part, as follows:

M. HERNANDEZ    Asked, "Can you have two ready? I'm grabbing
them right now."

D. HERNANDEZ    Said, yeah.

109.    On June 2, 2013, at approximately 12:46 p.m., M. HERNANDEZ

made an outgoing call from Target Telephone #1 to Target Telephone #2 and

spoke with D. HERNANDEZ.  The call is summarized, in part, as follows:

M. HERNANDEZ    Asked what D. HERNANDEZ was doing.

| D. HERNANDEZ | Said, "My house, walking." |
|---|---|
| M. HERNANDEZ | Asked, "Want me to come watch the battle station?" |
| D. HERNANDEZ | Said, "No, just right here. I'm not spending no money. I only have $40 extra." |
| M. HERNANDEZ | Said, "That's good. I got Joey's (UM7440) money with me." |
| D. HERNANDEZ | Said, "All right, good. I'll talk to you when you get here." |

110.    On June 2, 2013, at approximately 9:39 p.m., M. HERNANDEZ received an incoming text message on Target Telephone from (760) 902-7440 and exchanged text messages with an individual otherwise identified as UM7440. The text message exchange, in part, reads as follows (and may not include the entirety of the text messages during this exchange):

| UM7440 | Hey bro I need to see you |
|---|---|

111.    On June 2, 2013, at approximately 9:40:12 p.m., M. HERNANDEZ made an outgoing text message to (760) 902-7440 and exchanged text messages with an individual otherwise identified as UM7440.  The text message exchange, in part, reads as follows (and may not include the entirety of the text messages during this exchange):

| M. HERNANDEZ | Ok |
|---|---|

112.    On June 2, 2013, at approximately 9:40:25 p.m., M. HERNANDEZ made an outgoing text message to (760) 902-7440 and exchanged text messages with an individual otherwise identified as UM7440. The text message exchange, in part, reads as follows (and may not include the entirety of the text messages during this exchange):

M. HERNANDEZ    Got some new product

113.    On June 2, 2013, at approximately 9:45:17 p.m., M. HERNANDEZ received an incoming text message on Target Telephone from (760) 902-7440 and exchanged text messages with an individual otherwise identified as UM7440. The text message exchange, in part, reads as follows (and may not include the entirety of the text messages during this exchange):

UM7440              Where you want me sosas

114.    On June 2, 2013, at approximately 9:45:41 p.m., M. HERNANDEZ made an outgoing text message to (760) 902-7440 and exchanged text messages with an individual otherwise identified as UM7440. The text message exchange, in part, reads as follows (and may not include the entirety of the text messages during this exchange):

M. HERNANDEZ    Valero

115.    On June 2, 2013, at approximately 10:01:12 p.m., M. HERNANDEZ received an incoming text message on Target Telephone from (760) 902-7440 and

exchanged text messages with an individual otherwise identified as UM7440. The text message exchange, in part, reads as follows (and may not include the entirety of the text messages during this exchange):

UM7440          I m leaving my house now

116.    In June 2, 2013, at approximately 10:01:37 p.m., M. HERNANDEZ made an outgoing text message to (760) 902-7440 and exchanged text messages with an individual otherwise identified as UM7440.  The text message exchange, in part, reads as follows (and may not include the entirety of the text messages during this exchange):

M. HERNANDEZ    Sossas them you fucking lag

117.    On June 2, 2013, at approximately 10:21 p.m., M. HERNANDEZ received an incoming text message on Target Telephone from (760) 902-7440 and exchanged text messages with an individual otherwise identified as UM7440. The text message exchange, in part, reads as follows (and may not include the entirety of the text messages during this exchange):

UM7440          I m here

118.    On June 3, 2013, at approximately 12:05 p.m., D. HERNANDEZ made an outgoing text message from Target Telephone #2 to (760) 625-6947 and exchanged text messages with an individual otherwise identified as UM6947[10].

---

[10] "UM6947" is an unidentified male using a telephone ending in "6947."

The text message exchange, in part, reads as follows (and may not include the entirety of the text messages during this exchange):

> D. HERNANDEZ  What s cracking got some new let me know when your ready

119.   Based on my training and experience, knowledge of this investigation, review of intercepted communications over Target Telephones, and summaries thereof, surveillance observations, and other investigative techniques, I believe, among other things, the following regarding the activities of June 1 and June 2, 2013: M. HERNANDEZ and UM7440 discussed the quality of methamphetamine available and that there was a significant amount on the streets for sale.  M. HERNANDEZ asked if UM7440 was ready to conduct a drug transaction and that M. HERNANDEZ needed to contact his brother D. HERNANDEZ to determine his availability.  M. HERNANDEZ then spoke with D. HERNANDEZ regarding the impending drug sale with UM7440 and asked if D. HERNANDEZ had an undetermined quantity of methamphetamine in his possession that could be supplied to UM7440.  M. HERNANDEZ and D. HERNANDEZ spoke about the logistics of supplying UM7440 with methamphetamine and M. HERNANDEZ agreed to obtain the methamphetamine from D. HERNANDEZ and then conduct an exchange later that day with UM7440.   On June 2, 2013, M. HERNANDEZ told D. HERNANDEZ that he had the money from the methamphetamine sale involving

- 62 -

UM7440 and that he agreed to meet D. HERNANDEZ. M. HERNANDEZ then communicated by text message with UM7440 wherein M. HERNANDEZ told UM7440 that he had a new shipment of methamphetamine and that the two agreed to meet later that day. On June 3, 2013, D. HERNANDEZ communicated by text message with UM7440 that he recently received a new shipment of methamphetamine and wanted to determine if UM7440 was interested in purchasing the methamphetamine.

I.  *Training and experience regarding drug trafficking*

120.   Based on my training, experience, and participation in this investigation, as well as numerous other investigations involving the trafficking of narcotics, and my consultation with the other law enforcement personnel described herein, I know:

a.   That drug traffickers maintain on hand large amounts of U.S. currency in order to maintain and finance their ongoing drug business, or as proceeds from their illicit trafficking activities. That drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, cashier check receipts and other papers relating to the transportation, ordering, sale and distribution of controlled substance, even though such documents may be in code.

b.      That drug traffickers commonly "front" drugs (provide controlled substances on consignment) to their clients, and that records are maintained by such dealers so they can account for their drugs and the monies owed for these illegal drugs.

c.      That the aforementioned books, records, receipts, notes, ledgers, etc., are commonly maintained where drug traffickers have ready access to them, including but not limited to homes, offices, automobiles, storage places and locations used by traffickers to store and sell narcotics, commonly called "stash houses."

d.      That drug traffickers commonly secrete contraband, proceeds of drug and firearms sales and/or records of transactions, sources, and customers in secure locations within residences, businesses, offices, garages, storage buildings, safes, vaults, safe deposit boxes, vehicles, and obscure locations such as storage containers buried underground, in order to conceal such items from law enforcement authorities.

e.      That persons involved in drug trafficking conceal caches of drugs, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug transactions, in their residences, garages, freestanding structures on their property (including sheds, storage buildings, etc.), safes, vaults, and/or vehicles.

f.      That persons illegally engaged in the business of selling drugs keep lists of and contact information for persons whom they buy firearms and drugs from and sell firearms and drugs to, including amounts paid to or owed by these persons (commonly referred to as "pay/owe sheets").  They also tend to keep for long periods of time receipts related to the purchase, sale, and repair of firearm parts and accessories.

g.      That drug traffickers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses, and/or telephone numbers for their associates in drug and firearm trafficking, even if said items may be in code, and that these types of records are sometimes maintained in computers or other electronic data storage devices, including telephones.

h.      That drug traffickers frequently take, or cause to be taken, photographs and/or videos of themselves, their associates, their property, and their product, and that these traffickers usually maintain these photographs and/or videos, in their residences, offices or other places under their control.

i.      That drug traffickers frequently use two-way radios, police scanners, video surveillance systems, and other counter-surveillance equipment to detect the presence of law enforcement attempting to conduct surveillance or

drug offense), and 846 (conspiracy to distribute or to possess with intent to

distribute controlled substances), as alleged in the criminal complaint.


SEAN ZELKA
Special Agent, DEA


Subscribed to and sworn before me
This 4th day of June, 2013.

HONORABLE DAVID T. BRISTOW
United States Magistrate Judge

# EXHIBIT B

```
LOSD3            *        PUBLIC INFORMATION         *        07-28-2020
PAGE 001         *             INMATE DATA           *        10:15:17
                          AS OF 07-28-2020

REGNO..: 64977-112 NAME: HERNANDEZ, DYLON ROBERT

                      RESP OF: MAR
                      PHONE..: 618-964-1441    FAX: 618-964-2058
                                               RACE/SEX...: WHITE / MALE
                                               AGE:  39
PROJ REL MT: GOOD CONDUCT TIME RELEASE         PAR ELIG DT: N/A
PROJ REL DT: 03-26-2024                         PAR HEAR DT:




G0002      MORE PAGES TO FOLLOW . . .
```

```
LOSD3              *      PUBLIC INFORMATION      *      07-28-2020
PAGE 002           *        INMATE DATA           *      10:15:17
                          AS OF 07-28-2020


REGNO..: 64977-112 NAME: HERNANDEZ, DYLON ROBERT

                    RESP OF: MAR
                    PHONE..: 618-964-1441   FAX: 618-964-2058
HOME DETENTION ELIGIBILITY DATE: 09-26-2023


THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S CURRENT COMMITMENT.
THE INMATE IS PROJECTED FOR RELEASE:  03-26-2024 VIA GCT REL

---------------------CURRENT JUDGMENT/WARRANT NO: 010 -----------------------

COURT OF JURISDICTION...........: CALIFORNIA, CENTRAL DISTRICT
DOCKET NUMBER...................: ED CR 13-00122 VAP
JUDGE...........................: PHILLIPS
DATE SENTENCED/PROBATION IMPOSED: 11-16-2015
DATE COMMITTED..................: 01-21-2016
HOW COMMITTED...................: US DISTRICT COURT COMMITMENT
PROBATION IMPOSED...............: NO


                FELONY ASSESS  MISDMNR ASSESS  FINES       COSTS
NON-COMMITTED.: $100.00        $00.00          $00.00      $00.00

RESTITUTION...: PROPERTY:  NO  SERVICES:  NO      AMOUNT: $00.00

------------------------CURRENT OBLIGATION NO: 010 ------------------------
OFFENSE CODE....: 383   21:841 SCH II NON-NARCOTIC
OFF/CHG: 21:841(A)(1),(B)(1)(A)(VIII) AND 18:2(B) DISTRIBUTION OF
         METHAMPHETAMINE; AND CAUSING AN ACT TO BE DONE

 SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
 SENTENCE IMPOSED/TIME TO SERVE.:   120 MONTHS
 TERM OF SUPERVISION............:     5 YEARS
 DATE OF OFFENSE................: 09-20-2012
```

```
G0002      MORE PAGES TO FOLLOW . . .
```

```
 LOSD3              *        PUBLIC INFORMATION        *        07-28-2020
PAGE 003 OF 003 *                INMATE DATA           *        10:15:17
                              AS OF 07-28-2020
```

REGNO..: 64977-112 NAME: HERNANDEZ, DYLON ROBERT

```
                      RESP OF: MAR
                      PHONE..: 618-964-1441   FAX: 618-964-2058
-------------------------CURRENT COMPUTATION NO: 010 -------------------------
```

COMPUTATION 010 WAS LAST UPDATED ON 12-12-2019 AT DSC AUTOMATICALLY
COMPUTATION CERTIFIED ON 01-13-2016 BY DESIG/SENTENCE COMPUTATION CTR

THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
CURRENT COMPUTATION 010: 010 010

```
DATE COMPUTATION BEGAN..........: 11-16-2015
TOTAL TERM IN EFFECT............:  120 MONTHS
TOTAL TERM IN EFFECT CONVERTED..:   10 YEARS
EARLIEST DATE OF OFFENSE........: 09-20-2012

JAIL CREDIT.....................:   FROM DATE    THRU DATE
                                    06-05-2013   09-12-2013

TOTAL PRIOR CREDIT TIME.........: 100
TOTAL INOPERATIVE TIME..........: 0
TOTAL GCT EARNED AND PROJECTED..: 499
TOTAL GCT EARNED................: 175
STATUTORY RELEASE DATE PROJECTED: 03-26-2024
TWO THIRDS DATE.................: 04-08-2022
EXPIRATION FULL TERM DATE.......: 08-07-2025
TIME SERVED.....................:    4 YEARS    11 MONTHS     21 DAYS
PERCENTAGE OF FULL TERM SERVED..: 49.7
PERCENT OF STATUTORY TERM SERVED: 57.6

PROJECTED SATISFACTION DATE.....: 03-26-2024
PROJECTED SATISFACTION METHOD...: GCT REL
```

S0055       NO PRIOR SENTENCE DATA EXISTS FOR THIS INMATE

# EXHIBIT C

# Bureau of Prisons
## Health Services
## COVID-19 RNA

| Begin Date: | 01/01/2020 | End Date: | 07/28/2020 |
|---|---|---|---|
| Reg #: | 64977-112 | Inmate Name: | HERNANDEZ, DYLON ROBERT |

(Reference Range - Negative)

| **Effective Date** | **COVID-19 RNA** | | **Provider** |
|---|---|---|---|
| 07/27/2020 14:50 MAR | Negative | Asymptomatic | Johnson, Leslie Phlebotomist |
| **Orig Entered:** | 07/27/2020 15:52 EST | Johnson, Leslie Phlebotomist | |
| 07/22/2020 09:20 MAR | Negative | Asymptomatic | Pass, Randall MD/CD |
| **Orig Entered:** | 07/22/2020 10:22 EST | Pass, Randall MD/CD | |
| 07/16/2020 17:39 MAR | Negative | Asymptomatic | Rodden, Rhonda RN, NCRO |
| **Orig Entered:** | 07/16/2020 18:40 EST | Rodden, Rhonda RN, NCRO | |

**Total:** 3

# EXHIBIT D

**HERNANDEZ, Dylan #64977-112**

You requested a reduction in sentence (RIS) based on concerns about COVID-19.  After careful consideration, your request is denied.

Title 18 of the United States Code, section 3582(c)(1)(A), allows a sentencing court, on motion of the Director of the BOP, to reduce a term of imprisonment for extraordinary or compelling reasons.  BOP Program Statement No. 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), provides guidance on the types of circumstances that present extraordinary or compelling reasons, such as the inmate's terminal medical condition; debilitated medical condition; status as a "new law" elderly inmate, an elderly inmate with medical conditions, or an "other elderly inmate"; the death or incapacitation of the family member caregiver of the inmate's child; or the incapacitation of the inmate's spouse or registered partner.  Your request has been evaluated consistent with this general guidance.

The BOP is taking extraordinary measures to contain the spread of COVID-19 and treat any affected inmates.  We recognize that you, like all of us, have legitimate concerns and fears about the spread and effects of the virus.  However, your concern about being potentially exposed to, or possibly contracting, COVID-19 does not currently warrant an early release from your sentence.  Accordingly, your RIS request is denied at this time.

If you are not satisfied with this response to your request, you may commence an appeal of this decision via the administrative remedy process by submitting your concerns on the appropriate form (BP-9) within 20 days of the receipt of this response.

07/31/2020
_____

Date

_____

D. Sproul, Warden

# EXHIBIT F

```
LOSD3  531.01 *              INMATE HISTORY           *    07-28-2020
PAGE 001 OF 001 *              FIRST STEP             *    10:12:02


 REG NO..: 64977-112 NAME....: HERNANDEZ, DYLON ROBERT
 CATEGORY: FSA         FUNCTION: PRT        FORMAT:


FCL     ASSIGNMENT  DESCRIPTION                  START DATE/TIME STOP  DATE/TIME
MAR     FTC ELIG    FTC-ELIGIBLE - REVIEWED      01-26-2020 1912 CURRENT
MAR     R-HI        HIGH RISK RECIDIVISM LEVEL   05-27-2020 0900 CURRENT
MAR     R-HI        HIGH RISK RECIDIVISM LEVEL   11-10-2019 1449 05-27-2020 0900
MAR     FTC INELIG  FTC-INELIGIBLE-REVIEWED      11-10-2019 1443 01-26-2020 1912
MAR     UNASSG RSK  UNASSIGNED RISK LEVEL        10-07-2019 0111 11-10-2019 1449
MAR     UNREVW HIS  UNREVIEWED OFFENSES          10-07-2019 0111 11-10-2019 1443




G0000       TRANSACTION SUCCESSFULLY COMPLETED
```

# EXHIBIT G

```
LOSD3          *      INMATE DISCIPLINE DATA      *      07-28-2020
PAGE 001       *   CHRONOLOGICAL DISCIPLINARY RECORD   *      10:12:25


REGISTER NO: 64977-112 NAME..: HERNANDEZ, DYLON ROBERT
FUNCTION...: PRT        FORMAT: CHRONO    LIMIT TO ___ MOS PRIOR TO 07-28-2020

--------------------------------------------------------------------------------
REPORT NUMBER/STATUS.: 3080971 - SANCTIONED INCIDENT DATE/TIME: 01-23-2018 1830
DHO HEARING DATE/TIME: 01-29-2018 1130            DHO REPT DEL: 02-01-2018 0800
FACL/CHAIRPERSON.....: CAA/ZEVAN,G
REPORT REMARKS.......: GRT WGT;REFUSED PRGM ASSIGNMENT TO RETURN TO GP.
                       NO STATEMENT.
   306  REFUSING WORK/PGM ASSIGNMENT - FREQ: 2
        DS        / 90 DAYS / CS
        COMP:     LAW:    TO DEMONSTRATE SERIOUSNESS OF ACT.
        LP COMM   / 30 DAYS / CS
        COMP:     LAW:    TO DETER.
        LP MPLAYER / 30 DAYS / CS
        COMP:     LAW:    TO DETER.
--------------------------------------------------------------------------------
REPORT NUMBER/STATUS.: 3075471 - SANCTIONED INCIDENT DATE/TIME: 01-08-2018 0800
UDC HEARING DATE/TIME: 01-10-2018 0708
FACL/UDC/CHAIRPERSON.: CAA/F2 UNIT/GAMBONE
REPORT REMARKS.......: INMATE SANCTIONED TO 30 DAYS LP COMM
   306  REFUSING WORK/PGM ASSIGNMENT - FREQ: 1
        LP COMM   / 30 DAYS / CS
        COMP:     LAW:
--------------------------------------------------------------------------------
REPORT NUMBER/STATUS.: 2928241 - SANCTIONED INCIDENT DATE/TIME: 12-13-2016 1330
UDC HEARING DATE/TIME: 12-14-2016 1015
FACL/UDC/CHAIRPERSON.: VIM/C3/4/K.ROBERSON
REPORT REMARKS.......: NO COMMENT
   310  BEING ABSENT FROM ASSIGNMENT - FREQ: 1
        LP COMM   / 30 DAYS / CS / SUSPENDED 90 DAYS
        COMP:     LAW:    30 DAYS LOSS OF COMM SUSPENDED PENDING 90 DAYS
                         CLEAR CONDUCT
--------------------------------------------------------------------------------
REPORT NUMBER/STATUS.: 2894553 - SANCTIONED INCIDENT DATE/TIME: 09-10-2016 0900
DHO HEARING DATE/TIME: 09-20-2016 0712
FACL/CHAIRPERSON.....: VIM/R. BOURN
REPORT REMARKS.......: ADMITS TO DRINKING ALCOHOL
   112  USE OF DRUGS/ALCOHOL - FREQ: 1 ATI: DAB
        DIS GCT   / 41 DAYS / CS
        COMP:010 LAW:P
        LP MPLAYER / 90 DAYS / CS
        COMP:     LAW:    LOSS OF MP3 PLAYER THROUGH 12-20-2016
        LP PHONE  / 3 MONTHS / CS
        COMP:     LAW:    LOSS OF TELEPHONE THROUGH 12-20-2016




G0002       MORE PAGES TO FOLLOW . . .
```

```
LOSD3          *        INMATE DISCIPLINE DATA        *      07-28-2020
PAGE 002 OF 002 *    CHRONOLOGICAL DISCIPLINARY RECORD    *      10:12:25

REGISTER NO: 64977-112 NAME..: HERNANDEZ, DYLON ROBERT
FUNCTION...: PRT        FORMAT: CHRONO     LIMIT TO ___ MOS PRIOR TO 07-28-2020

-----------------------------------------------------------------------------
REPORT NUMBER/STATUS.: 2885062 - SANCTIONED INCIDENT DATE/TIME: 08-16-2016 0730
UDC HEARING DATE/TIME: 08-23-2016 1700
FACL/UDC/CHAIRPERSON.: VIM/C1/2/A. COATES
REPORT REMARKS.......: I/M ADMITS CHARGE.
    310  BEING ABSENT FROM ASSIGNMENT - FREQ: 1
         LP COMM    / 30 DAYS / CS / SUSPENDED 60 DAYS
         COMP:   LAW:   LP COMM SUSPENDED PENDING 60 DAYS CLEAR CONDUCT.




G0005       TRANSACTION SUCCESSFULLY COMPLETED - CONTINUE PROCESSING IF DESIRED
```

## DECLARATION OF  James C. LeClair

I, James C. LeClair, do hereby declare and state the following:

    1.    I am employed by the Federal Bureau of Prisons ("BOP") as the Associate Warden at the United States Penitentiary in Marion, Illinois ("USP Marion").  I have held this position since March 1, 2020, and have been employed by the BOP since March 15, 2009.

    2.    The facts set forth in this declaration are provided based on my knowledge of events at USP Marion, or based on my review of BOP records.  If called upon, I would testify as set forth below.   I am providing this declaration in support of the United States' Response to the Motion to Reduce Sentence pursuant to 18 U.S.C. § 3582(C)(1)(A) filed by Defendant Dylon Hernandez, Register Number 64977-112.  More specifically I am providing this declaration to explain the current conditions and situation at USP Marion as it affects the defendant.

    3.    USP Marion is an all-male medium security facility located in Williamson County, Illinois housing approximately 1,050 inmates.

    4.    As part of my official duties, I have access to the BOP database known as SENTRY, which is capable of generating reports regarding federal inmates. One such report is entitled "Inmate Profile" which provides a synopsis of information about an inmate. Attached, as Exhibit A is a true and correct redacted copy of this report for the defendant generated on August 7, 2020.  Redacted from this report are the defendant's date of birth, social security number and the telephone extensions for his Unit Team.  Also included in Exhibit A is a report entitled "Inmate History" generated on August 7, 2020, that has been filtered for medical duty status information.  These reports shows that:

    a.    The defendant's current projected release date is March 26, 2024.

Ex. A

PROJ REL DATE..: 03-26-2024

b.     The defendant has been evaluated as medical Care Level 2, meaning that he has chronic but stable medical conditions.  Id.

```
MAR CARE LEVEL CARE2 STABLE, CHRONIC CARE 01-27-2016 1510
```

c.     The defendant has been evaluated under the Department of Justices' PATTERN system to have a high risk of recidivism.  Id.

```
MAR FIRST STEP R-HI HIGH RISK RECIDIVISM LEVEL 05-27-2020 0900
```

d.  The defendant is currently in quarantine and has been in COVID-19 quarantine since July 16, 2020.  Id.

```
MAR C19-QUAR COVID-19 QUARANTINED 07-27-2020 0846 CURRENT
MAR C19-QUAR COVID-19 QUARANTINED 07-16-2020 1600 07-27-2020 0846
```

e.     The defendant's has tested negative for COVID-19 on multiple occasions.  Id.

```
MAR C19-T NEG COVID-19 TEST-RESULTS NEGATIVE 08-04-2020 0906 CURRENT
MAR C19-T NEG COVID-19 TEST-RESULTS NEGATIVE 07-27-2020 0856 08-04-2020 0906
MAR C19-T NEG COVID-19 TEST-RESULTS NEGATIVE 07-27-2020 0658 07-27-2020 0856
MAR C19-T NEG COVID-19 TEST-RESULTS NEGATIVE 07-16-2020 1600 07-27-2020 0658
```

f.     The defendant is currently housed in housing unit C.  Id.

```
MAR QUARTERS C04-005L HOUSE C/RANGE 04/BED 005L 04-28-2020 1800
```

5.     USP Marion conforms to all of the BOP's protocols for the management of the COVID-19.  These protocols include the monitoring of all inmates for COVID-19 symptoms, placement of inmates in isolation or quarantine when warranted and the ongoing institution of safety and hygiene requirements for all inmates and staff.  For example, all inmates at USP Marion have been provided with cloth masks that they are required to wear when they are out of their cells.  The institution has also instituted a regular sanitation schedule for the cleaning of all areas and the frequent and repeated cleaning of Institute a continuous cleaning/disinfection schedule for all high traffic/touch areas such as doors, door handles, and lights, as well as telephone and computer use areas.  These and other of the BOP's protocols for managing the COVID-19 pandemic are available at https://www.bop.gov/foia/docs/2020_COVID_Guidance_part_1.pdf; and https://www.bop.gov/foia/docs/2020_COVID_Guidance_part_2.pdf.  The BOP's Action

1   Plan and Phases Two through Seven of the Action Plan are available at

2   https://www.bop.gov/foia/docs/2020_COVID_memos.pdf.  Attached hereto as Exhibit B

3   and C, respectively, are Phases Eight and Nine of the Action Plan.  Phase Nine was

4   issued on August 5, 2020.

5        6.     As part of these protocols, the institution has implemented a testing regime

6   in conformance with the BOP's national guidance.  Attached hereto as Exhibit D is a

7   copy of the BOP's current COVID-19 testing guidance that became effective on July 24,

8   2020.  Attached hereto as Exhibit E is a copy of the COVID-19 testing, isolation and

9   quarantine flow algorithm that have been in place since May 20, 2020.

10       7.     Housing unit C is composed of four ranges of single man, open grill cells

11   arranged on two levels.  On July 16, 2020, one of the inmates assigned to this housing

12   unit tested positive for COVID-19.  This inmate was immediately removed from the

13   housing unit and placed in isolation.  Meanwhile, the rest of the housing unit was

14   immediately placed under quarantine.  Attached hereto as Exhibit F is a copy of the

15   BOP's COVID Quarantine flow chart that has been in place since April 26, 2020.

16   Attached hereto as Exhibit G is a copy of the BOP's Quarantine Procedures Checklist

17   that has been in place since May 22, 2020.

18       8.     Pursuant to this guidance, on July 16, 2020, the defendant and all of the

19   other inmates housed in Housing Unit C were as tested for COVID-19 because their

20   possible exposure to the inmate with a confirmed positive case of COVID-19.  The

21   sample was tested using Abbott ID NOW testing platform and the result was negative.

22   On July 17, 2020, a further nasal swab was taken and sent out to a laboratory for PCR

23   test.  This sample came back negative on July 20, 2020.  Follow up tests using the

24   Abbott platform were performed on July 22, July 27 and August 3, 2020.  This testing

25   protocol is consistent with the BOP's most recent guidance, which recommends re-

26   testing negative close contacts of confirmed positive COVID-19 cases every 3 to 4 days

27   whenever feasible.  Exhibit D, p. 3. All of the defendant's test results were negative.

28

Attached hereto as Exhibit H is a copy of the defendant's test COVID-19 test results from his medical records.

9. As a result of this regular re-testing of the entire housing unit, several more inmates were identified as positive, most recently on July 27, 2020. Each time an inmates was identified as positive, they were removed from the housing unit and placed in isolation. The inmates that remained in housing unit C then had their quarantine period reset to day 1 to ensure that the entire housing unit passed through a full 14 days of quarantine without having developed symptoms or tested positive for COVID-19. Thus, the defendant's current quarantine will not terminate until August 10, at the earliest.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief. Executed on this 6th day of August 2020, at Marion, Illinois.

James LeClair
Associate Warden

4

# LECLAIR

# EXHIBIT A

```
MARBE  535.03 *               INMATE PROFILE              *        08-07-2020
PAGE 001 OF 001                                                   13:11:59
              64977-112          REG

REGNO: 64977-112              FUNCTION: PRT DOB/AGE.: ████████ / 39
NAME.: HERNANDEZ, DYLON ROBERT               R/S/ETH.: W/M/H    WALSH: NO
RSP..: MAR-MARION USP                        MILEAGE.: 1566 MILES
PHONE: 618-964-1441    FAX: 618-964-2058
 PROJ REL METHOD: GOOD CONDUCT TIME RELEASE   FBI NO..: 357101PB5
 PROJ REL DATE..: 03-26-2024                  INS NO..: N/A
 PAR ELIG DATE..: N/A                         SSN.....: ████████
 PAR HEAR DATE..:              PSYCH: NO      DETAINER: NO        CMC..: YES
OFFN/CHG RMKS: ED CR 13-00122 VAP. 21:841 DISTRIBUTION OF METH.
OFFN/CHG RMKS: 120 MONTHS/5 YEARS SRT
  FACL CATEGORY    - - - - CURRENT ASSIGNMENT - - - - - EFF DATE  TIME
  MAR  ADM-REL   A-DES     DESIGNATED, AT ASSIGNED FACIL 08-14-2018 2053
  MAR  CARE LEVEL CARE1-MH  CARE1-MENTAL HEALTH          01-25-2016 0710
  MAR  CARE LEVEL CARE2     STABLE, CHRONIC CARE         01-27-2016 1510
  MAR  COR COUNSL CCC 4     M. THOMPSON - E/F/G EXT ████  02-20-2020 0711
  MAR  CASE MGT   BIR CERT N BIRTH CERTIFICATE - NO      04-20-2018 1511
  MAR  CASE MGT   DEPEND Y   DEPENDENTS UNDER 21 - YES   04-20-2018 1511
  MAR  CASE MGT   PHOTO ID N PHOTO ID - NO               04-20-2018 1511
  MAR  CASE MGT   RPP NEEDS  RELEASE PREP PGM NEEDS      02-02-2016 1327
  MAR  CASE MGT   SSN CARD N SOCIAL SECURITY CARD - NO   04-20-2018 1511
  MAR  CASE MGT   VET P/S N  PARENT/SPOUSE VETERAN - NO  04-20-2018 1511
  MAR  CASE MGT   VETERAN N  VETERAN - NO                04-20-2018 1511
  MAR  CASE MGT   V94 CDA913 V94 CURR DRG TRAF ON/AFT 91394 02-02-2016 1328
  MAR  CASE MGT                                          11-25-2015 1017
  MAR  CASEWORKER CSW 1      H. CLARK - B/C/D EXT ████    04-02-2020 1521
  MAR  CUSTODY    IN         IN CUSTODY                  11-25-2015 1010
  MAR  DRUG PGMS  DAP DECL   RESIDENT DRUG TRMT DECLINED 03-19-2020 1310
  MAR  DRUG PGMS  ED COMP    DRUG EDUCATION COMPLETE     04-12-2016 0939
  MAR  DRUG PGMS  INELIGIBLE 18 USC 3621 RELEASE INELIGIBLE 03-19-2020 1315
  MAR  DRUG PGMS  NR WAIT    NRES DRUG TMT WAITING       09-03-2019 0915
  MAR  DESIG/SENT FCAC YES   FCAC-FULLY COMPLIED W/JUD REC 01-13-2016 1316
  MAR  DESIG/SENT NOVEMBER   TEAM NOVEMBER               11-25-2015 1017
  MAR  EDUC INFO  ESL HAS    ENGLISH PROFICIENT          02-22-2016 1326
  MAR  EDUC INFO  GED EARNED GED EARNED IN BOP           01-10-2018 0703
  MAR  FIN RESP   COMPLT     FINANC RESP-COMPLETED       03-18-2016 1328
  MAR  FIRST STEP FTC ELIG   FTC-ELIGIBLE - REVIEWED     01-26-2020 1912
  MAR  FIRST STEP N-WORK Y   NEED - WORK YES             07-29-2020 0854
  MAR  FIRST STEP R-HI       HIGH RISK RECIDIVISM LEVEL  05-27-2020 0900
  MAR  LEVEL      MEDIUM     SECURITY CLASSIFICATION MEDIUM 04-23-2018 1211
  MAR  MED DY ST  C19-QUAR   COVID-19 QUARANTINED        07-27-2020 0846
  MAR  MED DY ST  C19-T NEG  COVID-19 TEST-RESULTS NEGATIVE 08-04-2020 0906
  MAR  MED DY ST  LOWER BUNK LOWER BUNK REQUIRED         01-25-2017 0738
  MAR  MED DY ST  NO PAPER   NO PAPER MEDICAL RECORD     01-21-2016 1116
  MAR  MED DY ST  REG DUTY   NO MEDICAL RESTR--REGULAR DUTY 01-27-2016 1510
  MAR  MED DY ST  YES F/S    CLEARED FOR FOOD SERVICE    01-27-2016 1510
  MAR  PGM REVIEW NOV        NOVEMBER PROGRAM REVIEW     11-05-2020 0634
  MAR  QUARTERS   C04-005L   HOUSE C/RANGE 04/BED 005L   04-28-2020 1800
  MAR  RELIGION   PROTESTANT PROTESTANT                  06-26-2018 1014
  MAR  UNIT       UM EAST    S. BYRAM B/C/D/E/F/G EXT ████ 02-20-2020 0711
  MAR  WRK DETAIL CAPT ORD   CAPTAIN'S OFFICE ORDERLY    05-31-2019 0001

G0000      TRANSACTION SUCCESSFULLY COMPLETED
```

```
  MARBE  531.01 *                INMATE HISTORY          *      08-07-2020
PAGE 001 OF 001 *                  MED DY ST             *      13:07:40


  REG NO..: 64977-112 NAME....: HERNANDEZ, DYLON ROBERT
  CATEGORY: MDS        FUNCTION: PRT        FORMAT:


FCL     ASSIGNMENT  DESCRIPTION                     START DATE/TIME STOP  DATE/TIME
MAR     C19-QUAR    COVID-19 QUARANTINED            07-27-2020 0846 CURRENT
MAR     C19-T NEG   COVID-19 TEST-RESULTS NEGATIVE  08-04-2020 0906 CURRENT
MAR     LOWER BUNK  LOWER BUNK REQUIRED             01-25-2017 0738 CURRENT
MAR     NO PAPER    NO PAPER MEDICAL RECORD         01-21-2016 1116 CURRENT
MAR     REG DUTY    NO MEDICAL RESTR--REGULAR DUTY  01-27-2016 1510 CURRENT
MAR     YES F/S     CLEARED FOR FOOD SERVICE        01-27-2016 1510 CURRENT
MAR     C19-T NEG   COVID-19 TEST-RESULTS NEGATIVE  07-27-2020 0856 08-04-2020 0906
MAR     C19-T NEG   COVID-19 TEST-RESULTS NEGATIVE  07-27-2020 0658 07-27-2020 0856
MAR     C19-QUAR    COVID-19 QUARANTINED            07-16-2020 1600 07-27-2020 0846
MAR     C19-T NEG   COVID-19 TEST-RESULTS NEGATIVE  07-16-2020 1600 07-27-2020 0658
MAR     MED HOLD    MEDICAL HOLD - DO NOT TRANSFER  10-04-2018 1554 12-18-2018 1305
VIM     LOWER BUNK  LOWER BUNK REQUIRED             02-02-2016 1426 01-25-2017 0738
VIM     NOT MED CL  NOT MEDICALLY CLEARED           11-25-2015 1010 01-27-2016 1510


G0000       TRANSACTION SUCCESSFULLY COMPLETED
```

# LECLAIR

# EXHIBIT B



**U.S. Department of Justice**
**Federal Bureau of Prisons**

*Washington, D.C. 20534*

June 30, 2020

**MEMORANDUM FOR ALL CHIEF EXECUTIVE OFFICERS**

**FROM:**          **ANDRE MATEVOUSIAN, ASSISTANT DIRECTOR**
                          **CORRECTIONAL PROGRAMS DIVISION**

                          NICOLE    Digitally signed by NICOLE ENGLISH
                          ENGLISH   Date: 2020.06.30 14:46:26 -04'00'
                          **N. C. ENGLISH, ASSISTANT DIRECTOR**
                          **HEALTH SERVICES DIVISION**

**SUBJECT:**      **CORONAVIRUS (COVID-19) PHASE EIGHT ACTION PLAN**

This memorandum describes the Bureau's (BOP) Coronavirus (COVID-19) Phase Eight Action Plan, which includes an extension of previously disseminated guidance along with new measures to implement in the management of the pandemic.

## EXTENSION OF PHASE SEVEN ACTION PLAN:

Effective Wednesday, July 1, 2020, the BOP will continue its nationwide action as described in the Phase Seven Action Plan. These restrictions will remain in place through July 31, 2020, at which time the plan will be reevaluated.

## COURT TRIPS:

A number of variables affect the risk of COVID-19 transmission during in-person court appearances and will determine some of the specific management strategies that are needed at each location. The U.S. Marshals Service (USMS) takes responsibility for the inmate once they leave the BOP institution until their return. Each USMS district may have their own procedures. Individual courts may also have different COVID mitigation procedures and requirements. Knowing the likelihood of BOP inmates mixing with non-quarantined, Non-BOP inmates while in USMS custody during a court visit is essential to determine the risk of COVID-19 exposure. The frequency of an inmate's court appearance and the number of inmates going to a court at any one time are also important factors to consider. It is recommended that each BOP detention center contact the USMS and the court to ascertain their COVID-19 mitigation procedures and consult with Regional Health Services staff on developing an individualized strategy. The following are general principles to follow:

- Inmates in COVID isolation should not have in-person court appearances unless absolutely necessary. Strongly consider the inmate appearing via telephone hearing. If a VTC is accessible, that can also be used as an alternative.

- Inmates in COVID quarantine (intake/exposure) should delay in-person court appearances until they are COVID tested at the end of quarantine. It is recommended that VTC or telephone appearances be used as alternatives. In general, testing an inmate immediately before or after a court visit would have little utility and is not recommended. However, Abbott ID NOW tests can be used on a case-by-case basis, especially if a visit is required by the court.

- Inmates should wear face coverings and perform hand hygiene just before departure from and upon return to the institution.

- BOP officials should request that BOP inmates be cohorted only within their own housing or quarantine cohort and not be mixed with inmates from other housing units or other institutions, or transported with inmates from other institutions to the extent possible while at court.

- Upon return to the detention center, inmates should be quarantined if they were outside of the institution and were exposed to inmates from other housing units or locations (e.g., county jails). Periodic testing of inmates with frequent court appearances should be considered. The 14-day quarantine period must be restarted for any inmate who is in close contact with other inmates not from their housing unit or location.

## INTAKES:

As we return to a more normalized inmate movement, the quarantine site model will no longer be utilized. All inmates entering an institution will require enhanced intake procedures:

- Institutions are to designate specific quarantine and isolation areas in advance with capacity numbers commensurate with anticipated levels and frequency of incoming inmates. Ideally, inmates should be quarantined or isolated in single-cell, if possible. When cohorting is necessary, the best practice is to keep cohorted inmates together and not add to the cohort when new intakes arrive.

  New intakes should undergo the same previously described intake screening process with symptom and temperature screening. Inmates will be tested on arrival with an approved viral PCR test from a nasopharyngeal swab using either an Abbott ID Now POC test or commercial send out lab test.
  - o Inmates that test positive and/or are symptomatic will be placed immediately in isolation. They will remain in Isolation until they meet the CDC test-based strategy criteria for isolation release which includes two negative tests at least 24 hours apart, the first may be performed with either Abbott ID POC or commercial lab test, but second must be commercial lab test.

  - o Inmates that are asymptomatic and test negative are placed in quarantine. They will remain in quarantine until:

- They become symptomatic during the quarantine period.  These inmates should be tested (Abbott or commercial) and placed in Isolation immediately.  Depending on the housing circumstances, potential contacts (e.g. cellmate, cohort, housing unit) will need to reset their quarantine.  When risk of exposure and/ or spread of transmission is higher, re-testing of potential contacts could be considered.  A testing frequency of every 3 to 4 days is preferred whenever feasible in consultation with Regional Infection Prevention and Control Consultant and the Regional Medical Director.

- On or after 14 days.  The inmates that have remained asymptomatic will be tested with a commercial lab test.  Inmates should remain in quarantine status until test results are complete.  If the test is positive, see above bullet. If the test is negative, the inmate may be released to General Population.

## MOVEMENT:

Movement of inmates between BOP institutions can be a simple, short-distance transfer between two institutions or a complex, multi-day, multi-institution process.  When a planned movement involves multiple stops, staff and agencies, and potential mixing with other inmate groups from other BOP facilities or other correctional jurisdictions, the risk of COVID-19 exposure and transmission increases. Refer to the HSD Guidance (6/19/20) for Inmates who are transferring or Releasing from a BOP Facility, https://sallyport.bop.gov/co/hsd/infectious_disease/covid19/docs/guidance_for%20_transferring_or%20releasing%20inmates_20200619.pdf

- As inmate movement operations move toward "normalizing", the number and complexity of inmate moves will increase.  This process of normalizing should be done in a measured approach to allow institutions, regions and the agency develop best practices moving forward.

- Institutions/ Regions should evaluate their space and staffing resources to accommodate increased numbers of the various types of quarantine inmate groups (intake, exposed and pre-release) as well as isolation inmates in various stages of the process.  Moving to a test out strategy for discontinuation of isolation may prolong isolation for various groups of inmates longer than 14 days.  Various and/or large groups of quarantine and isolation inmates may require a re-distribution of inmates amongst institutions within a region.

- The first step in ensuring safe inmate movement is a full test-in/out, 14-day pre-release quarantine of transferring inmates prior to transport.

  o Planning an inmate move should occur with enough time in advance to allow for a full test in/out 14-day quarantine and turnaround time for test results (21 days).

  o Planning should be coordinated with all the institutions involved from the beginning stages so that setting of dates will allow for the above process to occur for all the potential inmates on that move.

- o Inmates who have tested negative at the completion of their quarantine should stay in quarantine status until they are transferred, preferably within 5 days of the negative result, but may still move within 14 days of the negative result.

- o If an inmate develops symptoms and/or tests positive, they will not be permitted to travel until they have met the CDC test-based criteria for test-based release from isolation.  On rare occasions, there may be exceptions where an inmate must travel prior to the completion of this process or even with a positive result (e.g. court ordered transfer). In these cases, the transfer must be discussed and approved by local executive staff from the institutions and regions involved with input from health services staff, as needed.

- o For inmates who have previously tested positive for COVID-19: (refer to https://sallyport.bop.gov/co/hsd/infectious_disease/covid19/docs/covid19_testing_expanded_inmate_testing_strategies_2020619.pdf)

    - If they cleared isolation using the CDC test-based strategy more than 14 days prior to travel date, they will need one negative commercial viral lab test completed prior to travel and do not need any further testing or quarantine prior to transfer

    - If they cleared isolation using a symptom or time-based strategy, they will need one negative commercial viral lab test completed prior to travel and do not need further testing or quarantine prior to transfer.

    - If the test is positive, they cannot travel and must be placed in isolation until they meet the test-based criteria with two negative tests at least 24 hours apart. The first may be performed with either Abbott ID POC or commercial lab test, but second must be commercial lab test.

- Planning of inmate movement should be coordinated with close involvement of local Executive Staff, CMC, Unit Team and Health Services staff from all involved institutions/regions and transport agencies.  Communication and accurate information are vital to ensure a proposed inmate movement has minimized any potential risk of COVID-19 exposure/transmission.

- To the extent possible, manifests should be generated that allow for appropriate social distancing during transport (e.g. loading a bus/ plane at 50% capacity).

- "Normal" transport routes and schedules will need to be reviewed and reconsidered.  Inmate movement should be coordinated in a manner that:

    - o **Has minimal stops/holdovers:** e.g. consider institutions meeting at a halfway point to pick-up inmates rather than having multiple stops and holdovers.

- o **Minimizes the amount of time inmates are held in holdover:** the longer an inmate spends in transit, the greater the risk. The frequency of certain drop offs/pick-ups may need to be increased to minimize holdover times.

- o **Avoids mixing of inmate groups** as much as possible:

  - The following Inmate group terms will be defined as follows:

    - **BOP group** - inmates who have completed a full test in/out pre-release/ transfer quarantine process prior to transfer from a BOP facility.

    - **Non-BOP group** - inmates from other agency/correctional jurisdiction who have not undergone a full test in/out quarantine.

  - Maximize runs with only BOP groups; make every effort to coordinate runs for Non-BOP groups separately.

  - There are many scenarios where mixing of BOP groups from different BOP institutions is unavoidable.  If all BOP-groups have been properly tested in/out of a pre-release/transfer quarantine just prior to transport at their sending institution, this practice is acceptable.

  - Ideally, any Non-BOP group during a transfer will have been tested for COVID-19 prior to transport.  However, this is often not possible or verifiable.  All Non-BOP group inmates must have a temperature check and symptom screen immediately prior to transport.  Anyone with a known positive COVID-19 test or who has fever or symptoms will not be admitted on the transport.

  - If a BOP group is mixed with a Non-BOP group at any point in the transfer process, all the inmates in that group will require intake screening, testing and intake quarantine (asymptomatic) or isolation (symptomatic) at their destination institution.

- During transport, BOP-group inmates should wear at least facial coverings and staff should wear at least facial covering and gloves. For transport of Non-BOP or mixed groups, inmates should wear surgical masks and staff should wear surgical masks and gloves during transport and add gown and eye protection with direct contact.

- Documentation on the BEMR exit summary/transfer paperwork (e.g. In-Transit Form) needs to include results of the same-day symptom screen and temperature check, the most recent COVID-19 test result, and the inmate's COVID-19 history.  To ensure proper documentation of negative COVID-19 testing from a commercial lab is displayed on the exit summary, the BOP ICD code of Z03818-c19 will need to be added to the inmate's health problem list.  This will then display properly upon the inmate Exit Summary.  The BEMR Exit Summary/transfer paperwork

should be provided to the bus LT/USMS to verify that a commercial lab test has been completed with a negative test result.

- **Holdover Sites/Bus Hubs:**

  - Holdover/Bus hub sites should designate specific holdover quarantine areas in advance in numbers commensurate with anticipated levels and frequency of incoming inmates.

  - For BOP group transfers that have not mixed with Non-BOP groups and require holdover at a facility, the BOP groups can generally be placed directly into a holdover unit setting without a test in/out process and do not need to complete a full 14-day quarantine prior to moving on to their next destination.

  - These holdover groups should be housed separately from the new intake, post-exposure and prior to release/transfer* quarantine groups at that institution.
  *Note there is a distinction between inmates coming from another institution in holdover status waiting to "transfer"/continue on to their next destination versus inmates that are originating from the holdover site and waiting to transfer.

  - The various holdover groups may be housed together, if necessary.

  - If a holdover site/bus hub is known to receive Non-BOP groups, they should consider having designated quarantine/isolation units for them and manage them as new intakes.

    - Those that are symptomatic and/or test positive must be placed in isolation and can be released after meeting CDC test-based criteria for release from isolation into general population or transfer. If transfer is to occur after 14 days from their release from isolation, they will need one negative commercial viral lab test completed prior to travel. They do not need any further quarantine prior to transfer.
    - Those that are asymptomatic and test negative will be placed in quarantine. When they complete quarantine and test-out:

      - For those inmates that are expected to remain at the holdover site for a prolonged period of time, they can be released to General Population. If they are released to General Population, future transfers will require pre-transfer test-in/test-out quarantine.

      - For those inmates expected to transfer within a reasonable period of time, they should remain in quarantine until their transfer date. They should transfer within 14 days of the test-out negative result or be re-tested prior to transfer.

- If a holdover site/bus hub receives a mixed group of BOP and Non-BOP groups or BOP group that has previously mixed with a Non-BOP group, they must now all be managed as a Non-BOP group.

## DESIGNATED (FINAL RECEIVING) INSTITUTIONS:

Transferred inmates will undergo the same process as a new intake, to include intake screen and temperature check, COVID-19 testing and isolation versus new intake quarantine at the final designated facility.

## QUESTIONS:

If staff have questions about COVID-19, they may reach out to the agency at the following email box: COVID19Questions@bop.gov.

We appreciate your assistance as we continue to work collaboratively to mitigate the transmission of COVID-19 within our prisons nationwide, and with all phases of our COVID-19 response.

# LECLAIR

# EXHIBIT C



**U.S. Department of Justice**
**Federal Bureau of Prisons**

_Washington, D.C. 20534_

August 5, 2020

**MEMORANDUM FOR ALL CHIEF EXECUTIVE OFFICERS**

**FROM:**          **ANDRE MATEVOUSIAN, ASSISTANT DIRECTOR**
**CORRECTIONAL PROGRAMS DIVISION**

**L. CRISTINA GRIFFITH, ASSISTANT DIRECTOR**
**HUMAN RESOURCE MANAGEMENT DIVISION**     LINELL GRIFFITH   Digitally signed by LINELL GRIFFITH
Date: 2020.08.05
08:36:50 -04'00'

**N. C. ENGLISH, ASSISTANT DIRECTOR**   NICOLE    Digitally signed by NICOLE ENGLISH
**HEALTH SERVICES DIVISION**     ENGLISH   Date: 2020.08.05 08:22:21 -04'00'

**SUBJECT:**          **CORONAVIRUS (COVID-19) PHASE NINE ACTION PLAN**

This memorandum describes the Bureau's (BOP) Coronavirus (COVID-19) Phase Nine Action Plan, which includes an extension of previously disseminated guidance along with new measures to implement in the management of the pandemic.

## EXTENSION OF PHASE EIGHT ACTION PLAN

The BOP will continue its nationwide action as described in previous phase memorandums. These measures will remain in place through August 31, 2020, at which time the plan will be evaluated.

## STAFF TRAINING

All in-person training is suspended through August 31, 2020.   Exceptions to in-person training includes: ICT I, ICT II, completion of mandatory requirements for Annual Training, OSHA mandated certifications, and any training that can be conducted remotely to fulfill ongoing mandatory credentialing requirements that cannot be waived.   Any other exceptions to this suspension must be routed through the appropriate Assistant Director or Regional Director, and submitted to the Deputy Director for final approval.

## STAFF TRAVEL

All non-essential official staff travel is suspended through August 31, 2020.   Any requests for travel, except for deployment to institutions to assist with the COVID-19 pandemic, must be approved by the appropriate Regional Director or Assistant Director.

## LEGAL ACCESS

As courts begin to conduct more criminal and civil proceedings, inmates will need increased access to counsel and legal materials.

Legal calls and/or virtual legal visits:   Telephone calls and/or video conferencing with outside counsel should be accommodated to the extent possible.   Please work with your IT Department to provide and expand virtual access to attorneys whenever possible using either a VTC unit and/or WebEx.

In-Person Legal Visits: Consistent with standing guidance, in-person legal visits should be accommodated upon request. The legal visits should be accommodated based on local resources, and consistent with the following recommendations:

Inmates in medical isolation for COVID-19 should not have in-person legal visits unless absolutely necessary. Strongly consider rescheduling or, as an alternative, utilize video teleconferences (VTC) and telephone legal calls.

Inmates in quarantine for COVID-19 may have asymptomatic COVID-19 infection or be in the incubation period, and should delay legal visits until they are COVID-19 tested negative at the end of quarantine. Video tele-conferencing (VTC) or legal telephone calls with attorneys are recommended as alternatives, if available.

In general, testing an inmate for COVID-19 immediately after a legal visit would have little utility and is not recommended.

Further considerations for in-person legal visits include:

> o Inmates and attorneys/ legal visitors should wear face coverings (cloth or surgical mask) and should perform hand hygiene (washing hand with soap and water or using hand sanitizer) just before and after in-person visits.

> o Use of Plexiglas or similar barrier between inmate and attorney is strongly recommended for in-person visits.   In the alternative, if a barrier is not present, social distancing (i.e., 6 feet apart) should be used.

o Attorney/legal visitors should be symptom screened and temperature checked upon entry into the facility, should wear a face covering, and perform hand hygiene just before and after the legal visit. Legal visitors who are sick or symptomatic should not be allowed to visit.

o If necessary, documents should be passed back and forth in a manner to avoid touching.

o When legal attorney rooms are available, they should be utilized to allow for social distancing among all present in the room. If there is no legal attorney room available and if there are more than one attorney/inmate pair present, all pairs should be separated by more than six feet to the extent possible while protecting attorney-client communications.

o Tables, chairs, and other high-touch surfaces should be disinfected between usage.

Electronic Law Library and Discovery Materials:    Whenever possible, consistent with social distancing protocols and safe institution operations, inmates should be permitted access to the Electronic Law Library (ELL) under conditions determined by the Warden at each facility.   Similarly, inmates will need access to discovery materials relevant to pending cases, beyond those which are maintained by the inmate in his or her cell.   We recommend that a schedule be established to permit fair and timely access to ELL terminals and discovery materials upon inmate request, and that the schedule be provided to inmates at the facility.

## PROGRAMMING

Inmate programming is an essential function in our facilities, and delivery of First Step Act approved Evidence-Based Recidivism Reduction (EBRR) Programs and Productive Activities (PAs) is required by law.   Institutions will offer programming in the following ways:

• Residential programs (i.e., RDAP, BRAVE, SOTP, TCU, FIT, etc.) will immediately resume full time treatment, as required by policy.   Programs may resume groups with more than ten participants, however, other social distancing modifications should remain in place (e.g., holding groups in larger spaces; suspending community meetings).

• Delivery of non-residential EBRR Programs and PAs (e.g., GED, Anger Management) will resume/continue.   These services will be offered at no less than half of their regular capacity.

• Institutions should continue to deliver EBRR and PA programming consistent with the curriculum; however, staff may offer programs on the housing unit or in outdoor or unused spaces for safety/social distancing.

> • GED testing, in groups of six or less, will resume with priority given to inmates releasing within 120 days. Other inmates may be tested if resources allow.

Appropriate SENTRY assignments must be used to track program enrollment and participation. Inmates must be recommended for and allowed to sign up for programs that meet their assessed needs.

General population recreation access will resume.   Ordinarily, inmates in groups of no more than 100 will be able to access the recreation yard for a minimum of one hour at a time as long as they remain appropriately distant from one another.   Inmates should have access at least three times per week and attend the recreation yard with inmates from their designated housing units.   Group sports or use of gym equipment (e.g., weights, basketballs) are prohibited.   Small classes that do not involve physical contact may be offered at the discretion of the Warden.   If this occurs, all materials must be thoroughly sanitized after each use.

> • Recreation in Special Housing will resume, consistent with standards outlined in policy.

Institutions with active COVID-19 cases may make exceptions to these programming requirements for the safety of staff and inmates.   Modification requests are sent to the Regional Director and concurrence given by the Reentry Services Division.

Beyond program delivery, staff are required to complete needs assessments on all newly-committed inmates, and this process remains in effect during the pandemic. As a reminder, needs are assessed by Unit Team, Health Services, Psychology Services, and Education staff.   The results of the assessments must be keyed into SENTRY or Insight.   Based on the needs assessment, inmates must be enrolled in an appropriate EBRR Program or PA.

## VOLUNTEERS AND CONTRACTORS

Institution access for Volunteers and Contractors will continue as previously described in the Phase Six Action Plan.

## UNICOR

In consultation with Safety & Health Services departments, Wardens will develop plans to safely have UNICOR operations at their institutions running at least 80% capacity no later than September 1, 2020 and 100% normal operation levels no later than October 1, 2020.   Written plans are due to the Regional Directors for approval by Tuesday, August 11, 2020. Wardens whose institutions have a UNICOR operation will also develop and forward plans to establish UNICOR units.   A standard questionnaire for reporting of these plans will be provided by the Assistant Director for FPI.

Institutions with active COVID-19 cases may make exceptions to these work requirements for the safety of staff and inmates.   Modification requests are sent to the Regional Director and concurrence given by the Assistant Director, FPI.

## COMPLIANCE REVIEWS

Effective immediately, the Program Review Division (PRD) will be conducting unannounced site visits to ensure institution operations conform to the ongoing COVID guidance.   This compliance review will include, but is not limited to, adherence with the Health Services Division guidance on best practices for managing COVID-19 outbreaks, CDC guidance on COVID-19 precautions, and all of the Phase Memorandums outlining our progression as an agency through this crisis.   PRD will soon disseminate written standards that will encompass the scope of their review.

## COURT TRIPS

A number of variables affect the risk of COVID-19 transmission during in-person court appearances and will influence some of the specific management strategies that are needed at each location.   The U.S. Marshals Service (USMS) takes responsibility for the inmate once they leave the BOP institution until their return.   Each USMS district may have their own COVID management procedures.   Individual courts may also have different COVID prevention/mitigation procedures and requirements.   Recognizing the likelihood of BOP inmates mixing with non-quarantined, non-BOP inmates while in USMS custody during a court visit is essential to assess the risk of COVID-19 exposure.

The frequency of an inmate's court appearance and the number of inmates going to a court at any one time are also important factors to consider.   It is recommended that each BOP detention center contact the USMS and the court to ascertain their COVID-19 mitigation procedures and consult with Regional Health Services staff on developing an individualized strategy.   The following are general principles to follow:

- Inmates in COVID isolation should not have in-person court appearances unless absolutely necessary.   Strongly consider the inmate appearing via telephone hearing or via a VTC if it is accessible.

- Inmates in COVID quarantine (intake/exposure) should delay in-person court appearances until they are COVID tested negative at the end of quarantine.   It is recommended that VTC or telephone appearances be used as alternatives.   In general, testing an inmate immediately after a court visit would have little utility and is not recommended as a strategy.   If in-person attendance is required, however, Abbott ID NOW tests can be used on a case-by-case basis if a visit is ordered by the court.

- Inmates should wear face coverings and perform hand hygiene just before departure from and upon return to the institution.

- BOP officials should request to the USMS that BOP inmates be cohorted only within their own housing or quarantine cohort and not be mixed with inmates from other housing units or other institutions, or transported with inmates from other institutions to the extent possible while at court.

- Upon return to the detention center, inmates should be quarantined if they were outside of the institution and were exposed to inmates from other housing units or locations (i.e., county jails).   Periodic testing of inmates with frequent court appearances should be considered.   The 14-day quarantine period must be restarted for any inmate who is in close contact with other inmates not from their housing unit or location.

## INTAKES

As we return to a more normalized inmate movement, the quarantine site model will no longer be utilized.   All inmates entering an institution will require enhanced intake procedures:

- Institutions are to designate specific quarantine and isolation areas in advance with capacity numbers commensurate with anticipated levels and frequency of incoming inmates.   Ideally, inmates should be quarantined or isolated in single-cells, if possible. When cohorting is necessary, the best practice is to keep cohorted inmates together and not add to the cohort when new intakes arrive.

- All new intakes should be screened for COVID-19 on arrival, to include a symptom screen, temperature check, and an approved viral PCR test (either an Abbott ID Now POC test or commercial send out lab test) performed on a sample obtained from a nasopharyngeal, mid-turbinate, or anterior nares swab.

  o Inmates who test positive and/or are symptomatic will be placed immediately in medical isolation.   They will remain in medical isolation until they meet the CDC symptom-based (for symptomatic inmates) or time-based (for asymptomatic inmates) release from isolation criteria.

  o Inmates who are asymptomatic and test negative are placed in quarantine. They will remain in quarantine until:

    - They become symptomatic during the quarantine period.   These inmates should be tested (Abbott or commercial) and placed in medical isolation immediately.   Depending on the housing circumstances, potential contacts (e.g., cellmate, cohort, housing unit) will need to reset their quarantine.   When risk of exposure and/ or spread of transmission is higher, re-testing of potential contacts could be considered.

- A testing frequency of every 3 to 4 days is preferred whenever feasible in consultation with the Regional Infection Prevention and Control Consultant and the Regional Medical Director.

- On or after 14 days.    The inmates who have remained asymptomatic will have a symptom screen, temperature check, and be tested with a commercial lab test.    Inmates should remain in quarantine status until test results are available.    If the test is positive, see above bullet. If the test is negative, the inmate may be released to General Population.

## MOVEMENT

Movement of inmates between BOP institutions can be a simple, short-distance transfer between two institutions or a complex, multi-day, multi-institution process.    The risk of COVID-19 exposure and transmission increases as the complexity of the move increases. Movement variables that increase the risk of COVID-19 exposure and transmission should be avoided whenever possible and include multiple stops, staff and agencies; and potential mixing with other inmate groups from other BOP facilities or other correctional jurisdictions. However, even a direct movement from one facility to another is not without some degree of risk due to the characteristics and communicability of COVID-19.    Refer to the HSD Guidance (6/19/20) for Inmates who are transferring or Releasing from a BOP Facility,
https://sallyport.bop.gov/co/hsd/infectious_disease/covid19/docs/guidance_for%20_transferring_or%20releasing%20inmates_20200619.pdf

- As inmate movement operations move toward "normalizing", the number and complexity of inmate moves will increase.    This process of normalizing should be done in a measured approach to allow institutions, regions and the agency develop best practices moving forward.

- Institutions/ Regions should evaluate their space and staffing resources to accommodate increased numbers of the various types of quarantine inmate groups (intake, exposed and pre-release) as well as isolation inmates in various stages of the process.    Various and/or large groups of quarantine and isolation inmates may require a re-distribution of inmates amongst institutions within a region.

- The first step in ensuring safe inmate movement is a full test-in/out, 14-day pre-release quarantine of transferring inmates prior to transport.

  o Planning an inmate move should occur with enough time in advance to allow for a full test in/out 14-day quarantine and turnaround time for test results (21 days).

- o Planning should be coordinated with all the institutions involved from the beginning stages so that setting of dates will allow for the above process to occur for all the potential inmates on that move.

- o Inmates who have tested negative at the completion of their quarantine should stay in quarantine status until they are transferred, preferably within 5 days of the negative result, but may still move within 14 days of the negative result.

- o If an inmate develops symptoms and/or tests positive, they will not be permitted to travel until they have met the CDC symptom or time-based criteria for release from isolation.   On rare occasions, there may be exceptions where an inmate must travel prior to the completion of this process or even with a positive result (e.g., court ordered transfer). In these cases, the transfer must be discussed and approved by local executive staff from the institutions and regions involved with input from health services staff, as needed.

- o For inmates who have previously tested positive for COVID-19: (refer to https://sallyport.bop.gov/co/hsd/infectious_disease/covid19/docs/covid19_testin g_expanded_inmate_testing_strategies_2020619.pdf)

    - If they meet CDC release from isolation criteria and are within 90 days of their original COVID-19 diagnosis (initial symptom onset for symptomatic patients or initial positive COVID-19 test for asymptomatic patients), they do not need any further testing or quarantine prior to transfer.

    - If they meet CDC release from isolation criteria but are more than 90 days out from their original COVID-19 diagnosis, they should be placed in quarantine and tested just like an inmate who has never had the infection.

    - If the test is positive, they cannot travel and must be placed in isolation until they meet the CDC release from isolation criteria.

- Planning of inmate movement should be coordinated with close involvement of local Executive Staff, CMC, Unit Team, and Health Services staff from all involved institutions/regions and transport agencies.   Communication and accurate information are vital to ensure a proposed inmate movement has minimized any potential risk of COVID-19 exposure/transmission.

- To the extent possible, manifests should be generated that allow for appropriate social distancing during transport (e.g., loading a bus/ plane at 50% capacity).

- "Normal" transport routes and schedules will need to be reviewed and reconsidered. Inmate movement should be coordinated in a manner that:

    - **Has minimal stops/holdovers:** e.g., consider institutions meeting at a halfway point to pick-up inmates rather than having multiple stops and holdovers.

    - **Minimizes the amount of time inmates are held in holdover:** the longer an inmate spends in transit, the greater the risk. The frequency of certain drop offs/pick-ups may need to be increased to minimize holdover times.

    - **Avoids mixing of inmate groups** as much as possible:

        - The following Inmate group terms will be defined as follows:

            - **BOP group** - inmates who have completed a full test in/out pre-release/transfer quarantine process prior to transfer from a BOP facility.

            - **Non-BOP group** - inmates from other agency/correctional jurisdiction who have not undergone a full test in/out quarantine.

        - Maximize runs with only BOP groups; make every effort to coordinate runs for Non-BOP groups separately.

        - There are many scenarios where mixing of BOP groups from different BOP institutions is unavoidable. If all BOP-groups have been properly tested in/out of a pre-release/transfer quarantine just prior to transport at their sending institution, this practice is acceptable.

        - Ideally, any non-BOP group during a transfer will have been tested for COVID-19 prior to transport.   However, this is often not possible or verifiable.   All non-BOP group inmates must have a temperature check and symptom screen immediately prior to transport.   Anyone with a known positive COVID-19 test or who has fever or symptoms will not be admitted on the transport.

        - If a BOP group is mixed with a non-BOP group at any point in the transfer process, all the inmates in that group will require intake screening, testing

and intake quarantine (asymptomatic) or isolation (symptomatic) at their destination institution.

- During transport, BOP-group inmates should wear at least facial coverings and staff should wear at least facial covering and gloves. For transport of Non-BOP or mixed groups, inmates should wear surgical masks and staff should wear surgical masks and gloves during transport and add gown and eye protection with direct contact.

- Documentation on the BEMR exit summary/transfer paperwork (e.g. In-Transit Form) needs to include results of the symptom screen and temperature check performed within 24 hours of release or transfer; the most recent COVID-19 test result; and the inmate's COVID-19 history.   To ensure proper documentation of negative COVID-19 testing from a commercial lab is displayed on the exit summary, the **BOP ICD code of Z03818-c19** will need to be added to the inmate's health problem list.   This marking will then display properly upon the inmate Exit Summary.   The BEMR Exit Summary/transfer paperwork should be provided to the bus LT/USMS to verify that a commercial lab test has been completed with a negative test result.

- **Holdover Sites/Bus Hubs:**

  - Holdover/ Bus hub sites should designate specific holdover quarantine areas in advance in numbers commensurate with anticipated levels and frequency of incoming inmates.

  - For BOP group transfers that have not mixed with Non-BOP groups and require holdover at a facility, the BOP groups can generally be placed directly into a holdover unit setting without a test in/out process and do not need to complete a full 14-day quarantine prior to moving on to their next destination.

  - These holdover groups should be housed separately from the new intake, post-exposure and prior to release/transfer* quarantine groups at that institution.

    *Note there is a distinction between inmates coming from another institution in holdover status waiting to "transfer"/continue on to their next destination vs. inmates that are originating from the holdover site and waiting to transfer.*

  - The various holdover groups may be housed together, if necessary.

  - If a holdover site/bus hub is known to receive Non-BOP groups, they should consider having designated quarantine/isolation units for them and manage them as new intakes.

- Those inmates that are symptomatic and/or test positive must be placed in medical isolation and can be released after meeting CDC symptom- or time-based criteria for release from isolation into general population or transfer. If transfer is to occur more than 90 days from their initial symptom onset (symptomatic cases) or positive COVID-19 test (asymptomatic cases), the inmates will need to be quarantined and tested prior to transfer.

- Those who are asymptomatic and test negative will be placed in quarantine. When they complete quarantine and test-out:

  - Inmates who are expected to remain at the holdover site for a prolonged period of time can be released to General Population. If they are released to General Population, future transfers will require pre-transfer test-in/test-out quarantine.

  - For those inmates expected to transfer within a reasonable period of time, they should remain in quarantine until their transfer date. They should transfer within 14 days of the test-out negative result or be re-tested prior to transfer.

- If a holdover site/bus hub receives a mixed group of BOP and Non-BOP groups or BOP group that has previously mixed with a Non-BOP group, they must now all be managed as a Non-BOP group.

## DESIGNATED (FINAL RECEIVING) INSTITUTIONS:

Transferred inmates will undergo the same process as a new intake, to include intake screen and temperature check, COVID-19 testing and isolation vs new intake quarantine at the final designated facility.   One exception to this process is the inmate who has previously tested positive, has met the CDC's symptom- or time-based release from isolation criteria, and is within 90 days of the initial symptom onset or positive test. Such cases do not need to be quarantined upon arrival at the designated facility.

## Questions

If staff have questions about COVID-19, they may reach out to the agency at the following email box: COVID19Questions@bop.gov.

We appreciate your assistance and cooperation in this important matter.

# LECLAIR

# EXHIBIT D

# COVID-19 TESTING: INDICATIONS FOR TESTING INMATES
# IN THE FEDERAL BUREAU OF PRISONS
# 7/24/2020

The primary diagnostic test for the Sars-CoV-2 virus which causes COVID-19 is a molecular test performed on respiratory secretions using nucleic acid amplification technology (NAAT), usually a reverse transcriptase-polymerase chain reaction (RT-PCR, or PCR). In the outpatient setting, a sample from the upper respiratory tract is recommended for most cases. The Centers for Disease Control and Prevention (CDC) considers the following to be acceptable samples - a swab of the nasopharynx, nasal mid-turbinate, anterior nares, or oropharynx, or an aspirate/washing from the nasopharynx or nasal passage.   The Infectious Disease Society of America recommends against using oropharyngeal or salivary specimens due to concerns about accuracy of test results. Based on the available evidence and published recommendations, **the BOP-preferred sample for both symptomatic and asymptomatic cases is:**

- A swab from the nasopharynx, mid-turbinates, or anterior nares.

A lower respiratory tract specimen is usually reserved for testing in a hospital setting or for patients whose upper respiratory tract specimen has tested negative despite a high degree of clinical suspicion. Sputum induction is not recommended in the outpatient setting due to increased risk for exposure to respiratory droplets or aerosols. Testing for COVID-19 antibodies in the blood is also available but is not currently recommended for diagnosing COVID-19, with a few limited exceptions. In addition, its role in determining immunity is not yet defined.

- In general, the BOP does not recommend the use of antibody testing unless it is required by civilian health care entities for a patient to be evaluated.

COVID-19 PCR tests are performed by local / state health authorities, or commercial laboratories using an FDA-approved test (including Emergency Use Authorizations). Rapid, point-of-care (POC) tests that are FDA-approved are also available. All of the currently available POC tests must be performed by a lab certified for moderate/high complexity tests with the exception of the Abbott ID Now system which is temporarily CLIA-waived for COVID-19 testing.

- Institutions are strongly encouraged to identify a variety of sources for obtaining swabs/viral transport media, high volume PCR lab testing, and testing materials for the Abbott ID now system.
  - Communication and collaboration with local/state health authorities regarding institution testing strategies is recommended.
  - Utilization of the BOP national contract for COVID-19 testing is required.
  - If institutions require additional testing supplies and they are unable to obtain supplies from the sources above, they should consult with their local contract laboratory representative, Regional Health Services Administrator, Regional Infection Prevention and Control Consultant and the Regional Medical Director and then send the request to BOP-HSD/AIMS@bop.gov.
- Allocation and distribution of Abbott instruments and test kits will be determined by Central Office Health Services Division based on institutional needs and agency priorities.

- o The major advantage of using the Abbott system is obtaining rapid test results. Potential limitations include false negative test results and the time required to run individual tests (10 to 15 minutes per test).
- o Testing symptomatic inmates is the primary reason for use of the Abbott test in the BOP. A negative test result in a symptomatic person requires a specimen to be recollected and sent to a commercial lab.
- o The Abbott system also may be used for testing asymptomatic persons being placed into quarantine or immediate releases who do not have time to complete a full quarantine, In such cases, a negative result does not require recollection and sending to a commercial lab.
- o A positive Abbott ID Now COVID-19 test result does not require confirmatory testing by a commercial lab test.
- ➡ A negative Sars-CoV-2 test result from an Abbott ID Now test should not be used as the sole basis for patient management decisions due to concerns about higher rates of false negative results. *The BOP recommends against using the Abbott machine for release from quarantine or as the final test in a test-based release from isolation strategy.* A commercial lab test should be used for these purposes.

## INDICATIONS AND PRIORITIES FOR TESTING

Initially, the primary indication for testing was the presence of symptoms consistent with COVID-19. With the increased availability of testing supplies and increased understanding of the epidemiology of transmission, expanded testing strategies have become an important tool in the prevention and management of COVID-19 infections, especially in congregate living / residential settings such as correctional facilities where social distancing may be difficult to achieve or maintain. The indications for testing in a correctional environment now include both asymptomatic and symptomatic inmates with compelling reasons or priorities for testing.

Specific indications for testing in the BOP are listed below in four main categories. If there are limitations in the number of tests that can be performed at a given location, prioritization of testing indications may be needed and should be done in consultation with the Regional Medical Director, Regional Health Services Administrator, and Regional Infection, Prevention and Control Consultant.

**Symptomatic**

- All inmates with symptoms consistent with or suggestive of COVID-19 should be tested and placed in isolation.

**Asymptomatic inmates with known or suspected contact with a COVID-19 case**

- ➡ When a staff or inmate case of COVID-19 is identified at an institution, a contact tracing of both inmates and staff should be performed expeditiously.

- All inmates identified as close contacts of the index case should be tested and placed into quarantine or isolation, based on test results or the presence of symptoms.

- o Because Sars-CoV-2 is very contagious and may be spread by asymptomatic as well as symptomatic individuals, expanded testing of all inmates in an entire housing unit should be considered, especially if the unit has open sleeping areas (rather than cells with solid walls and doors) or common areas where inmates have close contact.
- Institution-wide testing of inmates may be considered where one or more inmate or staff cases of COVID-19 have been identified.
  - o This is recommended especially if substantial transmission is confirmed beyond the index case or if staff or inmates have moved about the institution.
- Periodic retesting of COVID-19 negative close contacts or broader retesting is recommended when there is widespread institution transmission.
  - o A testing frequency of every 3 to 4 days is preferred whenever feasible in consultation with Regional Infection, Prevention and Control Consultant and the Regional Medical Director.

**Asymptomatic inmates with no known or suspected contact with a COVID-19 case**

- All inmate intakes to the BOP should be tested.
  - o New intakes include new commitments, voluntary surrenders, writ returns, and any inmate brought to a BOP facility by the U.S. Marshals Service, Justice Prisoner and Alien Transportation Service, Customs and Border Patrol, and Immigration and Customs Enforcement.
    - ➡ Testing of new BOP admissions/intakes does not negate the need for a full 14-day quarantine.
  - o BOP intrasystem transfers need to be tested and quarantined on arrival at their gaining / designated institution. .
  - o Inmates returning from the community including court hearings, an extended time in an emergency department or crowded waiting area, residing overnight in the community or alternative setting including hospitalization, furlough, work release, etc…
  - o Inmates with frequent or regular trips to the community (e.g. court hearings, work release), may need to be housed in a separate housing group and tested periodically (e.g. once every three to seven days).
- All inmates on admission to and discharge from quarantine (test in / test out)
  - o This includes all types of quarantine – intake, exposure, and release/transfer.
  - o Testing out of quarantine must be performed on or after the 14th day of quarantine while the inmate remains in quarantine.
- The following inmate releases and transfers should be tested.
  - o Full Term releases, Good Conduct Time releases, detainer releases, furloughs, transfers to Residential Re-entry Centers/Home Confinement, transfers to private facilities, and transfers to other BOP facilities or correctional jurisdictions.
  - o Inmates who are placed in release / transfer quarantine must follow the test in / test out approach.
  - o *Inmates with a history of COVID-19 who have been released from medical isolation using CDC criteria (symptom-based, time-based, or test-based) do not need to be placed in quarantine and should not be tested within 90 days of their initial symptoms or positive test results.*

- If it has been longer than 90 days, follow established release / transfer procedures to include quarantine and COVID-19 testing.
- Those who test positive need to be evaluated on a case-by-case basis and considered for possible placement in isolation, especially if symptomatic.
- Asymptomatic inmates required to be tested in order to be seen at a civilian health care system.
- Asymptomatic inmates transferring to / arriving at a BOP Medical Referral Center
- For residential health care units at MRCs (e.g. Nursing Care Center units) without any known or suspected cases of COVID-19, baseline testing of inmate residents is recommended by the CDC in conjunction with baseline plus periodic retesting of staff.
- Testing all inmates at an institution without any known COVID-19 cases as part of an institution-wide surveillance program.
  - The effectiveness, feasibility, and role of this type of testing in a correctional setting is not clearly defined and requires considerable resources.  Low participation rates are likely to limit its effectiveness and institution health care staffing levels are likely to be insufficient to accomplish it.
  - When institution-wide surveillance testing of inmates is not feasible, alternative strategies may be considered, e.g. periodic testing of inmates with risk factors for severe COVID-19 illness, CPAP users, inmates who work in groups or who may interact with large numbers of staff or inmates as part of their duties (e.g. food service, orderlies), inmates housed in a residential health care unit, etc...

**Release from COVID-19 isolation**

➡️ **Testing for release from COVID-19 isolation is no longer recommended** (based on CDC guidance dated July 20, 2020, https://www.cdc.gov/coronavirus/2019-ncov/hcp/disposition-in-home-patients.html).

➡️ **The BOP now recommends using a symptom-based approach for releasing inmates with symptomatic COVD-19 from isolation and a time-based approach for releasing inmates with asymptomatic COVD-19 from isolation.**

  - Asymptomatic inmates can be released from medical isolation 10 days *after the date of their first positive RT-PCR test.*
  - Inmates with mild or moderate symptoms can be released from medical isolation 10 days *after symptom onset* and resolution of fever for at least 24 hours, without the use of fever-reducing medications, and with improvement of other symptoms.
  - Inmates with severe COVID-19 symptoms requiring hospitalization or severely immunocompromised inmates can be released from medical isolation 20 days after symptom onset.
  - Although these same strategies are appropriate for COVID-19 patients who are severely immunocompromised, the CDC indicates a test-based approach may also be *considered* in these cases. Consultation with the Regional Medical Director is recommended prior to using a test-based strategy in this scenario.
    - https://www.cdc.gov/coronavirus/2019-ncov/hcp/disposition-in-home-patients.html
    - Severely immunocompromised is defined as being on chemotherapy for cancer, untreated HIV infection with CD4 T lymphocyte count < 200, combined primary

immunodeficiency disorder, and receipt of prednisone >20mg/day (or equivalent doses of other corticosteroids) for more than 14 days.

➡ Retesting someone who has met symptom- or time-based release from isolation criteria is not recommended during the 90 days from symptom onset or the first positive test (in asymptomatic cases). However, a person previously released from isolation who develops COVID-19 symptoms during this time may be considered for retesting and isolation if there is a known exposure to an active COVID-19 case or symptoms cannot be explained by an alternative etiology such as influenza.

## INFECTION PREVENTION DURING TESTING

- Appropriate personal protective equipment (PPE) should be worn during respiratory specimen collection and cleaning/disinfection activities. Please refer to the guidance titled COVID-19 Testing: Specimen Collection - Swab Testing located at https://sallyport.bop.gov/co/hsd/infectious_disease/covid19/covid19_guidance.jsp#1_9 for additional information on PPE, preferred locations for testing, and an example of a Collection Procedure.

## GENERAL MANAGEMENT BASED ON SYMPTOMS AND TEST RESULTS

Please see the BOP guidance on Isolation, Quarantine, and Release/Transfer for disposition and housing of inmates based upon results of testing.

## TESTING OF BOP STAFF

- Testing staff for COVID-19 can be an important tool in the prevention and management of COVID-19 at correctional facilities. Institutions are encouraged to develop options for voluntary testing of staff in accordance with CDC and BOP guidance.

# LECLAIR

# EXHIBIT E

**COVID-19 TESTING, ISOLATION, AND QUARANTINE FLOW ALGORITHM**



Criteria for release from quarantine/isolation.

**Population**

**Symptomatic**
- Inmate _symptomatic_ with a **positive** COVID-19 test → **Isolation** / Daily Note / PPE - N95, gloves, gown, eye protection → *Have met the criteria for ending medical isolation*
- Inmate _symptomatic_ with a **negative** COVID-19 test / Retest- different PCR test → **Isolation** / Daily Note / PPE - N95, gloves, gown, eye protection → *Have met the criteria for ending medical isolation*

**Asymptomatic**
- Inmate asymptomatic with a **positive** COVID-19 test → **Isolation*** / 2x daily temp and symptom check PPE - N95, gloves, gown, eye protection → *Have met the criteria for ending medical isolation*
- Inmate _asymptomatic_ with a **negative** COVID-19 test → **Quarantine** / 2x daily temp and symptom check PPE-Mask, gloves, eye protection → *14 days if no one pulled out of group which reset back to 0*

---

**Key Concept:  "SEPARATE THE SICK FROM THE WELL" positive test or positive symptoms**

*If _asymptomatic_ positive becomes _symptomatic_-daily clinical encounter and use release criteria for _symptomatic_ inmate are added*

**Criteria for Release from Isolation**

**COVID positive** (HP U07.1) **OR COVID negative/symptomatic** (HP U07.2 COVID probable/suspect):
- *The individual has been free from fever for at least 72 hours without the use of fever-reducing medications AND*
- *other symptoms have improved (e.g., cough, shortness of breath) AND*
- *At least 14 days have passed since the first symptoms appeared*

**COVID positive/asymptomatic:** (HP U07.1)
- *At least 14 days have passed since the date of the individual's first positive COVID-19 test AND*
- *The individual has had no subsequent illness*

**COVID negative/asymptomatic:** (HP Z0489q)
- *Quarantine for 14 days*
- *If any persons in contact with case become COVID positive, the 14 day quarantine resets to day 0.*

# LECLAIR

# EXHIBIT F

# COVID Quarantine Flowchart

**INMATE POPULATION**

Having three separate areas for quarantine is best practice .

**Area 1**
Brand new admission to the BOP

**Area 2**
Inmate exposed to a COVID positive person

**Area 3**
Inmate leaving confinement
- Half way house
- Home confinement
- Full term release

Quarantine is defined as a secure physical environment which has a controlled entry point with a designated area at the entry/exit for the donning and doffing of PPE.

Efforts should be made to keep the groups separate.

## QUARANTINE

Time in the quarantine area can vary.

Generally inmates should be symptom free for 14 days without any new exposures. With each new exposure the 14 day time frame should be restarted.

Inmates that become symptomatic should be transferred to isolation

**Post Quarantine**

**Release**

**Transfer to general population**

# LECLAIR

# EXHIBIT G

| QUARANTINE<br>COVID-19 | |
|---|---|
| Move to Quarantine<br>• **New Intakes**<br>• **Contacts** | Quarantine is used to separate **asymptomatic** persons who have **Risk Factors or who are Contacts to a person with COVID-19** during the incubation period (up to 14 days). Escort inmate, in mask, to a designated single room with door **OR** cohort with other asymptomatic inmates in a housing area with door. Staff escorting asymptomatic inmates with direct contact will wear at a minimum surgical mask, eye protection, and gloves. |
| Implement<br>**Transmission Based Precautions - Standard/Contact/ Eye Protection/ Droplet.**<br><br>**PPE** | *Standard precautions/Contact/Eye Protection/Droplet Isolation*<br>1) Hand hygiene (before and after wearing gloves)<br>2) PPE (*gloves, gown, eye protection, surgical mask*) for entry into room and direct contact.<br>3) If not entering room and ≥ 6 feet away, utilize standard precautions – gloves (e.g. place food container in food slot while inmate(s) stand at back of room). Inmate should wear mask or facial coverings, if able.<br>  **-Prior to room entry:** Perform hand hygiene. Apply (don) gloves, gown,* surgical mask and eye protection before room entry or inmate contact. *See donning checklist.* (*gown if available supply)<br>  **-Doffing with Anteroom:** Have inmate(s) move to a social distance ≥ 6 feet, if possible, and remove gloves and gown* and then exit room. Perform hand hygiene, remove (doff) eye protection, mask and repeat hand hygiene. **IF no anteroom is available, exit out of room to doff all PPE in a designated doffing area (tape off area for doffing) located immediately outside of room.** *See doffing checklist. Deposit used PPE in a trash receptacle designated for this purpose near the doffing area.* |
| Signage | A Respiratory QUARANTINE Sign is placed on the door |
| Inmate Education | Advise/educate inmate regarding reportable symptoms of COVID-19 illness and notify housing unit office if symptoms arise. Educate regarding social distancing and facial covering.  Provide education sheet. |
| Communication and Documentation | 1)  Notify facility leadership, infection prevention and control (QIIPC)/health services, Incident Command, Chief Psychologist and Regional QIIPC Consultants.<br>2)  Conduct temperature checks twice daily, this can be conducted by non-healthcare staff after training.  Any positive symptoms or febrile temperatures, move to isolation and notify health services staff (if screening conducted by non-health care staff) See Medical Care Below<br>3)  Place a medical hold in BEMR and Sentry for the duration of the quarantine. Code inmate as Z0489-q. |
| Staff Interaction | Staff assessments not requiring direct contact will be conducted with social distancing ≥ 6 feet away. Limit the number of staff interactions with inmate(s) and take measures to reduce rotation of staff interacting with quarantined inmate(s). Dedicate personnel if possible. |
| Medical Equipment | Medical equipment should be dedicated to area if possible. |
| Medical Care | Isolate inmate(s) if symptomatic (cough, SOB, HA, dizziness, fatigue, loss of taste or smell, sore throat, chest pain) and/or a temperature ≥ 100.4 F.  Positive symptoms require Clinical Encounter. Limit close or direct contact as much as possible. Provide necessary medical care as needed. |
| Food Service | Regular trays or use disposable dish wear. Wear gloves and maintain social distancing. Dispose of in regular trash. |
| Laundry | Wear gloves.  Regular central laundry processes are acceptable. Do not shake dirty laundry. Disinfect dirty carts after use. |
| Visits | In-person visits will be suspended until the end of quarantine. Consult local leadership for exceptions. |
| Telephone Calls | Phone should be cleaned and disinfected after each use with a product from the EPA registered disinfectant List N. |
| Trash | For disposal of trash, wear gloves and **double bag** in clear waste bags; *Ensure it is not processed by recycling.* |
| Cleaning/Disinfection | The inmate(s) should be provided supplies to clean room. Use disinfectant from EPA list N. |
| Discontinuation of Quarantine | Duration of quarantine is 14 days. *If at all possible,* do not add individuals to an existing quarantine after the 14-day quarantine clock has started, if no other option exists and new inmates are added into a quarantine cohort, the original group may be released from quarantine on the original schedule if no inmates develop COVID-19 symptoms or are diagnosed with COVID-19. Asymptomatic inmates should undergo COVID-19 testing resulting with negative findings prior to being released from quarantine. |
| Terminal Cleaning | When quarantine ends, the inmate(s), if possible, should clean the area.  If inmates in quarantine became symptomatic, wait 24 hours (if possible), and then the area should be cleaned again with an EPA List N registered disinfectant while wearing gloves, gown and any other PPE recommended by the disinfectant manufacturer (i.e., if splashes are anticipated, wear mask and eye protection). |

5/22/2020

# LECLAIR

# EXHIBIT H

PATIENT INFORMATION
**HERNANDEZ,DYLON**

REPORT STATUS   **Final**

Nichols Institute, Chantilly

DOB: ███████████   Age: 39Y
SEX: M

ORDERING PHYSICIAN
**PASS,RANDALL S**
CLIENT INFORMATION
320
USP - MARION - MAR

SPECIMEN INFORMATION
SPECIMEN:   CH907300M
REQUISITION: 0000290
LAB REF NO:  3200000290

ID: 64977-112
PHONE: 618 9641441

4500 PRISON ROAD
MARION, IL 62959

COLLECTED:  07/17/2020     09:15
RECEIVED:   07/20/2020     08:23
REPORTED:   07/20/2020     23:12

| Test Name | In Range | Out of Range | Reference Range | Lab |
|---|---|---|---|---|
| SARS CoV 2 RNA(COVID 19), QL NAAT | | | | AMD |
|   SARS CoV 2 RNA(COVID 19), QL NAAT | | | | |
|    SARS CoV 2 RNA | | Not Detected | Not Detected | |

A Not Detected (negative) test result for this test
means that SARS-CoV-2 RNA was not present in the
specimen above the limit of detection.
A negative result does not rule out the possibility
of COVID-19 and should not be used as the
sole basis for treatment or patient management
decisions.  If COVID-19 is still suspected, based on
exposure history together with other clinical findings,
re-testing should be considered in consultation with
public health authorities. Laboratory test results
should always be considered in the context of clinical
observations and epidemiological data in making a
final diagnosis and patient management decisions.

Please review the "Fact Sheets" and FDA authorized
labeling available for health care providers and
patients using the following websites:
https://www.questdiagnostics.com/home/Covid-19/HCP/
QuestLDT/fact-sheet
https://www.questdiagnostics.com/home/Covid-19/
Patients/QuestLDT/fact-sheet.html

This test has been authorized by the FDA under an
Emergency Use Authorization (EUA) for use by authorized
laboratories.

Due to the current public health emergency, Quest
Diagnostics is receiving a high volume of samples from
a wide variety of swabs and media for COVID-19 testing.
In order to serve patients during this public health
crisis, samples from appropriate clinical sources are
being tested. Negative test results derived from
specimens received in non-commercially manufactured
viral collection and transport media, or in media and
sample collection kits not yet authorized by FDA for
COVID-19 testing should be cautiously evaluated and
the patient potentially subjected to extra precautions
such as additional clinical monitoring, including
collection of an additional specimen.

Methodology:  Nucleic Acid Amplification Test (NAAT)

PATIENT INFORMATION
**HERNANDEZ,DYLON**

| REPORT STATUS   **Final** |

Nichols Institute, Chantilly

DOB: ████████         Age: 39Y
SEX: M
ID: 64977-112

ORDERING PHYSICIAN
**PASS,RANDALL S**

COLLECTED:  07/17/2020    09:15
REPORTED:   07/20/2020    23:12

| Test Name | In Range | Out of Range | Reference Range | Lab |
|-----------|----------|--------------|-----------------|-----|

SARS CoV 2 RNA(COVID 19), QL NAAT (Continued)
  SARS CoV 2 RNA (Continued)

                          includes PCR or TMA

                          Additional information about COVID-19 can be found at
                          the Quest Diagnostics website:
                          www.QuestDiagnostics.com/Covid19

-------------------------------------------------------------------------------

**Performing Laboratory Information:**

AMD    Quest Diagnostics Nichols Institute 14225 Newbrook Drive Chantilly VA  20151 Laboratory Director: Patrick W Mason, M.D.

# Bureau of Prisons
# Health Services
# Cosign/Review

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | HERNANDEZ, DYLON ROBERT | | | Reg #: | 64977-112 |
| Date of Birth: | ■■■■■ | Sex: | M | Race: | WHITE |
| Encounter Date: | 07/21/2020 06:22 | Provider: | Lab Result Receive | Facility: | MAR |

**Cosigned by Pass, Randall MD/CD on 07/21/2020 08:05.**

# Bureau of Prisons
## Health Services
## COVID-19 RNA

| Begin Date: 01/01/2020 | | End Date: 12/31/2020 |
|---|---|---|
| Reg #: 64977-112 | | Inmate Name: HERNANDEZ, DYLON ROBERT |

(Reference Range - Negative)

| **Effective Date** | **COVID-19 RNA** | | **Provider** |
|---|---|---|---|
| 08/03/2020 16:01 MAR | Negative | Asymptomatic | Trovillion, Patrick RN, IOP/IDC |
| **Orig Entered:** | 08/03/2020 17:02 EST | Trovillion, Patrick RN, IOP/IDC | |
| 07/27/2020 14:50 MAR | Negative | Asymptomatic | Johnson, Leslie Phlebotomist |
| **Orig Entered:** | 07/27/2020 15:52 EST | Johnson, Leslie Phlebotomist | |
| 07/22/2020 09:20 MAR | Negative | Asymptomatic | Pass, Randall MD/CD |
| **Orig Entered:** | 07/22/2020 10:22 EST | Pass, Randall MD/CD | |
| 07/16/2020 17:39 MAR | Negative | Asymptomatic | Rodden, Rhonda RN, NCRO |
| **Orig Entered:** | 07/16/2020 18:40 EST | Rodden, Rhonda RN, NCRO | |

**Total:** 4